```
             IN THE UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF GEORGIA
                      ATLANTA DIVISION




UNITED STATES OF AMERICA,      )
                               )
              PLAINTIFF,        )
                               )
       VS.                     )
                               )              DOCKET NUMBER
ALBEAR GARCIA CAMERINO,        )          1:12-CR-329-TCB-2
                               )
              DEFENDANT.        )          ATLANTA, GEORGIA
                               )          APRIL 1, 2013
                               )
_____)



              TRANSCRIPT OF MAGISTRATE PROCEEDINGS
            BEFORE THE HONORABLE LINDA T. WALKER,
                UNITED STATES MAGISTRATE JUDGE


APPEARANCES:

FOR THE PLAINTIFF:              BRET WILLIAMS
                               UNITED STATES ATTORNEY'S OFFICE
                               ATLANTA, GEORGIA  30303

FOR THE DEFENDANT:             JAY SHREENATH
                               SHREENATH & ASSOCIATES
                               AUSTELL, GEORGIA  30106



          MECHANICAL STENOGRAPHY OF PROCEEDINGS
         AND COMPUTER-AIDED TRANSCRIPT PRODUCED BY

OFFICIAL COURT REPORTER:       MONTRELL VANN, CCR,RPR,RMR,CRR
                               1794 UNITED STATES COURTHOUSE
                               75 SPRING STREET, SOUTHWEST
                               ATLANTA, GEORGIA  30303
                               (404)215-1549
```

UNITED STATES DISTRICT COURT OFFICIAL CERTIFIED TRANSCRIPT

I N D E X

                                                     PAGE

GOVERNMENT'S WITNESSES

KEITH CROMER

    DIRECT EXAMINATION BY MR. WILLIAMS            7
    CROSS-EXAMINATION BY MR. SHREENATH           16

TYLER HOOKS

    DIRECT EXAMINATION BY MR. WILLIAMS           43
    CROSS-EXAMINATION BY MR. SHREENATH           52

T.P. DONAHUE

    DIRECT EXAMINATION BY MR. WILLIAMS           62
    CROSS-EXAMINATION BY MR. SHREENATH           75
    REDIRECT EXAMINATION BY MR. WILLIAMS         86
    RECROSS-EXAMINATION BY MR. SHREENATH         90

DAVID AGUILAR

    DIRECT EXAMINATION BY MR. WILLIAMS           91
    CROSS-EXAMINATION BY MR. SHREENATH          103
    REDIRECT EXAMINATION BY MR. WILLIAMS        120
    RECROSS-EXAMINATION BY MR. SHREENATH        122
    REDIRECT EXAMINATION BY MR. WILLIAMS        126

DEFENDANT'S WITNESS

PABLO CAMANEY ARZATE

    DIRECT EXAMINATION BY MR. SHREENATH         129
    CROSS-EXAMINATION BY MR. WILLIAMS           139
    REDIRECT EXAMINATION BY MR. SHREENATH       159
    RECROSS-EXAMINATION BY MR. WILLIAMS         160

REPORTER'S CERTIFICATE                          166

1    *(IN ATLANTA, FULTON COUNTY, GEORGIA, APRIL 1, 2013, IN OPEN*

2  *COURT.)*

3          THE COURT:  PLEASE BE SEATED.  GOOD MORNING.

4          MR. SHREENATH:  GOOD MORNING.

5          MR. WILLIAMS:  GOOD MORNING, JUDGE.

6          THE COURT:  THE COURT CALLS THE CASE OF UNITED STATES

7  OF AMERICA VERSUS ALBEAR CAMERINO.  THIS IS CASE NUMBER

8  1:12-CR-329.  WE HAVE APPEARING ON BEHALF OF THE GOVERNMENT BRET

9  WILLIAMS.  BRET WILLIAMS.  I'M SORRY.  AND APPEARING ON BEHALF

10  OF THE DEFENDANT WE HAVE JAY SHREENATH.

11    GOOD MORNING.

12          MR. SHREENATH:  GOOD MORNING.

13          THE COURT:  WE'RE HERE THIS MORNING FOR A SUPPRESSION

14  HEARING.  THE DEFENDANT HAS FILED A MOTION TO SUPPRESS

15  STATEMENTS.  IS THERE ANY OTHER EVIDENCE THAT WE'RE SUPPRESSING

16  AS WELL, OR JUST THE CONVERSATION?

17          MR. WILLIAMS:  YOUR HONOR, MY UNDERSTANDING IS THAT,

18  FOR LACK OF A BETTER WAY TO PUT IT, DEFENDANT'S SEEKING TO

19  SUPPRESS --

20          THE COURT:  OH, THAT'S RIGHT.  THE DRUGS THAT WERE

21  FOUND IN THE APARTMENT, IS THAT CORRECT, METH AND COKE?

22          MR. WILLIAMS:  AS WELL AS --

23          MR. SHREENATH:  YES.

24          THE COURT:  OKAY.  ANYTHING ELSE, TELEPHONE OR

25  ANYTHING ELSE OTHER THAN THAT?  JUST THE SEARCH OF THE

1    RESIDENCE.

2           MR. SHREENATH:  SEARCH OF THE RESIDENCE IS WHAT WE'RE

3    ASKING THE COURT TO SUPPRESS THE EVIDENCE THAT WAS FOUND IN THE

4    APARTMENT.

5           THE COURT:  I'D LIKE TO JUST SPELL OUT WERE THERE ANY

6    CELL PHONES OR DOCUMENTS OR ANYTHING ELSE OF THAT NATURE OR

7    JUST --

8           MR. SHREENATH:  THE DOCUMENTS PERTAINING TO HIS

9    PASSPORT AND IDENTIFICATION, THE DRUGS THAT WERE -- WE CONTEND

10   ARE THE PRODUCT OF AN ILLEGAL SEARCH, ANY WEAPONS THAT WERE A

11   PRODUCT OF THE ILLEGAL SEARCH.

12          THE COURT:  OKAY.

13          MR. SHREENATH:  JUDGE, IF I MAY, YOUR HONOR, AT THE

14   COURT'S PLEASURE, MY CLIENT INFORMED ME THIS MORNING THAT HE

15   WOULD ASK THE COURT -- HE WOULD LIKE THE COURT TO HEAR FROM HIM

16   REGARDING REPRESENTATION.

17          THE COURT:  OKAY.

18          MR. SHREENATH:  I DON'T KNOW IF THE COURT WOULD WANT

19   TO HEAR FROM HIM NOW OR --

20          THE COURT:  WE'LL GO AHEAD AND HEAR FROM HIM.  I'LL

21   HAVE THE GOVERNMENT STEP OUTSIDE FOR A SECOND IF IT'S OKAY.  LET

22   ME ASK THIS TOO:  IS THERE ALSO AN ISSUE REGARDING IDENTITY WITH

23   REGARD TO THIS DEFENDANT?

24          MR. SHREENATH:  THERE IS, YOUR HONOR, AND WE WERE

25   PREPARED TO ARGUE THAT TODAY.  HOWEVER, WE WOULD ASK THE COURT

1  TO ALLOW US A LITTLE BIT MORE TIME TO SUPPLEMENT SOME RECORDS.

2  WE ARE IN THE PROCESS OF GETTING SOME INFORMATION ABOUT WHO WE

3  BELIEVE ALBEAR CAMERINO IS.  THE INVESTIGATOR HAS TRIED TO FIND

4  SOME INFORMATION FROM CEDARTOWN, GEORGIA, AS WELL AS MEXICO, AND

5  WE'RE UNABLE TO GET THOSE RIGHT NOW AT THIS POINT.

6           (GOVERNMENT COUNSEL EXCUSED.)

7       THE COURT:  OKAY.  WELL, LET ME GO AHEAD AND HEAR FROM

8  MR. CAMERINO.  YOU CAN SIT DOWN.  YOU DON'T HAVE TO STAND.

9           (SEALED PORTION NOT TRANSCRIBED.)

10           (GOVERNMENT COUNSEL PRESENT.)

11       THE COURT:  AND I'LL ADVISE YOU ANYTHING YOU WANT TO

12  SAY, JUST WRITE IT DOWN DURING THE HEARING.  BECAUSE THERE MAY

13  BE SOME THINGS YOU DON'T AGREE WITH.  DON'T SPEAK OUT LOUD.

14  JUST WRITE IT DOWN FOR YOUR ATTORNEY.

15     MR. WILLIAMS, ARE YOU READY TO PROCEED?

16       MR. WILLIAMS:  I AM, YOUR HONOR.  BUT I WOULD LIKE TO

17  JUST CLARIFY ONE THING.  MY UNDERSTANDING WAS THAT AS PART OF

18  THIS HEARING, EITHER DIRECTLY OR INDIRECTLY, THAT DEFENDANT WAS

19  CHALLENGING OR SEEK TO CHALLENGE WHETHER OR NOT HE WAS IN FACT

20  ALBEAR CAMERINO.

21       THE COURT:  CORRECT.  WE HAVE AN IDENTITY ISSUE.  IF

22  YOU'RE PREPARED TO ADDRESS IT TODAY, OR DO WE NEED TO SET ASIDE

23  A SEPARATE HEARING?  BUT HE IS CHALLENGING THAT HE IS NOT

24  CAMERINO -- ALBEAR CAMERINO.

25       MR. WILLIAMS:  THAT'S MY UNDERSTANDING.  SO, YOUR

1    HONOR, THE GOVERNMENT WAS INTENDING TO ADDRESS IT TODAY,

2    ALTHOUGH IN THIS CONTEXT, THAT IT'S NOT SO MUCH WHETHER OR NOT

3    THE DEFENDANT IS THAT NAME OR ANY OTHER NAME, BUT WHETHER THE

4    DEFENDANT IS THE PERSON WHO THE GOVERNMENT BELIEVES COMMITTED

5    THE OFFENSES.  SO, IN OTHER WORDS, IN OTHER WORDS, DEFENDANTS

6    HAVE -- OFTEN HAVE MULTIPLE NAMES OR ALIASES IN QUESTION.  SO

7    THE QUESTION IS NOT PER SE WHETHER HE'S ALBEAR CAMERINO, BUT

8    WHETHER HE'S THE RIGHT PERSON WHO MAYBE USED THAT NAME, WE

9    BELIEVE USED THAT NAME AS WELL AS OTHERS, BUT THAT HE IS THE

10   RIGHT PERSON, AND WE'RE PREPARED TO PUT ON THAT EVIDENCE.  SO WE

11   DO -- WE JUST WANT TO BE CLEAR THAT WHEN WE TALK ABOUT IDENTITY,

12   WE'RE NOT TALKING ABOUT SIMPLY A NAME, BUT WE'RE TALKING ABOUT

13   IS HE THE PERSON, IS HE THE BODY.  AND WE THINK THAT INCLUDES

14   ALBEAR CAMERINO, IF THAT MAKES IT EASIER KIND OF TO

15   CONCEPTUALIZE.

16           THE COURT:  OKAY.

17           MR. WILLIAMS:  BUT THAT HE IS THE PERSON, THAT NAME,

18   AS WELL AS THE ONE HE'S BEEN USING.

19           THE COURT:  OKAY.  WELL, GO AHEAD AND GO FORWARD.

20           MR. WILLIAMS:  THANK YOU, YOUR HONOR.  YOUR HONOR, AT

21   THIS TIME THE GOVERNMENT WOULD LIKE TO CALL ITS FIRST WITNESS,

22   KEITH CROMER.

23           THE COURT:  OKAY.

24           COURTROOM DEPUTY CLERK:  SIR, IF YOU WOULD RAISE YOUR

25   RIGHT HAND, PLEASE, TO BE SWORN.  THANK YOU.

```
 1                    (WITNESS SWORN.)

 2              COURTROOM DEPUTY CLERK:  THANK YOU, SIR.  YOU CAN TAKE

 3   YOUR SEAT.  AND IF YOU WOULD, PLEASE, STATE YOUR FULL NAME FOR

 4   THE RECORD.

 5              THE WITNESS:  MY NAME IS KEITH CROMER, LAST NAME IS

 6   C-R-O-M-E-R.

 7              COURTROOM DEPUTY CLERK:  THANK YOU, SIR.

 8                          KEITH CROMER

 9        CALLED AS A WITNESS BY THE UNITED STATES OF AMERICA, AFTER

10          HAVING BEEN FIRST DULY SWORN, TESTIFIED AS FOLLOWS:

11                       DIRECT EXAMINATION

12   BY MR. WILLIAMS:

13   Q.   SPECIAL AGENT CROMER, HOW LONG HAVE YOU BEEN A POLICE

14   OFFICER -- OR AND I SHOULD SAY SPECIAL AGENT?

15   A.   WITH D.E.A.?

16   Q.   D.E.A.

17   A.   SINCE 1999.

18   Q.   AND HAVE YOU BEEN INVOLVED IN NUMEROUS NARCOTICS

19   INVESTIGATIONS?

20   A.   YES, SIR.

21   Q.   AND WERE YOU ONE OF THE AGENTS INVOLVED IN THE

22   INVESTIGATION OF THE DEFENDANT ALBEAR CAMERINO?

23   A.   YES, SIR.

24   Q.   AND IS HE IN THIS COURTROOM TODAY?

25   A.   YES, SIR.
```

1  Q.    COULD YOU PLEASE FOR STARTERS POINT HIM OUT INDICATING AN

2  ITEM OF CLOTHING?

3  A.    HE'S WEARING THE ORANGE JUMPSUIT WITH THE -- HE'S SITTING

4  BETWEEN THE TWO GENTLEMEN IN THE DARK-COLORED SUITS.

5  Q.    OKAY.  NOW, GETTING RIGHT INTO IT, HOW DID YOU FIRST BECOME

6  INVOLVED IN THIS INVESTIGATION?

7  A.    THERE WAS AN ONGOING INVESTIGATION THAT STARTED AT THE

8  FIRST OF -- IN 2000 -- AT THE BEGINNING OF 2011.

9  Q.    AND WHAT TYPE OF INVESTIGATION?

10 A.    IT WAS AN INVESTIGATION OF A MEXICO-BASED DRUG TRAFFICKING

11 ORGANIZATION THAT HAD DISTRIBUTION SALES HERE IN ATLANTA AND

12 OTHER DISTRIBUTION CITIES THROUGHOUT THE UNITED STATES.

13 Q.    NOW, DURING THE COURSE OF THAT INVESTIGATION DID THERE COME

14 A TIME WHERE YOU WENT TO A CERTAIN APARTMENT AS PART OF THAT

15 INVESTIGATION?

16 A.    YES, SIR.

17 Q.    COULD YOU PLEASE DESCRIBE THAT DATE AND WHAT OCCURRED?

18 A.    YES.  BEGINNING DURING THE LATE SPRING, EARLY SUMMER 2011,

19 WE HAD IDENTIFIED, I BELIEVE, 6750 PEACHTREE INDUSTRIAL

20 BOULEVARD IN THE APARTMENT L-8 IN DORAVILLE, GEORGIA AS A

21 LOCATION WHERE THE DEFENDANT THERE -- WE HAD OBSERVED THAT --

22 THE DEFENDANT COMING AND GOING FROM THAT APARTMENT ALONG WITH

23 OTHER APARTMENTS THAT WERE ASSOCIATED WITH HIM AND A GENTLEMAN

24 BY THE NAME OF ANGEL PERALTA A.K.A. GUERRO.

25 Q.    AND IN CONNECTION WITH THE IDENTIFICATION WHEN YOU SAY THAT

1  INDIVIDUAL, WAS THAT BY WAY OF PHYSICAL IDENTIFICATION OR JUST A

2  NAME?

3  A.   NO.   WE DIDN'T -- WE DIDN'T KNOW WHAT HIS NAME WAS AT THE

4  TIME.   WE TOOK SURVEILLANCE PHOTOGRAPHS OF THE DEFENDANT.

5  Q.   AND HAVE YOU HAD OCCASION TO REVIEW THOSE SURVEILLANCE

6  PHOTOGRAPHS?

7  A.   YES, SIR.

8  Q.   WHAT HAPPENED NEXT?

9  A.   THAT WAS JULY.   IN AUGUST, ON AUGUST 23RD, 2011, I MADE THE

10 DECISION THAT WE WOULD CONDUCT SOME ENFORCEMENT ACTIVITY AT

11 SEVERAL LOCATIONS THROUGHOUT THE NORTH DEKALB AREA AND SOUTH

12 GWINNETT AREA.

13 Q.   AND YOU MENTIONED YOU MADE THE DECISION.   WHAT -- WHAT'S

14 YOUR ROLE OR POSITION AT D.E.A.?

15 A.   I'M THE GROUP SUPERVISOR AND ASSIGNED TO TASK FORCE GROUP

16 TWO.

17 Q.   OKAY.   GO RIGHT AHEAD.

18 A.   SO AT THAT TIME EARLY THAT EVENING ON AUGUST 23RD, 2011, WE

19 HAD WENT TO -- PRIOR TO GOING TO THAT -- TO THE APARTMENT

20 WHERE -- WHERE WE KNEW THE DEFENDANT IN THIS CASE RIGHT HERE

21 WHERE HE WAS AT, WE WENT TO THREE ADDITIONAL LOCATIONS.   AND AT

22 THOSE LOCATIONS WE CONDUCTED SEARCH WARRANTS AND KNOCK-AND-TALKS

23 AT THOSE LOCATIONS WHERE DRUGS AND MONIES WERE SEIZED FROM THOSE

24 OTHER LOCATIONS AS WELL.

25 Q.   AND WHAT IS A KNOCK-AND-TALK?

1  A.   A KNOCK-AND-TALK IS WHERE YOU IDENTIFY THE LOCATION WHERE

2  YOU BELIEVE DRUG TRAFFICKING ACTIVITY IS OCCURRING, BUT YOU

3  DON'T HAVE PROBABLE CAUSE TO OBTAIN A SEARCH WARRANT FOR THE

4  LOCATION.  SO AT THAT TIME WHAT YOU DO, YOU APPROACH THE

5  LOCATION, YOU IDENTIFY YOURSELF AS LAW ENFORCEMENT PERSONNEL AND

6  THAT YOU'RE THERE TO FOLLOW UP ON A DRUG INVESTIGATION, AND TRY

7  TO ELICIT THE COOPERATION OF THE INDIVIDUALS WHO YOU IDENTIFY

8  WHO COME TO THE DOOR AFTER YOU KNOCK ON IT.

9  Q.   OKAY.  CONTINUE.

10  A.   SO ON THAT DAY AROUND 8:00 IN THE EVENING ON AUGUST 23RD,

11  2011, MYSELF, TASK FORCE OFFICER DAVE AGUILAR, TONY SMITH, AND

12  KEVIN CLONINGER APPROACHED THE FRONT DOOR OF L-8 OF THE

13  APARTMENT.

14  Q.   AND BRIEFLY DESCRIBE WHAT DID YOU OBSERVE WHEN YOU

15  APPROACHED L-8.  IN FACT, IN OTHER WORDS, HOW DID THE APARTMENT

16  LOOK IN THE AREA OF THE DOOR?  FOR INSTANCE, WERE YOU ON THE

17  SECOND FLOOR, THIRD FLOOR?

18  A.   WE WERE -- UPSTAIRS APARTMENT.

19  Q.   OKAY.

20  A.   YES.  TYPICAL APARTMENT COMPLEX.  I WENT UPSTAIRS.  DAVE

21  AGUILAR KNOCKED ON THE DOOR.  A FEW MINUTES LATER AN

22  INDIVIDUAL -- IT TOOK A FEW MINUTES FOR THE DOOR, BUT A FEW

23  MINUTES LATER A YOUNG MAN OPENED UP THE DOOR.  AT THAT TIME --

24  Q.   AND WHEN YOU SAY A YOUNG MAN, DID HE SEEM LIKE A MINOR OR

25  AN ADULT?

```
1   A.   HE WAS AN ADULT, JUST, YOU KNOW, YOUNG MAN, 19.

2   Q.   A YOUNG ADULT?

3   A.   YES, A YOUNG ADULT.

4   Q.   OKAY.

5   A.   HE WAS PAST BEING A MINOR.

6   Q.   WHAT HAPPENED NEXT?

7   A.   WE IDENTIFIED OURSELVES TO HIM.  HE ADVISED THAT HE WAS

8   STAYING THERE.  HE HAD JUST RECENTLY CAME --

9   Q.   AND WHEN YOU SAY YOU IDENTIFIED YOURSELF TO HIM, I TAKE IT

10  YOU MEAN IDENTIFYING YOURSELF TO HIM AS LAW ENFORCEMENT?

11  A.   YES.  NOT ONLY BY VERBALLY, BUT WE HAD ON MARKINGS, A VEST

12  THAT CLEARLY IDENTIFIED OURSELVES AS POLICE ON IT.  IT HAD

13  POLICE AND A D.E.A. BADGE ON IT, AND IT HAS D.E.A. ON THE BACK

14  OF THE VEST AS WELL.

15  Q.   WERE YOU AND THE OTHER AGENTS ARMED?

16  A.   YES.

17  Q.   DID YOU HAVE YOUR GUNS DRAWN?

18  A.   NO, SIR.  THAT'S ONE THING ABOUT A KNOCK-AND-TALK, IT'S A

19  FREE AND VOLUNTARILY INTERACTION, BUT NO WEAPONS ARE DRAWN AT

20  THAT TIME.

21  Q.   WHAT HAPPENED NEXT?

22  A.   THE -- THE PERSON INSIDE THE RESIDENCE, I HAD ASKED HIM, I

23  SAID -- THAT HE -- HE SPOKE ENGLISH BECAUSE HE HAD -- THROUGH

24  THE COURSE OF THE CONVERSATION HE HAD TOLD US THAT HE WAS A

25  RECENT GRADUATION OF HIGH SCHOOL IN GWINNETT COUNTY.  AND I
```

1   ASKED DID HE SPEAK ENGLISH.  HE SAID YES.  SO WE SPOKE --

2   INITIALLY AT FIRST IT WAS IN SPANISH OUT OF AN ABUNDANCE OF

3   CAUTION, BUT IN TALKING TO HIM WE REALIZED HE GRADUATED FROM

4   HIGH SCHOOL HERE IN THE METRO ATLANTA AREA.

5   Q.    AND JUST AS AN ASIDE, OF THE FOLKS THAT YOU MENTIONED

6   EARLIER WHO WERE WITH YOU, DO ANY OF THEM SPEAK FLUENT SPANISH,

7   TO YOUR KNOWLEDGE?

8   A.    YES, SIR.

9   Q.    DO YOU SPEAK FLUENT SPANISH?

10  A.    NO, SIR.

11  Q.    WHO AMONG THE GROUP SPEAKS SPANISH?

12  A.    TACK FORCE OFFICER DAVE AGUILAR.

13  Q.    WHAT HAPPENED NEXT?

14  A.    I WAS -- SPOKE TO -- SPOKE TO HIM.  HE ADVISED THAT HE WAS

15  STAYING AT THE APARTMENT WITH HIS SISTER'S BOYFRIEND AND --

16  Q.    THE YOUNG MAN?

17  A.    THE YOUNG MAN SAID HE WAS THERE WITH HIS SISTER'S

18  BOYFRIEND.  WE ASKED HIM WHERE WAS THE -- WHERE WAS HE AT.  HE

19  SAID HE WAS OUT, HE JUST LEFT AND HE WAS OUT WALKING THE DOG.

20  Q.    AND WHEN YOU SAY "HE," WHO DO YOU MEAN BY "HE?"

21  A.    THE PERSON WHO STAYED AT THE APARTMENT WITH HIM.  HE

22  DIDN'T -- HE DIDN'T SAY A NAME.  HE JUST SAID HE JUST WALKED OFF

23  AND HE'S WALKING THE DOG RIGHT NOW.

24  Q.    WHAT HAPPENED NEXT?

25  A.    AT THAT TIME I WENT DOWN AND ASKED -- TO ASCERTAIN DID THEY

1   SEE SOMEONE IN THE PARKING LOT WHO WAS WALKING A DOG.

2   Q.    AND "THEM" BEING OTHER AGENTS?

3   A.    YES, SIR.

4   Q.    AND WHAT WERE YOU TOLD OR BECAME AWARE OF?

5   A.    THAT THERE WAS AN INDIVIDUAL WHO WAS WALKING A DOG WHO WAS

6   STOPPED AND WAS IDENTIFIED, BUT HE WAS RELEASED.  THEY RELEASED

7   HIM.

8   Q.    WHAT HAPPENED NEXT?

9   A.    THROUGH THE COURSE OF THE INTERACTION WE ASKED FOR CONSENT

10  TO SEARCH THE APARTMENT, WHICH WE RECEIVED CONSENT TO SEARCH.

11  Q.    FROM WHOM?

12  A.    FROM THE OTHER PERSON WHO WAS INSIDE THE APARTMENT.

13  Q.    THE YOUNG MAN YOU DESCRIBED EARLIER?

14  A.    YES, SIR.

15  Q.    AND AFTER OBTAINING CONSENT FROM THAT YOUNG MAN, WAS THE

16  APARTMENT IN FACT SEARCHED?

17  A.    YES.  FIRST WE DID -- WE DID A PROTECTIVE SWEEP OF THE

18  APARTMENT TO ENSURE THAT NO ONE ELSE WAS IN THE APARTMENT.

19  Q.    YOU MAY -- WHAT DO YOU MEAN BY PROTECTIVE SWEEP?

20  A.    WELL, HE GAVE US CONSENT TO SEARCH, BUT BEFORE WE GET GOING

21  TO SEARCH IT WE JUST WANTED TO MAKE SURE THERE WAS NO ONE ELSE

22  IN THE APARTMENT.  EVEN THOUGH HE ADVISED US THAT THERE WAS NO

23  ONE ELSE IN THE APARTMENT IN THERE, I SAID, LET'S MAKE SURE NO

24  ONE ELSE IS IN HERE BEFORE WE START THE SEARCH.  AND THEN WE DID

25  THAT FOR OFFICER SAFETY RIGHT THERE.

```
 1  Q.   WHAT HAPPENED NEXT OR WHAT DID YOU DO NEXT?

 2  A.   THROUGH THE COURSE OF LOOKING IN THE APARTMENT, YOU SEE,

 3  YOU IDENTIFY.  THERE WAS CRYSTAL METHAMPHETAMINE THROUGHOUT

 4  DIFFERENT AREAS OF THE APARTMENT.  THERE WAS MONEY, NUMEROUS

 5  WEAPONS IN THE APARTMENT.

 6  Q.   NOW, WITHOUT GOING INTO ANY GREAT DETAIL, DID YOU STAY FOR

 7  THE ENTIRE SEARCH OR DID YOU LEAVE?

 8  A.   NO, SIR.  I LEFT.  AT SOME POINT I LEFT.

 9  Q.   OKAY.  NOW, JUST TURNING YOUR ATTENTION BACK A MOMENT

10  REGARDING THE PERSON IN THE PARKING LOT, DID YOU PERSONALLY EVER

11  SEE OR ENCOUNTER OR IN ANY WAY DEAL WITH THE PERSON IN THE

12  PARKING LOT?

13  A.   NO, SIR.

14  Q.   SO YOU WERE JUST INVOLVED, AS YOU'VE DESCRIBED, IN THE

15  SEARCH, THE KNOCK AND THEN THE SEARCH OF THE APARTMENT, 6-L --

16  SORRY, L-8 ON OR ABOUT AUGUST 23RD AT ABOUT 8:00 P.M.?

17  A.   YES, SIR, AND THE INTERVIEW OF THE PERSON WHO ANSWERED THE

18  DOOR.

19  Q.   ALL RIGHT.  AND, FINALLY, DURING THE COURSE OF THE PORTION

20  OF THE SEARCH THAT YOU WERE INVOLVED IN AND AVAILABLE FOR, DID

21  YOU SEE ANY EVIDENCE RELATED TO THE PERSON YOU WERE AT THE

22  APARTMENT LOOKING FOR WHOSE PICTURE THAT YOU HAD PREVIOUSLY

23  SEEN, AND, IF I UNDERSTAND, WHO YOU STATED IS IN THIS COURTROOM

24  TODAY?

25  A.   YES, SIR.
```

1   Q.   WHAT DID YOU SEE, JUST BRIEFLY?

2   A.   HIS PASSPORT WITH HIS PHOTOGRAPH ON IT WAS IN THE DRAWER

3   WITH A WEAPON.

4   Q.   IF THERE WAS, OR IF YOU RECALL, WAS THERE A NAME ATTACHED

5   TO IT?

6   A.   PABLO ARZATE.

7   Q.   SOMETHING ALONG THOSE LINES?

8   A.   YES, SIR.  CLEARLY IT'S THE SAME PERSON WHO WE HAVE TAKEN

9   SURVEILLANCE PHOTOS OF HIM BEFORE WE EVEN APPROACHED THE PLACE

10  IN JULY.  HE HAS A WHITE TANK TOP ON WITH A TATTOO ON THE SIDE

11  OF HIS NECK.  IT'S CLEARLY THE SAME PERSON WE TOOK SURVEILLANCE

12  PHOTOS PREVIOUSLY BEFORE WE EVER WENT TO THE APARTMENT FROM JULY

13  IS THE SAME PERSON WHO -- THAT'S THE PERSON WE WAS GOING TO THE

14  DOOR TO SPEAK TO.  WE THOUGHT WE WAS GOING TO SPEAK TO THAT --

15  THAT GENTLEMAN.  WE DIDN'T KNOW HIS NAME, BUT WE HAD HIS

16  PHOTOGRAPH.  AND WHEN WE WENT TO KNOCK-AND-TALK ON AUGUST 23RD,

17  THAT WAS THE PERSON WE HAD IDENTIFIED AS BEING THE OCCUPANT OF

18  THAT APARTMENT.  AND WE WENT THERE.  HE WASN'T THERE, BUT ALL OF

19  HIS IDENTIFICATION, EVERYTHING ELSE WAS IN THAT APARTMENT WHICH

20  CONFIRMED WHAT WE BELIEVE THAT HE WAS -- THAT HE WAS LIVING

21  THERE.

22  Q.   AND BY IDENTIFICATION, YOU PRIMARILY MEAN PHOTOGRAPHS OF

23  THE PERSON WHO YOU WERE LOOKING FROM (VERBATIM) FROM THE

24  SURVEILLANCE PHOTOGRAPHS IN THE INVESTIGATION?

25  A.   YES, SIR.

```
 1            MR. WILLIAMS:  YOUR HONOR, I HAVE NO FURTHER QUESTIONS
 2  FOR THIS WITNESS AT THIS TIME.
 3            THE COURT:  OKAY.  MR. SHREENATH, YOUR WITNESS.
 4                        CROSS-EXAMINATION
 5  BY MR. SHREENATH:
 6  Q.   GOOD MORNING, AGENT CROMER.
 7  A.   GOOD MORNING.
 8  Q.   MY NAME IS JAY SHREENATH.  I REPRESENT PABLO CAMANEY ARZATE
 9  IN THIS CASE.
10  A.   YES, SIR.
11  Q.   DID YOU TESTIFY AT ANOTHER HEARING IN DEKALB COUNTY
12  REGARDING THE ISSUE OF THE SEARCH --
13  A.   NO, SIR.
14  Q.   -- OF THIS CASE?  OKAY.  AND YOU HAD MENTIONED THAT THE
15  INVESTIGATION BEGAN IN 2011, SOMETIME IN THE BEGINNING OF 2011;
16  IS THAT CORRECT?
17  A.   YES, SIR.  IT WAS -- IT WAS A CONTINUING ONGOING
18  INVESTIGATION RELATED TO SOME INDIVIDUALS, INCLUDING YOUR
19  CLIENT, THAT HAD CAME UP THROUGHOUT THAT INVESTIGATION.
20  Q.   OKAY.  AND AT SOME POINT YOU SAID THAT WE HAD IDENTIFIED --
21  AND I'M QUOTING YOU -- WE IDENTIFIED 67 PEACHTREE INDUSTRIAL,
22  L-8, AS THE LOCATION THAT YOU MAY WANT TO LOOK INTO; IS THAT
23  CORRECT?
24  A.   YES, SIR.
25  Q.   OKAY.  AND --
```

1  A.   I THINK IT'S 6750.

2  Q.   6750?

3  A.   YES, BUT I KNOW IT'S APARTMENT L-8, WHICH ONE IT IS, YES,

4  SIR.

5  Q.   OKAY.  AND HOW DID YOU KNOW IT WAS APARTMENT L-8?

6  A.   BECAUSE WE HAD OBSERVED -- FROM SURVEILLANCE WE HAD

7  OBSERVED THAT APARTMENT.  WE OBSERVED YOUR CLIENT GOING UP TO

8  THAT APARTMENT.

9  Q.   OKAY.

10  A.   AND HIS ASSOCIATION WITH ANGEL PERALTA AND THE FAILED

11  CONTROLLED DELIVERY OF TWO SEPARATE OCCASIONS OF 2500 POUNDS OF

12  MARIJUANA.

13  Q.   AND WHEN WERE THOSE FAILED DELIVERIES?

14  A.   APRIL OF 2011 AND MAY OF 2011.  AND ON ONE OF THOSE YOUR

15  CLIENT'S BURGUNDY -- I MEAN, GRAY S.U.V. WOUND UP BEING OBSERVED

16  DURING -- DURING THAT SURVEILLANCE AS WELL.

17  Q.   AND THE APRIL -- LET'S TAKE ONE AT A TIME, IF YOU DON'T

18  MIND.  THE APRIL 2011 FAILED TRANSACTION, YOU SAID THAT WAS ON

19  SURVEILLANCE?

20  A.   YES, SIR.  IT WAS -- EXCUSE ME.  MAY, MAY 2011.  I'M SORRY.

21  ONE WAS MAY AND ONE WAS LATER ON DURING THE SUMMER.  I'M SORRY.

22  THE SECOND ONE.

23  Q.   OKAY.  SO THE FIRST ONE WAS IN MAY OF 2011 --

24  A.   YES, SIR.

25  Q.   -- CORRECT?  AND YOU SAID THERE WAS A VEHICLE, A GRAY

1  VEHICLE THAT WAS IDENTIFIED IN THAT ATTEMPT?

2  A.   THAT WAS THE SECOND ONE, THE SECOND FAILED CONTROLLED

3  DELIVERY.

4  Q.   ALL RIGHT.  DO YOU KNOW WHEN THE SECOND ONE TOOK PLACE?

5  A.   IT WAS THE SAME DAY THAT YOUR CLIENT'S UNCLE PASSED AWAY.

6  Q.   DO YOU KNOW WHAT MONTH?

7  A.   JUNE OR JULY.

8  Q.   OKAY.  ALL RIGHT.  SO GOING BACK TO THE MAY 2011, THAT WAS

9  THE FIRST ONE; CORRECT?

10  A.   YES, SIR.

11  Q.   AND THAT WAS ON SURVEILLANCE?

12  A.   YES.

13  Q.   OKAY.  WAS THERE AUDIO OR VIDEO OR BOTH IN TERMS OF

14  SURVEILLANCE?

15  A.   D.E.A. DID NOT CONDUCT THAT.  IT WAS A CONTROLLED DELIVERY

16  THAT DEPARTMENT OF HOMELAND SECURITY DID IT.  IT ATTEMPTED TO DO

17  A CONTROLLED DELIVERY FROM THE MEXICAN BORDER HERE TO THE U.S.

18  OF 2500 POUNDS OF MARIJUANA.

19  Q.   AND WHAT BASIS DO YOU HAVE TO SUGGEST THAT MY CLIENT MAY

20  HAVE BEEN INVOLVED IN THAT MAY 2011 TRANSACTION?

21  A.   HIS -- HIS -- WHO HE WAS WORKING WITH, ANGEL PERALTA, WAS

22  INVOLVED WITH THAT.  HE WAS THE PRINCIPAL PERSON THAT THAT

23  MARIJUANA WAS GOING TO, AND THERE WAS SURVEILLANCE.  HE WAS

24  STOPPED, DETAINED, AND IDENTIFIED BASED UPON THAT.  AND IN

25  CONTINUING OBSERVING, FOLLOWING ANGEL PERALTA, EVENTUALLY WE

1   WOUND UP IDENTIFYING YOUR CLIENT WAS INVOLVED WITH HIM AS WELL.

2   Q.   OKAY.  AND THIS WAS NOT HANDLED THROUGH YOUR OFFICE;

3   CORRECT?

4   A.   YES.

5   Q.   IT WAS HANDLED THROUGH THE DEPARTMENT OF HOMELAND SECURITY?

6   A.   YES.  AND WE SHARED THE INFORMATION TO THE DEKALB COUNTY --

7   DEKALB COUNTY DRUG TASK FORCE.

8   Q.   I JUST WANT TO UNDERSTAND.  YOU'RE SAYING THAT YOU GOT

9   INFORMATION FROM MR. PERALTA SUGGESTING THAT MY CLIENT WAS

10  INVOLVED IN THAT FAILED DRUG TRANSACTION MAY 2011?

11  A.   MR. PERALTA WAS INVOLVED WITH THAT BECAUSE HE WAS STOPPED

12  AND DETAINED AND IDENTIFIED.  WE WERE ALREADY FAMILIAR WITH

13  MR. PERALTA, AND WE CONTINUE ON OUR INVESTIGATION.  AND THROUGH

14  THE COURSE OF CONTINUING THAT INVESTIGATION, YOUR CLIENT WAS

15  IDENTIFIED BEING AN ASSOCIATE OF HIM AND OTHER INDIVIDUALS WHO

16  WERE INVOLVED IN THE DISTRIBUTION OF DRUGS IN THE METRO ATLANTA

17  AREA.

18  Q.   AND WHEN YOU SAY MY CLIENT WAS IDENTIFIED, HOW WAS THAT

19  DONE?

20          MR. WILLIAMS:  I OBJECT, YOUR HONOR.  THIS SEEMS TO BE

21  A LITTLE BIT FAR AFIELD AND AIMED AT DISCOVERY AS OPPOSED TO THE

22  ISSUES AT HAND WHICH IS SUPPRESSION OF THE EVIDENCE FOUND DURING

23  THE SEARCH.

24          THE COURT:  I THINK WE ALSO HAVE AN IDENTITY ISSUE, SO

25  I'LL ALLOW THE QUESTION.

```
 1            MR. SHREENATH:  THANK YOU.

 2            THE COURT:  OVERRULED.

 3   A.   HIS PHOTOGRAPH.  WE TOOK SURVEILLANCE PHOTOGRAPHS OF HIM.

 4   BY MR. SHREENATH:

 5   Q.   OKAY.  SO THAT'S WHAT I WAS ASKING EARLIER, IS WERE THERE

 6   SURVEILLANCE PHOTOGRAPHS IN THE TRANSACTION THAT DIDN'T TAKE

 7   PLACE IN MAY OF 2011?

 8   A.   NOT OF YOUR CLIENT, BUT LATER ON IN JULY I KNOW CERTAIN

 9   THAT WE TOOK PHOTOGRAPHS OF HIM GOING BACK AND FORTH TO

10   APARTMENT L-8.

11   Q.   AND I'M SORRY.  I'M JUST A LITTLE UNCLEAR ON WHAT IS IT

12   SPECIFICALLY THAT YOU GOT IN TERMS OF INFORMATION FOR THE MAY

13   2011 TRANSACTION THAT SUGGESTED THAT MY CLIENT WAS INVOLVED IN

14   THAT PARTICULAR TRANSACTION.

15   A.   YOUR CLIENT'S STATEMENTS.

16   Q.   WHAT STATEMENTS ARE YOU REFERRING TO?

17   A.   YOUR CLIENT'S STATEMENTS AT POST -- POST-ARREST INTERVIEW

18   THAT WE DID OF HIM.  YOUR CLIENT ADMITTED TO NOT ONLY THAT ONE,

19   HIS INVOLVEMENT WITH THE SECOND CONTROLLED DELIVERY, HIS

20   INVOLVEMENT WITH GUERRO (PHONETIC) IN THE -- DISTRIBUTING DRUGS

21   WITH GUERRO.  YOUR CLIENT ADMITTED TO ALL OF THAT.

22   Q.   SO YOU'RE SAYING THAT IN AUGUST 2011 AFTER -- AUGUST 2012,

23   HE MADE STATEMENTS SAYING THAT HE WAS INVOLVED IN THE MAY

24   2011 --

25   A.   CORRECT.
```

1  Q.    -- BUY?

2  A.    HE WAS INVOLVED WITH THAT, THAT HE WAS WORKING WITH ANGEL

3  PERALTA -- THEY CALL HIM GUERRO -- IN THE DISTRIBUTION OF DRUGS.

4  THE DRUGS THAT CAME TO APARTMENT L-8 ARRIVED THE DAY BEFORE WE

5  DID THE KNOCK-AND-TALK, AND THOSE DRUGS WERE ACCORDINGLY BROUGHT

6  THERE WITH HIM AND -- HIM AND GUERRO.

7  Q.    AND THOSE STATEMENTS CAME AFTER AUGUST OF 2012 -- OR IN

8  AUGUST OF 2012; CORRECT?

9  A.    YES, SIR.

10  Q.    SO BACK IN AUGUST OF 2011, YOU DIDN'T HAVE ANY INFORMATION

11  THAT SUGGESTED THAT MY CLIENT WAS INVOLVED IN THE MAY 2011 BUY?

12  A.    NOT THE MAY 2011, NO, SIR.  THE SECOND ONE, YES, BECAUSE

13  YOUR -- YOUR CLIENT'S S.U.V. WAS OBSERVED DURING THAT.  AND YOUR

14  CLIENT CORROBORATED THAT IN AUGUST OF 2012 WHEN HE SAID, YES,

15  THAT WAS HIS VEHICLE.  AND THE PLACE WHERE THEY WERE GOING TO

16  OFF-LOAD IT WAS THE PLACE THAT HE WORKED AT, HIS EMPLOYMENT

17  WHICH IS ON A SIDE STREET WHERE UNFORTUNATELY THEY WOUND UP

18  BURNING SURVEILLANCE AND THEY WAIVED OFF THE CONTROLLED

19  DELIVERY.

20  Q.    THE -- WHAT YOU MENTIONED, JUNE OR JULY OF 2011

21  TRANSACTION, WAS THAT ON ANY KIND OF SURVEILLANCE, AUDIO OR

22  VIDEO, OR ANY OTHER KIND OF SURVEILLANCE?

23  A.    THERE WASN'T ANY VIDEO SURVEILLANCE.  OF THE SECOND CONTROL

24  DELIVERY?

25

```
 1   Q.   THAT'S WHAT YOU MENTIONED.

 2   A.   THERE WAS -- THERE WASN'T ANY VIDEO.  IT'S JUST WHAT WE

 3   OBSERVED, THE AGENTS OBSERVED.

 4   Q.   OKAY.  ALL RIGHT.  AND YOU SAID THERE WAS A GRAY S.U.V.

 5   THAT YOU OBSERVED?

 6   A.   YES.

 7   Q.   OKAY.  AND I WANT TO CLARIFY, NOT THAT YOU OBSERVED, BUT

 8   OTHER AGENTS OBSERVED; CORRECT?

 9   A.   NO.  I SAW IT.

10   Q.   YOU WERE THERE ON THAT --

11   A.   THE SECOND CONTROLLED DELIVERY, THE 2500 POUNDS OF

12   MARIJUANA, I WAS THERE.

13   Q.   ALL RIGHT.  THE APARTMENT COMPLEX WE'RE TALKING ABOUT, THE

14   6750 PEACHTREE INDUSTRIAL BOULEVARD, YOU'VE MENTIONED APARTMENT

15   L-8.  THAT'S NOT ON THE GROUND FLOOR; CORRECT?

16   A.   NO.

17   Q.   IT'S ON FIRST OR SECOND FLOOR?

18   A.   I DON'T RECALL AT THIS TIME WHICH FLOOR, BUT IT'S ON --

19   IT'S UPSTAIRS.  IT'S AN UPSTAIRS APARTMENT.

20   Q.   OKAY.  AND YOU TESTIFIED THAT YOU HAD SURVEILLANCE PHOTOS

21   WHERE YOU SAW MY CLIENT COMING OUT OF THAT APARTMENT?

22   A.   HE WAS GOING INTO THE BUILDING INTO THAT PARTICULAR SIDE

23   WHERE L-8 WAS.  AND THROUGH THE COURSE OF SURVEILLANCE WE HAD

24   IDENTIFIED AND CORROBORATED HE WAS -- L-8 IS THE APARTMENT HE

25   WAS ASSOCIATED WITH.
```

1  Q.   DO YOU HAVE ANY VIDEO OR STILL PHOTOGRAPH SHOWING THAT HE

2  HAD ACTUALLY BEEN IN FRONT OF APARTMENT L-8?

3  A.   GOING INTO THE DOOR, NO, SIR.

4  Q.   EVEN BEING PRESENT IN FRONT OF THE DOOR FOR APARTMENT L-8,

5  DO YOU HAVE ANY PHOTOGRAPHS OF THAT?

6  A.   NO, NOT IN FRONT OF THE DOOR, BUT GOING INTO THAT SIDE OF

7  THE BUILDING WHERE L-8 WAS, YES, SIR, WE DO.

8  Q.   SO YOU HAVE HOW MANY PHOTOGRAPHS?

9  A.   I DON'T KNOW.  I SAW ONE.

10  Q.   ONE?

11  A.   YEAH, I SAW ONE.  I DON'T -- THE AGENTS WHO DID THE

12  SURVEILLANCE, I DON'T KNOW HOW MANY PHOTOS THEY HAVE.

13  Q.   OKAY.  AND WHO WERE THE AGENTS THAT DID THE SURVEILLANCE

14  BE?

15  A.   THAT WAS ANY AGENT IN MY GROUP.  THERE'S NOT ONE IN

16  PARTICULAR.

17  Q.   DO YOU HAVE SOME NAMES OF PEOPLE THAT MAY HAVE OTHER

18  PHOTOGRAPHS?

19  A.   IF YOU -- YOU HAVE IN DISCOVERY -- I DON'T RECALL THE

20  NAMES, BUT YOU JUST LOOK AT THE SURVEILLANCE OF THAT APARTMENT.

21  IT'S IN THE DISCOVERY THAT YOU HAVE.

22  Q.   ALL RIGHT.  AND THE PHOTO THAT YOU SAW WAS OF MY CLIENT --

23  A.   YES.

24  Q.   -- BEING OUTSIDE THAT APARTMENT BUILDING; CORRECT?

25  A.   YES.

1  Q.   OKAY.  NOT THE APARTMENT, BUT THE ACTUAL APARTMENT

2  BUILDING?

3  A.   THE APARTMENT BUILDING ON THAT SIDE.

4  Q.   OKAY.

5  A.   YOUR CLIENT IN THAT SAME POST-ARREST STATEMENT, HE

6  ACKNOWLEDGED THAT HE WAS THE OCCUPANT AT L-8.

7           MR. SHREENATH:  JUDGE, I ASK THE COURT TO INSTRUCT THE

8  WITNESS TO ANSWER THE QUESTION.

9           THE COURT:  OKAY.  ANSWER THE QUESTION FIRST.  AND IF

10 YOU WANT TO EXPLAIN IT, YOU CAN DO IT AFTER YOU ANSWER IT.

11          THE WITNESS:  YES, MA'AM.  YES.

12 BY MR. SHREENATH:

13 Q.   BEFORE AUGUST 2011, THE ONLY PHOTOGRAPH THAT YOU HAD OF MY

14 CLIENT IS THE ONE WHERE HE WAS OUTSIDE THE ENTIRE 6750 PEACHTREE

15 INDUSTRIAL BOULEVARD APARTMENT BUILDING; IS THAT CORRECT?

16 A.   YOU MEAN THE APARTMENT BUILDING THAT CONTAINS L-8?

17 Q.   YES.

18 A.   I'VE ONLY SEEN ONE.  I DON'T KNOW HOW MANY PHOTOS THERE

19 ARE, BUT I'VE ONLY SEEN ONE.  WE ONLY NEEDED ONE BECAUSE IT

20 CLEARLY SHOWS WHO THAT PERSON WAS.

21 Q.   AND DID YOU ALL AT SOME POINT TARGET APARTMENT L-7 AS A

22 POSSIBLE SOURCE FOR YOU TO INVESTIGATE, POSSIBLE LOCATION TO

23 INVESTIGATE IN THE SAME BUILDING?

24 A.   NO, SIR.  DO I HAVE ANY INFORMATION ON L-7?  NO, SIR.

25 Q.   SO YOUR INFORMATION WAS ALWAYS PERTAINING TO APARTMENT L-8;

1    CORRECT?

2    A.    WHERE YOUR CLIENT WAS.  THE APARTMENT WHERE YOUR CLIENT WAS

3    GOING INTO WAS THE ONE THAT WE WERE INVESTIGATING.

4    Q.    BUT YOU DIDN'T HAVE -- YOU DIDN'T KNOW WHICH APARTMENT HE

5    WAS GOING INTO.  YOU JUST KNEW HE WAS GOING INTO THE BUILDING

6    THAT HAD L-8 AND SOME OTHER APARTMENTS; CORRECT?

7    A.    I DON'T UNDERSTAND YOU.

8    Q.    HOW DID YOU KNOW TO TARGET SPECIFICALLY APARTMENT L-8?

9    A.    BECAUSE WE OBSERVED YOUR CLIENT.  WE DEDUCED IT DOWN BY

10   LOOKING AT WHERE HE WENT OVER THERE.  WE SPOKE TO THE PEOPLE IN

11   THE FRONT OFFICE ABOUT THE OCCUPANTS ON THAT SIDE OF THE

12   BUILDING AS WELL.

13   Q.    OKAY.  SO YOU MENTIONED YOU SPOKE TO PEOPLE IN THE FRONT

14   OFFICE.  DID YOU FIND OUT WHO THE OWNER OF -- OR THE LESSEE OF

15   APARTMENT L-8 WAS?

16   A.    I DID NOT.

17   Q.    OKAY.  WAS IT THE GENTLEMAN THAT OPENED THE DOOR, YOU SAID

18   SOMEBODY THAT LOOKED LIKE HE WAS A -- NOT A MINOR, MAYBE 19

19   YEARS OLD?

20   A.    THE OTHER DEFENDANT IN THIS CASE?

21   Q.    YES.

22   A.    I'M CONFUSED BY YOUR QUESTION.

23   Q.    AFTER HAVING REVIEWED THE INFORMATION ON THIS CASE DID YOU

24   COME TO FIND OUT WHO THE LESSEE FOR APARTMENT L-8 WAS BACK IN

25   AUGUST OF 2011?

1  A.   I DID NOT.

2  Q.   OKAY.  DO YOU KNOW WHETHER IT WAS THE CO-DEFENDANT, CARLOS

3  AREVELO, WHO WAS THE LESSEE?

4  A.   I DON'T KNOW.

5  Q.   YOU DON'T KNOW.  OKAY.  YOU SAID THAT YOU MADE THE DECISION

6  TO CONDUCT WHAT YOU CALL ENFORCEMENT ACTIVITY ON AUGUST 23RD,

7  2011; CORRECT?

8  A.   YES, SIR.

9  Q.   OKAY.  AND SPECIFICALLY WITH REGARD TO 67 (VERBATIM)

10 PEACHTREE INDUSTRIAL BOULEVARD, WAS THAT THE FOURTH LOCATION

11 THAT YOU WENT TO ON THAT DAY?

12 A.   YES, SIR.

13 Q.   THE PREVIOUS LOCATIONS, YOU SAID THERE WERE THREE OTHER

14 LOCATIONS?

15 A.   YES, SIR.

16 Q.   AND THOSE WERE SEARCHES CONDUCTED PURSUANT TO A

17 KNOCK-AND-TALK AND A SEARCH WARRANT?

18 A.   NO.  TWO OF THE LOCATIONS WERE SEARCH WARRANTS, THE OTHER

19 ONE THE OCCUPANT DID NOT ANSWER THE DOOR OR NO ONE WAS THERE,

20 AND THEN THE FOURTH LOCATION WE WENT TO L-8.

21 Q.   THERE WAS NO INFORMATION THAT YOU GOT FROM THOSE THREE

22 LOCATIONS THAT INDICATED TO YOU THAT L-8 SHOULD BE PURSUED AT

23 THIS POINT; CORRECT?

24 A.   THAT'S NOT CORRECT.

25 Q.   DID YOU -- WHY DIDN'T YOU OBTAIN A SEARCH WARRANT FOR L-8?

```
 1   A.   WE DIDN'T HAVE ANY PROBABLE CAUSE TO SEARCH L-8.

 2   Q.   OKAY.

 3   A.   TO GET -- TO OBTAIN A SEARCH WARRANT FOR L-8, WE DIDN'T

 4   HAVE PROBABLE CAUSE.

 5   Q.   ALL RIGHT.  SO IT'S YOU, AGENT AGUILAR, TONY SMITH, AND

 6   KEVIN?

 7   A.   CLONINGER.

 8   Q.   CLONINGER.  ALL FOUR OF YOU APPROACHED THE FRONT DOOR OF

 9   L-8; CORRECT?

10   A.   WE ALL WENT UP THERE TO THE LANDING.  I STAYED IN THE BACK.

11   I LET THE AGENTS TAKE CARE OF THAT, THE INITIAL INTERACTION WITH

12   THE OCCUPANT WHO ANSWERED THE DOOR.

13   Q.   AND YOU SAID IT TOOK A WHILE BEFORE THE PERSON OPENED THE

14   DOOR; CORRECT?

15   A.   YES, SIR.

16   Q.   OKAY.  AND ONCE THEY OPENED THE DOOR, WHO WAS THE ONE THAT

17   WAS ACTUALLY TALKING TO THE PERSON THAT OPENED THE DOOR?

18   A.   DAVID AGUILAR.

19   Q.   AND AT SOME POINT Y'ALL DETERMINED THAT HE SPOKE ENGLISH;

20   CORRECT?

21   A.   YES, SIR.

22   Q.   DID HE SAY HE WAS STAYING AT THAT APARTMENT?

23   A.   YES, SIR.

24   Q.   AND WHAT DID YOU -- STAYING AS IN WAS LIVING THERE OR

25   HAPPENED TO BE PRESENT THERE?
```

1  A.    NO.   HE WAS STAYING THERE.   HE WAS STAYING AT THE APARTMENT

2  WITH HIS SISTER'S BOYFRIEND.

3  Q.    OKAY.   AND DID HE MENTION HOW MANY DAYS HE WAS THERE?

4  A.    NO, SIR.   BECAUSE AS -- NOT HOW MANY DAYS HE WAS THERE,

5  BUT, AS HE -- I SAID, WELL, WHO -- WHERE IS THE PERSON -- WHERE

6  IS YOUR SISTER'S BOYFRIEND?   HE SAID, HE JUST LEFT OUT WALKING

7  THE DOG.   AT THAT POINT WHILE THEY CONTINUED SPEAKING TO HIM, I

8  WENT OUT AND I ASKED ANOTHER AGENT, HEY, HAVE YOU GUYS SEEN

9  SOMEONE WALKING A DOG?   AND THEY SAID, YES, THEY HAD STOPPED

10 HIM, AND THEN THEY HAD RELEASED HIM.

11 Q.    DID YOU -- EITHER YOU OR THE OTHER THREE AGENTS THAT WERE

12 WITH YOU, AT ANY POINT BEFORE YOU ACTUALLY DID THE

13 KNOCK-AND-TALK DID YOU ALL CHECK WITH THE FRONT OFFICE OF THE

14 APARTMENT COMPLEX TO SEE WHO THE -- THE RIGHTFUL OCCUPANT OF

15 APARTMENT L-8 WAS ON AUGUST 23RD, 2011?

16 A.    WE DIDN'T -- WE DIDN'T SPEAK TO THE APARTMENT MANAGEMENT ON

17 AUGUST 23RD, 2011 BEFORE WE DID THE KNOCK-AND-TALK.

18 Q.    AT ANY POINT PRIOR TO AUGUST 23RD DID YOU TRY TO DETERMINE

19 WHO THE RIGHTFUL OCCUPANT OF APARTMENT L-8 WAS?

20 A.    I DON'T KNOW IF THE -- WHAT THE AGENTS -- IF THEY DID OR

21 DID NOT BEFORE OR AFTER WE WENT TO THE APARTMENT.

22 Q.    AND YOU MENTIONED THAT SOMEBODY STOPPED A GENTLEMAN WHO WAS

23 WALKING THE DOG OUTSIDE; CORRECT?

24 A.    YES.

25 Q.    AND DO YOU KNOW -- YOU WEREN'T THE ONE WHO DID THAT;

```
1   CORRECT?

2   A.    NO, SIR.

3   Q.    BUT IT WAS ONE OF THE OFFICERS THAT WAS WORKING WITH YOU?

4   A.    YES.

5   Q.    WHO ACTUALLY STOPPED THIS INDIVIDUAL?

6   A.    TASK FORCE OFFICER TYLER HOOKS.

7   Q.    HOOKS?

8   A.    YES.

9   Q.    OKAY.  AND DO YOU KNOW IN RELATION TO THE APARTMENT

10  BUILDING WHERE THIS ENCOUNTER TOOK PLACE BETWEEN OFFICER HOOKS

11  AND THIS INDIVIDUAL?

12  A.    NO, SIR.

13  Q.    OKAY.  DO YOU KNOW --

14  A.    I KNOW IT WAS IN THE PARKING LOT SOMEWHERE.

15  Q.    OKAY.  AND DO YOU KNOW HOW LONG THE ENCOUNTER WAS?

16  A.    NO, SIR.

17  Q.    OKAY.  AND AT THAT POINT YOU KNEW BASED ON THE

18  CO-DEFENDANT'S STATEMENT THAT A SISTER'S BOYFRIEND WHO WAS OUT

19  WALKING THE DOG WAS THE ONE WHO ACTUALLY LIVED IN APARTMENT L-8;

20  CORRECT?

21  A.    NO.  WE ASKED HIM, WHERE IS YOUR SISTER'S BOYFRIEND?  HE

22  SAID HE WAS OUTSIDE WALKING THE DOG.

23  Q.    OKAY.

24  A.    THE -- THE FIRST PERSON SAID HE WAS LIVING THERE WITH HIS

25  SISTER'S BOYFRIEND.
```

```
1   Q.   WHAT DO YOU MEAN "THE FIRST PERSON," SIR?

2   A.   THE PERSON ANSWERED THE DOOR --

3   Q.   YEAH.

4   A.   -- SAID HE WAS LIVING -- STATED HE WAS LIVING THERE WITH

5   HIS SISTER'S BOYFRIEND.

6   Q.   OKAY.  AND WAS IT JUST COINCIDENTAL THAT AGENT -- THAT

7   OFFICER HOOKS STOPPED THAT INDIVIDUAL, OR DID HE KNOW TO LOOK

8   FOR SOMEBODY WALKING THE DOG TO TALK TO THAT PERSON?

9   A.   I THINK IT WAS COINCIDENTAL BECAUSE WE DIDN'T KNOW WHO THE

10  PERSON WAS.  I DON'T KNOW WHAT -- WHAT THEIR -- WHAT HIS THOUGHT

11  PROCESS OUT THERE.  YOU'D HAVE TO ASK HIM.  BUT ONLY THING I

12  KNEW IS THAT WHAT I -- THE YOUNG MAN INSIDE THE APARTMENT SAID

13  HER -- HIS SISTER'S BOYFRIEND IS WALKING THE DOG.  I JUST

14  ASKED -- WENT AND ASKED THE OTHER AGENTS WHILE THEY WERE STILL

15  TALKING TO HIM, HAVE YOU SEEN SOMEONE WALKING A DOG?  AND THEY

16  SAID, YES, WE HAD -- THEY HAD JUST STOPPED THE PERSON AND THEN

17  LET HIM GO.  I DIDN'T HAVE A NAME TO GIVE A REFERENCE POINT OR

18  ANYTHING.  I JUST ASKED THEM ONE QUESTION.  THEY TOLD ME, YES,

19  AND THEN I ASKED THEM TO LOOK FOR HIM.

20  Q.   DID -- DID YOU TALK TO AGENT HOOKS ABOUT THAT INDIVIDUAL

21  THAT HE SPOKE TO WHO WAS WALKING THE DOG?

22  A.   I DON'T RECALL IF I DID OR NOT BECAUSE THERE WERE A LOT OF

23  THINGS GOING ON AT THAT MOMENT.

24  Q.   OKAY.  IS THERE ANY KIND OF AUDIO SURVEILLANCE OR RECORDING

25  OF THIS WHOLE ENCOUNTER FROM THE TIME THAT YOU ALL APPROACHED
```

1  67 (VERBATIM) PEACHTREE INDUSTRIAL BOULEVARD UNTIL THE END WHEN

2  YOU LEFT 6750 PEACHTREE INDUSTRIAL BOULEVARD ON AUGUST 23RD,

3  2011?

4  A.   NO, SIR.

5  Q.   ANY KIND OF VIDEO SURVEILLANCE FOR THAT TIME PERIOD?

6  A.   NO, SIR.

7  Q.   ANY VIDEO CAMERAS FROM PATROL VEHICLES?

8  A.   VIDEO CAMERAS?  NOT THAT I'M AWARE OF, NO.

9  Q.   YOU MENTIONED THAT THE -- THE FOUR OF YOU THAT WERE THERE.

10  WERE THERE OTHER OFFICERS OTHER THAN OFFICER HOOKS?

11  A.   YES, THERE WERE -- THERE WERE MULTIPLE AGENTS THERE.

12  Q.   OKAY.  AND ANY LOCAL DEKALB COUNTY OFFICERS?

13  A.   YES, SIR.

14  Q.   OKAY.  ANY KIND OF PATROL VEHICLE, CAMERAS FROM ANY OF

15  THOSE VEHICLES?

16  A.   INITIALLY IT WAS JUST A D.E.A. OPERATION ITSELF.  AT SOME

17  POINT I ASKED THEM TO CALL DEKALB COUNTY, WHO DEKALB WAS ALREADY

18  ASSISTING US AT THE OTHER LOCATION THAT WE WENT TO EARLIER DOING

19  THE SEARCH WARRANTS AT, AND ASKED THEM IF THEY WOULD COME OVER

20  TO APARTMENT L-8 AS WELL.

21  Q.   OKAY.  AND DO YOU KNOW HOW MANY UNITS RESPONDED?

22  A.   NO, SIR.

23  Q.   OKAY.

24  A.   RIGHT AFTER THEY FIRST GOT THERE I WOUND UP LEAVING.

25  Q.   WHEN THE DEKALB LAW ENFORCEMENT OFFICERS GOT THERE YOU --

```
 1  A.    YES.  THEY CAME THERE.  I GAVE THEM A BRIEFING BASICALLY
 2  ABOUT WHAT'S GOING ON, WHAT WE FOUND HERE, WHO THIS PERSON WHO
 3  WAS IN THE APARTMENT WAS, AND THEN I LEFT.
 4  Q.    OKAY.  YOU SAID MR. AREVELO, CARLOS, GAVE CONSENT TO
 5  SEARCH; IS THAT CORRECT?
 6  A.    YES.
 7  Q.    AND DO YOU KNOW WHO ASKED FOR CONSENT AMONGST THE FOUR OF
 8  YOU?
 9  A.    DAVID AGUILAR.
10  Q.    OKAY.  AND DID HE ASK FOR THAT IN ENGLISH OR SPANISH?
11  A.    I DON'T RECALL.
12  Q.    WERE YOU PRESENT AT THE TIME OF THE CONSENT BEING GIVEN?
13  A.    I WAS PRESENT, BUT I DIDN'T PAY ATTENTION TO THEIR
14  INTERACTION INITIALLY.  I JUST WANTED TO MAKE SURE THAT NO
15  ONE -- OUR SAFETY WAS THE MOST PARAMOUNT THING FOR ME BECAUSE
16  I'M RESPONSIBLE FOR EVERY SINGLE PERSON THERE.  AND I JUST -- WE
17  GAVE -- I WAS JUST A COVER PERSON TO MAKE SURE THERE WAS NO ONE
18  ELSE IN THE APARTMENT WHO WOULD COME OUT SHOOTING.  THERE WERE
19  WEAPONS THAT WE HAD SEIZED FROM PEOPLE JUMPING OFF OF THIRD
20  STORY BALCONIES EARLIER IN THE DAY AND GUNS AND DRUGS FALLING ON
21  THE GROUND.  I JUST WANTED TO MAKE SURE THAT DIDN'T HAPPEN HERE.
22  THE ONLY THING I DID KNOW WAS THAT THE YOUNG MAN WHO WAS IN THE
23  APARTMENT -- WELL, WE WERE TOLD -- TRIED TO -- WENT OUT TO THE
24  BACK PATIO, AND THEN WHEN HE SAW THE OTHER AGENTS THERE, THEN HE
25  CAME IN AND ANSWERED THE DOOR AFTER.  I JUST WANT TO MAKE SURE
```

1   THERE WAS NO ONE ELSE IN THERE.  AND IF IT WAS, THAT WE WOULD BE

2   ABLE TO -- I WOULD PREPARE TO RESPOND TO MAKE SURE THAT OUR

3   SAFETY WAS OKAY.

4   Q.   AND WHEN THE CONSENT WAS GIVEN, YOU SAID DAVE AGUILAR ASKED

5   FOR CONSENT; CORRECT?

6   A.   YES, SIR.

7   Q.   AND WHERE WERE YOU ALL IN RELATION TO THE ENTRANCE OF THE

8   APARTMENT?

9   A.   WE WERE OUTSIDE IN A -- OUTSIDE OF THE DOOR AT THE -- IN

10  THE HALLWAY AREA.

11  Q.   OKAY.  DID ANY OF YOU EVER GO INSIDE TO TALK TO CARLOS AT

12  ANY POINT?

13  A.   YES, SIR.

14  Q.   OKAY.  AND WAS THAT YOU OR ALL OF YOU WHO WENT IN TO TALK

15  TO HIM?

16  A.   AFTER WE GOT CONSENT, THE FOUR OF US, HE WENT INTO THE

17  APARTMENT.  WE SPOKE TO HIM WHILE OTHER AGENTS -- ONCE HE GAVE

18  US CONSENT, I ASKED HIM -- ASKED MORE AGENTS TO COME IN AND HELP

19  SECURE THE PLACE FIRST, AND THEN WE SEARCHED AND THEY WOUND

20  UP -- WE WOUND UP SPEAKING TO CARLOS SHORTLY THEREAFTER.

21  Q.   OKAY.  AND YOU DON'T KNOW -- YOU DIDN'T HEAR THE

22  CONVERSATION WHERE CONSENT WAS GIVEN.  YOU WERE THERE, BUT YOU

23  DIDN'T HEAR THAT PARTICULAR CONVERSATION; CORRECT?

24  A.   YES.  I WAS JUST ADVISED THAT HE DID GIVE CONSENT.

25  Q.   OKAY.  AND YOU SAID THAT WHEN YOU WENT IN WITH THE OTHERS

1   YOU DID A PROTECTIVE SEARCH, CORRECT, PROTECTIVE SWEEP?

2   A.   YES, TO MAKE SURE THERE WERE NO OTHER INDIVIDUALS IN THERE.

3   Q.   AND THERE WAS METH, MONEY, AND WEAPONS FOUND, AS YOU

4   TESTIFIED EARLIER?

5   A.   YES.  IT WAS IN PLAIN VIEW, YES, SIR.

6   Q.   OKAY.  WHERE EXACTLY -- LET'S TAKE ONE AT A TIME.  THE

7   ALLEGED METHAMPHETAMINE, WHERE WAS THAT FOUND?

8   A.   IN A BATHROOM.  I MEAN, IT WAS A BIG BUCKET OF IT ON THE

9   GROUND RIGHT OUTSIDE THE DOOR TO THE -- CLOSET BATHROOM WAS

10  OPEN.  YOU GO IN -- AS SOON AS YOU GO INTO THE FIRST BEDROOM, ON

11  THE RIGHT THERE'S SEVERAL HIGH-POWERED RIFLES JUST LAID OUT,

12  STACKED UP TACTICALLY ON THE -- ON THE -- ON THE -- AND ON THE

13  BEDROOM FLOOR.  THERE WAS HANDGUNS ON THE DRESSERS AND THEN YOU

14  CAN SEE THE MONEY AS WELL AND PACKAGE MATERIALS AND EVERYTHING

15  ELSE.

16  Q.   OKAY.  SO THE DRUGS, THE METHAMPHETAMINE WAS FOUND IN THE

17  BATHROOM; CORRECT?

18  A.   SOME OF IT.  IT WAS -- IT WAS COCAINE AND METHAMPHETAMINE

19  FOUND IN THE APARTMENT, BUT WHEN YOU WALK DOWN THE HALLWAY

20  BEFORE YOU GET TO THE FIRST BATHROOM, THERE'S A BATHROOM ON THE

21  LEFT, THERE'S A BIG TIN BUCKET FULL OF CRYSTAL METH, SEVERAL --

22  SEVERAL POUNDS OF IT THAT THEY WERE WASHING, YOU COULD TELL

23  REPROCESSING.  THEY WERE TRYING TO WASH THE IMPURITIES OFF THE

24  CRYSTAL METH.  YOU COULD SMELL IT IN THE APARTMENT AS SOON AS

25  YOU WALKED IN.

1   Q.    WHAT ABOUT THE COCAINE?

2   A.    THE COCAINE WAS -- THAT WAS SOMEWHAT -- BUT IN PLAIN VIEW,

3   I'M TALKING ABOUT INITIALLY IN PLAIN VIEW WHAT YOU CAN SEE.  THE

4   COCAINE WAS EVENTUALLY FOUND IN THE APARTMENT DURING THE SEARCH

5   OF IT, BUT WHAT YOU -- WHAT I CAN CLEARLY SEE WAS -- NO DOUBT

6   BECAUSE I'VE SEEN IT SO MANY TIMES BEFORE, WAS THE CRYSTAL METH

7   THAT WAS OUT THERE IN THE OPEN IN THE BATHROOM.  SO THAT'S THE

8   DRUGS, NUMBER ONE.

9   Q.    SO THE COCAINE WASN'T IN PLAIN VIEW, BUT IT WAS EVENTUALLY

10  FOUND IN THE APARTMENT; IS THAT CORRECT?

11  A.    I DON'T KNOW IF IT WAS IN PLAIN VIEW.  THE ONLY THING I SAW

12  WHEN I WENT IN -- WHEN I WAS IN THE APARTMENT JUST LOOKING TO

13  MAKE SURE NO ONE ELSE IN THERE, WHAT YOU CAN SEE IN THE

14  BATHROOM, THE BIG TUB IN THE MIDDLE OF IT, IN THE MIDDLE OF THE

15  FLOOR WITH CRYSTAL METH ALL IN IT.

16  Q.    DID YOU HAVE TO OPEN THE BATHROOM DOOR?

17  A.    NO, SIR.  YOU CAN SEE IT AND YOU CAN SMELL IT.

18  Q.    ALL RIGHT.  AND THE MONEY YOU SAID -- WHERE WAS THAT FOUND?

19  A.    JUST IN VARIOUS PLACES THROUGH -- THROUGHOUT -- THROUGHOUT

20  THE -- THE APARTMENT.

21          THE COURT:  MR. SHREENATH, I'M SORRY.  I'M GOING TO

22  HAVE TO -- I HATE TO INTERRUPT YOU --

23          MR. SHREENATH:  NO.  THAT'S FINE.

24          THE COURT:  -- IN THE MIDDLE OF YOUR CROSS.  JUDGE

25  JONES NEEDS TO BORROW OUR INTERPRETER -- I APOLOGIZE -- FOR

1    ABOUT 15 MINUTES OR MORE.  SO WE'RE GOING TO GO AHEAD AND

2    RECESS, AND WE CAN PICK BACK UP WITH YOUR QUESTIONS.

3         WHILE WE'RE RECESSING I WOULD LIKE TO NOTIFY --

4    MR. WILLIAMS, IF YOU WOULD NOTIFY THE MEXICAN CONSULATE, THE

5    DEFENDANT WOULD LIKE TO SPEAK TO THE CONSULATE REGARDING THESE

6    CHARGES.  SO HE IS EXERCISING HIS RIGHT, INVOKING HIS RIGHT TO

7    HAVE A CONSULATE NOTIFIED AND TO CONSULT WITH A CONSULATE

8    REPRESENTATIVE.

9         IS THAT RIGHT, MR. CAMERINO?

10        OKAY.  SO WE'RE GOING TO GO AHEAD AND RECESS AT THIS TIME

11   FOR ABOUT 15 OR 20 MINUTES UNTIL OUR INTERPRETER COMES BACK.

12                  (RECESS TAKEN.)

13             THE COURT:  MR. WILLIAMS -- I'M SORRY.  MR. SHREENATH.

14             MR. SHREENATH:  YES.

15             THE COURT:  YOU WANT TO GO AHEAD AND CONTINUE YOUR

16   CROSS-EXAMINATION OF THE WITNESS.

17             MR. SHREENATH:  THANK YOU, JUDGE.

18             THE COURT:  MM-HUM.

19   BY MR. SHREENATH:

20   Q.   AGENT CROMER, GOING BACK TO THE ISSUE OF CONSENT, WHEN

21   AGUILAR -- OFFICER AGUILAR ASKED FOR CONSENT, HE WAS ASKING THE

22   CONSENT FROM CARLOS, CORRECT, CARLOS AREVELO?

23   A.   YES, SIR.

24   Q.   OKAY.  THE 19-YEAR-OLD, OR SEEMINGLY 19-YEAR-OLD, WHO LIVES

25   AT THE APARTMENT?

1   A.   YES, SIR.

2   Q.   AND THERE WAS NOBODY ELSE AT THE APARTMENT; CORRECT?

3   A.   NO, SIR, THERE WASN'T ANYONE ELSE THERE.

4   Q.   AND AT THAT POINT YOU HAD NO INDICATION THAT CARLOS WAS

5   EVEN AN AUTHORIZED PERSON TO BE IN THAT APARTMENT; IS THAT

6   CORRECT?

7   A.   EXCEPT HIM TELLING US THAT HE WAS, THAT HE WAS LIVING

8   THERE.

9   Q.   OTHER THAN HIS STATEMENT THAT HE WAS -- WELL, YOU SAID HE

10  WAS LIVING THERE, BUT HE WAS -- HIS STATEMENTS WERE THAT HE WAS

11  ACTUALLY STAYING THERE, CORRECT, AS OPPOSED TO LIVING THERE?

12  A.   SAME THING.

13  Q.   WELL, WHAT WAS HIS STATEMENT EXACTLY?

14  A.   I'M STAYING HERE WITH MY SISTER'S BOYFRIEND.

15  Q.   OKAY.  SO HE SAID THAT HE WAS STAYING THERE WITH HIS

16  SISTER'S BOYFRIEND; CORRECT?

17  A.   YES.

18  Q.   OKAY.  AND HE NEVER GAVE ANY KIND OF INDICATION THAT HE WAS

19  A LESSOR OF THAT APARTMENT; CORRECT?

20  A.   HE SAID HE WAS LIVING THERE, SO THAT DID GIVE US INDICATION

21  THAT -- THAT HE'S AUTHORIZED TO BE IN THAT APARTMENT.

22  Q.   OKAY.  YOU KEEP GOING BACK TO LIVING THERE, BUT HIS ACTUAL

23  STATEMENT WAS HE WAS STAYING THERE; CORRECT?

24  A.   I DON'T KNOW IF HE SAID LIVING OR SINGLE (VERBATIM) -- FROM

25  THE -- IN TALKING TO HIM HE WAS LIVING THAT -- AT THAT APARTMENT

1  WITH HIS SISTER -- WITH HIS SISTER'S BOYFRIEND.

2  Q.   DID -- DID YOU --

3  A.   I DON'T DISTINGUISH ONE FROM THE OTHER.  I USE BOTH ONE IN

4  THE SAME.

5  Q.   BUT HIS STATEMENT TO YOU AND THE OTHER AGENTS WAS THAT HE

6  WAS STAYING THERE; CORRECT?

7  A.   HE COULD HAVE SAID HE WAS LIVING THERE OR HE COULD HAVE

8  SAID HE WAS STAYING THERE.  ONE WAY HE WAS LIVING IN THAT

9  APARTMENT.  THAT'S WHERE HE WAS STAYING AT.  I'M SORRY.  I DON'T

10  MEAN TO -- TO USE -- BUT I JUST SAY LET'S SAY HE WAS LIVING

11  THERE.  OKAY.  BUT WHEN I USE BOTH OF THEM, THEY MEAN ONE IN THE

12  SAME.  I LIVE -- I LIVE HERE.  LIKE, I STAY AT HOME.  I LIVE AT

13  HOME, SAME THING.  IT MEANS THE SAME THING.

14  Q.   TELL ME WHAT CARLOS TOLD YOU AND THE OTHER AGENTS ABOUT

15  WHETHER HE WAS LIVING OR STAYING.  SPECIFICALLY WHAT WAS THE

16  WORDS THAT HE USED?

17  A.   I CAN'T GIVE YOU THE EXACT WORD, BUT HE WAS -- AND I'M

18  SAYING MY -- I'M PARAPHRASING.  -- HE WAS LIVING THERE -- OR HE

19  WAS STAYING THERE WITH HIS SISTER'S BOYFRIEND.  THAT'S WHAT HE

20  SAID, AND I -- AND I -- NEXT QUESTION.  WELL, I DIDN'T HARP ON

21  THAT.  I JUST SAID OKAY.  WHERE IS YOUR SISTER'S BOYFRIEND NOW?

22  HE'S OUT WALKING THE DOG.

23  Q.   DID YA'LL MAKE ANY INQUIRY TO SEE IF HE WAS LEASING THE

24  APARTMENT?

25  A.   I DIDN'T MAKE ANY OF THE INQUIRIES.  THE CONVERSATION IN

1  THE INTERVIEW, TASK FORCE OFFICER AGUILAR CONTINUED THAT.  AT

2  THAT POINT ONCE WE -- HE TALKED TO HIM.  HE IDENTIFIED HIMSELF.

3  I WANTED TO MAKE SURE HE -- HE UNDERSTOOD WHO WE WERE, HE

4  BELIEVED WHO WERE AS FAR AS FOR HIS OWN SAFETY AND PEACE OF

5  MIND.  AND ONCE WE RECEIVED CONSENT, THEN I HAD OTHER DUTIES TO

6  DO AT THAT POINT, GIVING EVERYBODY ELSE DIRECTIONS OF WHAT TO

7  DO.  WHATEVER THE CONVERSATION FROM THAT, YOU HAVE TO SPEAK WITH

8  AGENT AGUILAR ON THAT.

9  Q.   DID HE EVER GIVE ANY KIND OF -- SHOW ANY KIND OF

10  IDENTIFICATION OR ANY DOCUMENTS?  I'M TALKING ABOUT CARLOS.

11  A.   TO ME?  NO, SIR.

12  Q.   YOU OR THE OTHER AGENTS THAT WERE IN YOUR PRESENCE.

13  A.   I'M PRETTY SURE HE DID, BUT NOT TO ME AT THAT TIME.

14  Q.   OKAY.  SO WHEN YOU SAY YOU'RE PRETTY SURE HE DID, WHEN

15  WOULD HE HAVE GIVEN THOSE DOCUMENTS?

16  A.   AT SOME POINT I THINK WE SEIZED THE DOCUMENTS -- HIS

17  DOCUMENTS WITH HIS -- HIS IDENTITY -- HIS PHOTOGRAPH ON IT, AND

18  THEN HE HAD PHOTOS IN THE -- AT THAT APARTMENT WITH HIS PICTURE

19  ON IT WHEN HE GRADUATED FROM HIGH SCHOOL.

20  Q.   SO THAT WAS AFTER THE -- THE SEARCH HAD TAKEN PLACE, NOT

21  BEFORE THE CONSENT WAS ASKED FOR; CORRECT?

22  A.   CAN YOU REPEAT THAT?

23  Q.   WAS -- THAT WAS AFTER THE SEARCH TOOK PLACE THAT YOU SEIZED

24  THE DOCUMENTS --

25  A.   YES.

1  Q.   -- THAT BELONGED TO CARLOS AREVELO?

2  A.   YES.

3  Q.   OKAY.  AND YOU DID -- JUST GOING BACK ON ONE ISSUE THAT YOU

4  HAD BROUGHT UP EARLIER WITH REGARD TO THE PHOTOGRAPH THAT YOU

5  SAW OF MY CLIENT, IS IT JUST ONE PHOTOGRAPH OR MULTIPLE

6  PHOTOGRAPHS PRIOR TO THE AUGUST 23RD, 2011 DATE?

7  A.   I ONLY SAW ONE PHOTOGRAPH.  THERE COULD BE MORE.  I DON'T

8  KNOW.  I JUST SAW THE ONE.

9  Q.   YOU ONLY SAW ONE; CORRECT?

10  A.   YES.

11  Q.   AND HAVE YOU LOOKED AT THAT PHOTO RECENTLY?

12  A.   NOT IN WEEKS, NO.

13  Q.   OKAY.

14  A.   BUT I KNOW IT WAS HIM FROM THE PHOTO.

15        MR. SHREENATH:  MAY I APPROACH THE WITNESS?

16        THE COURT:  YES, YOU MAY.

17  BY MR. SHREENATH:

18  Q.   I'M GOING TO HAND YOU A DOCUMENT THAT'S BEEN MARKED AS

19  GOVERNMENT'S EXHIBIT B1.

20  A.   YES.

21  Q.   CAN YOU IDENTIFY THAT DOCUMENT?

22  A.   YES.

23  Q.   AND HOW CAN YOU IDENTIFY THAT DOCUMENT?

24  A.   THIS IS THE PHOTO OF YOUR CLIENT THAT I SAW AT THE

25  APARTMENTS.

1    Q.   OKAY.  SO THIS IS THE COPY OF THE PHOTO THAT YOU ACTUALLY

2    SAW THAT YOU WERE REFERRING TO EARLIER; CORRECT?

3    A.   YES, SIR.

4    Q.   AND THE PHOTO DEPICTS MY CLIENT OUTSIDE THE APARTMENT

5    BUILDING; CORRECT?

6    A.   YES.

7    Q.   IS THERE ANYTHING INDICATING IN THE PHOTOGRAPH THAT HE'S

8    OUTSIDE 6750 PEACHTREE INDUSTRIAL BOULEVARD?

9    A.   MEANING ARE THERE ANY NUMBERS ON IT?

10   Q.   CORRECT.

11   A.   FROM THIS PHOTO, NO, SIR.

12   Q.   OKAY.  IS THERE ANYTHING INDICATING THAT HE'S CARRYING

13   ANYTHING WITH HIM?

14   A.   NO, SIR.

15   Q.   OKAY.  JUST A COUPLE OF QUESTIONS.  REGARDING OFFICER

16   HOOKS, YOU TALKED TO HIM ABOUT THE PERSON HE STOPPED WHO WAS

17   WALKING THE DOG; CORRECT?

18   A.   DID I?

19   Q.   DID YOU?  I'M ASKING.

20   A.   I DON'T RECALL IF I SPOKE TO HIM.  I JUST PUT THE GENERAL

21   QUESTION OUT THERE, DID ANYBODY SEE A GUY WALKING A DOG?  AND I

22   WAS ADVISED, I DON'T KNOW BY WHOM, THAT THEY HAD STOPPED A GUY

23   WALKING A DOG.  AND THE PERSON HAD TOLD THEM HE WAS IN ANOTHER

24   APARTMENT THAT WAS NEAR THERE.  I DON'T RECALL WHICH APARTMENT

25   NUMBER, BUT THE PERSON DIDN'T SAY L-8.

```
1   Q.   OKAY.  AND DID THEY GIVE YOU ANY KIND OF INFORMATION ABOUT

2   A DESCRIPTION OR ANYTHING LIKE THAT --

3   A.   NO.

4   Q.   -- OF THAT PERSON?

5   A.   NO.

6           MR. SHREENATH:  ALL RIGHT.  NOTHING FURTHER AT THIS

7   TIME, JUDGE.

8           THE COURT:  ALL RIGHT.  ANYTHING ELSE OF THIS WITNESS,

9   MR. WILLIAMS?

10          MR. WILLIAMS:  NO, YOUR HONOR, NOT AT THIS TIME.

11          THE COURT:  OKAY.  AGENT CROMER, YOU MAY STEP DOWN.

12          THE WITNESS:  YES, MA'AM.

13          THE COURT:  YOU MAY CALL YOUR NEXT WITNESS.  HOW MANY

14  WITNESSES DO YOU HAVE?  I'M JUST WONDERING.

15          MR. WILLIAMS:  YOUR HONOR, THREE, THREE WITNESSES?

16          THE COURT:  OKAY.

17          MR. WILLIAMS:  YOUR HONOR, AT THIS TIME I'D CALL AGENT

18  TYLER HOOKS.

19          COURTROOM DEPUTY CLERK:  SIR, IF YOU WOULD COME ON UP

20  AND TAKE THE WITNESS STAND, PLEASE.  RAISE YOUR RIGHT HAND AND

21  BE SWORN.  THANK YOU.

22              (WITNESS SWORN.)

23          COURTROOM DEPUTY CLERK:  THANK YOU, SIR.  YOU CAN TAKE

24  YOUR SEAT.  AND IF YOU WOULD, PLEASE, SIR, STATE YOUR FULL NAME

25  FOR THE RECORD AND SPELL YOUR LAST NAME.
```

| | |
|---|---|
| 1 | THE WITNESS:  TYLER HOOKS, H-O-O-K-S. |
| 2 | COURTROOM DEPUTY CLERK:  THANK YOU, SIR. |
| 3 | <u>TYLER HOOKS</u> |
| 4 | CALLED AS A WITNESS BY THE UNITED STATES OF AMERICA, AFTER |
| 5 | HAVING BEEN FIRST DULY SWORN, TESTIFIED AS FOLLOWS: |
| 6 | <u>DIRECT EXAMINATION</u> |
| 7 | BY MR. WILLIAMS: |
| 8 | Q.   OFFICER HOOKS, OR AGENT HOOKS, FOR WHOM DO YOU WORK? |
| 9 | A.   I WORK FOR THE ROCKDALE COUNTY SHERIFF'S OFFICE. |
| 10 | Q.   AND HOW LONG HAVE YOU WORKED FOR THE ROCKDALE COUNTY |
| 11 | SHERIFF'S OFFICE? |
| 12 | A.   SINCE FEBRUARY OF 2004. |
| 13 | Q.   OKAY.  AND AS PART OF YOUR DUTIES WITH ROCKDALE ARE YOU |
| 14 | ASSIGNED TO ANY PARTICULAR UNIT OR GROUP CURRENTLY? |
| 15 | A.   YES, SIR.  I'M ASSIGNED TO D.E.A. ATLANTA TASK FORCE GROUP |
| 16 | TWO. |
| 17 | Q.   TURNING YOUR ATTENTION BACK TO ON OR ABOUT OR IN OR AROUND |
| 18 | AUGUST OF 2010 -- |
| 19 | A.   2011. |
| 20 | Q.   2011.  WERE YOU ASSIGNED TO ANY PARTICULAR UNIT OR GROUP AT |
| 21 | THAT TIME? |
| 22 | A.   YES.  I HAD JUST GOT ASSIGNED TO TASK FORCE GROUP TWO IN |
| 23 | AUGUST OF 2011. |
| 24 | Q.   AND THAT'S D.E.A. TASK FORCE GROUP TWO? |
| 25 | A.   YES, SIR. |

```
1   Q.   SO YOU WORK FOR DEKALB COUNTY, BUT YOU WERE ASSIGNED TO
2   D.E.A. TASK FORCE?
3   A.   I WORK FOR ROCKDALE COUNTY SHERIFF'S OFFICE.
4   Q.   ROCKDALE.  I APOLOGIZE.  LET ME PAY ATTENTION.  THANK YOU.
5   AND APPROXIMATELY HOW LONG -- WELL, YOU TESTIFIED HOW LONG YOU
6   WORKED FOR ROCKDALE COUNTY.  BEFORE THAT WERE YOU A POLICE
7   OFFICER WITH ANY OTHER GROUP?
8   A.   NO.
9   Q.   OR ANY OTHER UNIT?
10  A.   NO, SIR.
11  Q.   AND -- AND WHAT -- AND WHAT -- WHAT TYPE OF CASES ARE YOU
12  TYPICALLY -- DO YOU TYPICALLY INVESTIGATE AS PART OF THE TASK
13  FORCE, THE D.E.A. TASK FORCE?
14  A.   DRUG CASES.
15  Q.   NOW, TURNING YOUR ATTENTION TO THE INSTANT CASE, HOW DID
16  YOU FIRST GET INVOLVED IN -- AND I UNDERSTAND YOU WERE WITH THE
17  TASK FORCE FOR APPROXIMATELY TWO WEEKS BEFORE THE EVENTS THIS --
18  THAT YOU'RE TESTIFYING TODAY CAME ABOUT; IS THAT CORRECT?
19  A.   YEAH.  I JUST GOT ASSIGNED IN THE FIRST PART OF AUGUST, AND
20  BY ME BEING ASSIGNED TO THE TASK FORCE GROUP TWO I WAS -- WHICH
21  PUT ME INVOLVED INTO THIS CASE.
22  Q.   TURNING YOUR ATTENTION TO ON OR ABOUT AUGUST 23RD, 2011,
23  APPROXIMATELY WHAT OCCURRED THAT DAY REGARDING THIS CASE?
24  A.   ON AUGUST 23RD, 2011, IT'S ABOUT APPROXIMATELY 8:00 P.M.
25  AGENTS WITH ATLANTA TASK FORCE GROUP TWO CONDUCTED A
```

1  KNOCK-AND-TALK AT 6750 PEACHTREE INDUSTRIAL BOULEVARD, APARTMENT

2  L-8.

3  Q.   AND WHAT WAS TO BE YOUR ROLE?

4  A.   MY ROLE WAS TO BE ON OUTSIDE JUST IF SOMEBODY, I GUESS, HAD

5  RAN FROM THE APARTMENT OR JUST OUTSIDE PERIMETERS TO MAKE SURE

6  THAT THE OFFICERS WHO WERE DOING THE KNOCK-AND-TALK WERE SAFE.

7  Q.   OKAY.  AND STARTING FROM THE BEGINNING, WHAT OCCURRED THAT

8  DAY?

9  A.   WHEN I PULLED UP TO THE APARTMENT L-8, THERE WAS A MALE WHO

10  WAS COMING OUT WALKING TWO DOGS.

11  Q.   AND, NOW, WHEN YOU SAY YOU "PULLED UP," WHAT TYPE OF CAR

12  WERE YOU IN?

13  A.   I WAS IN A --

14  Q.   MARKED OR UNMARKED, I GUESS?

15  A.   IT WAS AN UNMARKED CAR.

16  Q.   HOW WERE YOU DRESSED?

17  A.   I HAD, LIKE, BLUE JEANS ON AND A BULLETPROOF VEST THAT SAID

18  "SHERIFF" ON IT.

19  Q.   WERE YOU ARMED?

20  A.   I WAS.

21  Q.   DID YOU HAVE YOUR GUN DRAWN OR OUT?

22  A.   NO, SIR.

23  Q.   AND YOU INDICATED THAT THE VEST THAT YOU HAD ON -- OR NOT

24  THE VEST, LITTLE -- THE JACKET THAT YOU HAD ON WAS LABELED.  WAS

25  IT LABELED IN THE WAY THAT ANYBODY COULD TELL YOU WERE WITH THE

1   POLICE?

2   A.   YES, SIR.  IT SAID "SHERIFF" ON THE FRONT AND "SHERIFF" ON

3   THE BACK.

4   Q.   WHAT HAPPENED NEXT?

5   A.   I SAW A HISPANIC MALE WALKING TWO DOGS RIGHT IN THE

6   VICINITY OF THE BREEZEWAY WHICH LED UP TO THE APARTMENT L-8.  I

7   APPROACHED THE MALE, ASKED HIM IF HE HAD ANY I.D. OR WHERE HE

8   WAS COMING FROM.  THE HISPANIC MALE -- WE COULDN'T REALLY

9   COMMUNICATE.

10  Q.   AND WHY COULDN'T YOU COMMUNICATE?

11  A.   I SPOKE ENGLISH AND HE COULD NOT SPEAK ENGLISH.

12  Q.   AND DO YOU SPEAK ANY OTHER LANGUAGE OTHER THAN ENGLISH?

13  A.   NO, SIR.

14  Q.   WHAT LANGUAGE DO YOU BELIEVE HE SPOKE?

15  A.   I BELIEVE HE SPOKE SPANISH.

16  Q.   AND WHY DO YOU BELIEVE THAT?

17  A.   JUST BASED ON THE FACT THAT HE WAS A HISPANIC MALE, I WAS

18  JUST MAKING A GENERALIZED ASSUMPTION THAT HE SPEAKS SPANISH.

19  Q.    SO AFTER YOU STATED OR ASKED HIM FOR HIS INFORMATION, WHAT

20  HAPPENED NEXT?

21  A.   HE ACTUALLY -- I WROTE HIS INFORMATION DOWN.  HE HANDED ME

22  A -- AN I.D. WHICH WAS NOT A U.S. GOVERNMENT-ISSUED I.D.  IT WAS

23  JUST SOME FORM -- IT WAS, LIKE, A GREEN CARD AND I THINK IT HAD

24  THE WORD "MEXICO" WROTE ON IT.

25  Q.   SO WHEN YOU ASKED HIM IN ENGLISH FOR HIS IDENTIFICATION, HE

1  PROVIDED TO YOU, ALTHOUGH YOU PERCEIVED THAT HE DIDN'T

2  UNDERSTAND ENGLISH?

3  A.   YES.  HE PROVIDED THE I.D. JUST BECAUSE I HAD TO USE I.D.,

4  I JUST USED MY HAND LIKE THIS, I.D., AND HE JUST UNDERSTOOD THAT

5  THAT'S WHAT HE NEEDED, BUT THERE WAS NO OTHER CONVERSATIONS

6  AFTER THAT.

7  Q.   AND WHAT -- WHY DO YOU THINK HE UNDERSTOOD WHAT YOU SAID?

8  A.   I WOULD ASSUME THAT HE'D PROBABLY BEEN APPROACHED BY THE

9  POLICE BEFORE IN THE PAST AND HAD BEEN ASKED FOR HIS I.D. AND

10  MAYBE HAD LIVED HERE FOR SOME TIME AND HAD PICKED UP SOME WORDS.

11  Q.   WHAT HAPPENED NEXT?

12  A.   I WROTE THE INFORMATION DOWN.  ON THE I.D. IT SAID ALBEAR

13  CAMERINO.  I JUST WROTE IT DOWN ON A SMALL PIECE OF PAPER I HAD

14  IN MY POCKET, AND HE CONTINUED TO WALK HIS DOG.

15  Q.   NOW, WAS THE IDENTIFICATION -- DID IT HAVE A PICTURE AS

16  WELL?

17  A.   IT DID.

18  Q.   OKAY.  SO THERE WAS A PICTURE.  AND DID THE PICTURE MATCH

19  THE PERSON WHO YOU WERE TALKING TO?

20  A.   YES.

21  Q.   IN ADDITION TO WHAT YOU JUST TESTIFIED TO, WAS THERE ANY

22  OTHER CONVERSATION OR ATTEMPTED CONVERSATION BETWEEN YOU AND

23  THAT INDIVIDUAL IN THE PARKING LOT, EITHER WHAT YOU SAID OR WHAT

24  HE SAID?

25  A.   NO.

1  Q.   APPROXIMATELY HOW LONG DID THE INTERACTION LAST?

2  A.   JUST A FEW MINUTES, I MEAN, LESS THAN FIVE MINUTES.  I WAS

3  WAITING FOR THE -- THE OFFICERS THAT WERE DOING THE

4  KNOCK-AND-TALK TO MAKE SURE THAT THEY WERE OKAY GOING INSIDE THE

5  BUILDING.  I JUST KIND OF KEPT AN EYE ON HIM.

6  Q.   NOW, YOU SAY, "KEPT AN EYE ON HIM."  WAS HE STANDING THE

7  ENTIRE TIME, OR JUST DID THERE COME A POINT WHERE HE SAT DOWN?

8  A.   THERE WAS A TIME WHERE HE ACTUALLY SAT DOWN ON THE CURB.

9  Q.   AT HIS DIRECTION?  I MEAN, HIS OR YOUR DIRECTION OR --

10 A.   YES.  I ASKED HIM IF HE WANTED TO HAVE A SEAT ON THE CURB

11 WHILE THEY WERE DOING THEIR KNOCKING ON THE DOOR.

12 Q.   AND WHAT DID HE --

13 A.   AND HE --

14 Q.   WHAT DID HE SAY OR WHAT DID HE DO?

15 A.   HE JUST SAT DOWN ON THE CURB STILL WITH THE TWO DOGS RIGHT

16 BESIDE HIM.

17 Q.   THE DOGS WERE -- WHAT TYPE OF DOGS, IF YOU RECALL?

18 A.   THEY WERE LITTLE BITTY SMALL DOGS.  I DON'T KNOW THE BREED,

19 THE ACTUAL BREED, BUT THEY WERE VERY MINIATURE DOGS, TINY DOGS.

20 Q.   ON A LEASH OR WALKING BY THEMSELVES?

21 A.   ON A LEASH.

22 Q.   BOTH OF THEM?

23 A.   YES, I BELIEVE SO.

24 Q.   WHAT HAPPENED NEXT?

25 A.   I ASKED AGENT HEWITT IF HE WAS OKAY.

UNITED STATES DISTRICT COURT OFFICIAL CERTIFIED TRANSCRIPT

```
 1   Q.   WAS AGENT HEWITT WITH YOU?
 2   A.   SHE WAS -- SHE WAS APPROXIMATELY, LIKE, 50 FEET AWAY.  SHE
 3   WASN'T BESIDE ME.  WE COULDN'T CARRY A CONVERSATION, BUT I
 4   ACTUALLY HAD TO YELL TO HER, WAS HE OKAY.
 5   Q.   AND WHAT WAS HER RESPONSE TO YOU?
 6   A.   SHE GAVE ME THE THUMBS UP.
 7   Q.   WHAT DID YOU UNDERSTAND THAT TO MEAN?
 8   A.   THAT IT WAS OKAY FOR HIM TO -- FOR ME TO WALK AWAY FROM HIM
 9   AND TO GO ASSIST WITH THE SEARCH, THAT HE WAS NOT INVOLVED.
10   Q.   NOW, WITH RESPECT TO THE INDIVIDUALS WHO WERE SEARCHING OR
11   TRYING TO SEARCH APARTMENT L-8, WHERE WERE THEY IN RELATION TO
12   YOU?
13   A.   THEY WERE OFF TO MY LEFT.  I WAS --
14   Q.   FIRST FLOOR, UP -- UP -- OFF THE GROUND OR ON THE GROUND?
15   A.   THEY WERE UPSTAIRS.
16   Q.   DID YOU HAVE ANY INTERACTION WITH THEM --
17   A.   NO, NOT WHILE --
18   Q.   -- WHILE YOU WERE WITH THE INDIVIDUAL WITH THE TWO DOGS?
19   A.   NO, SIR.
20   Q.   NOW, YOU INDICATED OR YOU TESTIFIED THAT YOU YELLED OUT TO
21   AGENT HEWITT AND SHE MOTIONED BACK TO YOU A THUMBS UP.  AND TELL
22   US AGAIN WHAT YOU PERCEIVE THAT TO MEAN?
23   A.   I PERCEIVED IT TO MEAN THAT THE GENTLEMAN THAT WAS SITTING
24   ON THE CURB WAS OKAY, THAT HE WASN'T INVOLVED WITH THE
25   KNOCK-AND-TALK, AND, SO I WALKED AWAY.
```

1  Q.    AND WHAT DID THE INDIVIDUAL DO NEXT WHO HAD THE TWO DOGS?

2  A.    I -- I -- I DIDN'T PAY ATTENTION TO HIM.  EVENTUALLY IT WAS

3  ASKED, WHERE IS THE GENTLEMAN WITH THE TWO DOGS?  I TURNED

4  AROUND, AND HE WAS GONE.

5  Q.    WHO ASKED -- WELL, WAS THAT ASKED OF YOU?

6  A.    YEAH, I BELIEVE IT WAS ASKED OF ME BY G.S. KEITH CROMER.

7  Q.    WHAT HAPPENED NEXT?

8  A.    I ACTUALLY -- WE WALKED AROUND THE APARTMENT COMPLEX TRYING

9  TO FIND THE HISPANIC MALE WITH TWO DOGS, BUT WE WEREN'T ABLE TO

10 LOCATE HIM.

11 Q.    DID YOU DO ANYTHING IN FOLLOW-UP TO THE THUMBS-UP SIGN WITH

12 RESPECT TO WHAT IT MEANT OR HAD MEANT?

13 A.    YEAH.  I ASKED -- BECAUSE THEY WERE TRYING TO FIGURE OUT

14 WHERE IS THE GUY WITH THE TWO DOGS, AND I EXPLAINED THAT I

15 THOUGHT THAT AGENT HEWITT WAS SAYING -- GIVING ME THE THUMBS UP

16 THAT HE'S OKAY TO GO, BUT IT WAS ACTUALLY THAT IT'S THUMBS UP

17 THAT EVERYBODY WAS SAFE IN THE KNOCK-AND-TALK, I GUESS THEY WERE

18 COMMENCING WITH THE INTERVIEWS OR WHATEVER AT THAT TIME.

19 Q.    SO THERE WAS MISCOMMUNICATION ABOUT WHAT THE THUMBS UP

20 MEANT?

21 A.    YES, SIR.

22 Q.    DID YOU AND/OR AGENT CROMER FIND THE INDIVIDUAL WITH THE

23 TWO DOGS?

24 A.    NO, SIR.

25 Q.    AND APPROXIMATELY HOW LONG DID YOU LOOK FOR HIM?

```
1   A.   A FEW HOURS.  I MEAN, THE WHOLE TIME THEY WERE THERE WE
2   WERE TRYING TO FIND HIM.
3   Q.   WHAT HAPPENED NEXT, TO YOUR KNOWLEDGE?  WHAT HAPPENED NEXT?
4   A.   IN RESPECT TO --
5   Q.   WELL, SO THE INDIVIDUAL WITH THE TWO DOGS HAD LEFT.  WITH
6   RESPECT TO THE SEARCH, DID A SEARCH OCCUR, TO YOUR KNOWLEDGE?
7   A.   YES, THE SEARCH OCCURRED.
8   Q.   AND AT ANY POINT DURING THE COURSE OF THAT DAY AFTER THE
9   INDIVIDUAL WITH THE TWO DOGS LEFT, DID YOU EVER ENCOUNTER THE
10  INDIVIDUAL WITH THE TWO DOGS AGAIN?
11  A.   NO, NOT THAT I'M AWARE OF.
12  Q.   NOT THAT DAY?
13  A.   NOT THAT DAY, NO.
14  Q.   OR AT ALL THAT YOU'RE AWARE OF?
15  A.   NO.
16  Q.   IN FACT TO YOUR KNOWLEDGE HAVE YOU ENCOUNTERED, EXCUSE ME,
17  THE INDIVIDUAL WITH THE TWO DOGS AGAIN?  HAVE YOU ENCOUNTERED
18  HIM?
19  A.   I CAN'T DEFINITIVELY SAY THAT I HAVE SEEN THE GUY AGAIN.  I
20  MEAN, IT WAS A BRIEF ENCOUNTER.  I REALLY DON'T REMEMBER EXACTLY
21  WHAT HE LOOKED LIKE.
22  Q.   AND JUST AT THE TIME THAT YOU ENCOUNTERED HIM IN THE
23  PARKING LOT, WAS IT DAY OR NIGHT?
24  A.   IT WAS AT 8:00 AT NIGHT.  THE SUN WAS BEGINNING TO GO DOWN.
25  IT'S OBVIOUS -- SO THE SUN WOULD HAVE BEEN LATER, SO IT WOULD
```

1  HAVE BEEN LATE EVENING.

2  Q.   AND IF YOU CAN PUT A TIME FRAME ON IT, APPROXIMATELY HOW

3  LONG WAS YOUR ENCOUNTER WITH HIM?

4  A.   LESS -- LESS -- IT WAS FIVE MINUTES MAYBE.

5          MR. WILLIAMS:  YOUR HONOR, I HAVE NO FURTHER QUESTIONS

6  AT THIS TIME.

7          THE COURT:  OKAY.  MR. SHREENATH, YOUR WITNESS.

8          MR. SHREENATH:  THANK YOU, JUDGE.

9                    CROSS-EXAMINATION

10  BY MR. SHREENATH:

11  Q.   AGENT HOOKS, YOU JUST TESTIFIED THAT THE ENCOUNTER WITH THE

12  GUY WHO HAD THE TWO DOGS WAS ABOUT FIVE MINUTES; IS THAT

13  CORRECT?

14  A.   FROM WHAT I REMEMBER, YES, SIR.

15  Q.   OKAY.  DO YOU RECALL WHAT KIND OF CLOTHES HE WAS WEARING?

16  A.   NO, SIR.

17  Q.   YOU SAID IT WAS AUGUST 2011.  WAS IT -- WAS HE WEARING

18  CLOTHES THAT SEEMED LIKE SUMMERTIME CLOTHES?

19  A.   YEAH.  SOME PEOPLE WEAR BLUE JEANS, SOME PEOPLE WEAR

20  SHORTS.  I MEAN, I DON'T -- I DON'T KNOW IF HE HAD SHORTS OR

21  BLUE JEANS OR KHAKI POINTS ON OR KHAKI -- I DON'T -- I DON'T

22  REMEMBER.

23  Q.   DO YOU KNOW IF HE WAS WEARING A T-SHIRT OR A TANK TOP OR

24  LONG-SLEEVE SHIRT?

25  A.   NO.

1  Q.   OKAY.  DO YOU RECALL ANYTHING ABOUT HIS CLOTHING

2  DESCRIPTION IN TERMS OF THE COLOR OF CLOTHES OR ANYTHING LIKE

3  THAT?

4  A.   NO, SIR.

5  Q.   DO YOU RECALL ANYTHING DISTINGUISHING ABOUT THIS

6  INDIVIDUAL?

7  A.   THAT HE WAS WALKING TWO DOGS, NOTHING AS A PERSONAL

8  DESCRIPTIVE-WISE, NO, SIR.

9  Q.   OKAY.  ANY KIND OF TATTOOS OR ANYTHING LIKE THAT?

10  A.   NO, SIR.

11  Q.   OKAY.  ANY -- WHAT ABOUT FACIAL HAIR, DO YOU RECALL?

12  A.   NO, SIR.

13  Q.   NO AS IN, NO, YOU DON'T RECALL, OR, NO, HE DIDN'T HAVE ANY

14  FACIAL HAIR?

15  A.   NO, SIR, I DON'T RECALL ANY PHYSICAL DESCRIPTIVE.

16  Q.   AND YOU MENTIONED THAT THE -- THE INDIVIDUAL, HE GAVE

17  YOU -- WHEN YOU SAID I.D., AS YOU POINTED OUT WITH YOUR FINGERS,

18  HE GAVE YOU SOME KIND OF A I.D.; CORRECT?

19  A.   IT WAS SOME SORT OF I.D. WITH A NAME AND A PHOTOGRAPH ON

20  IT.

21  Q.   OKAY.  AND YOU SAID MEXICAN GREEN CARD.  YOU MEAN A MEXICAN

22  I.D., BUT NOT A U.S. GREEN CARD; IS THAT RIGHT?

23  A.   IT WASN'T -- THE I.D. WAS GREEN IN COLOR.  IT WAS NOT AN

24  OFFICIAL UNITED STATES GREEN CARD.

25  Q.   OKAY.

1  A.   OR I DON'T KNOW IF IT WAS A MEXICAN CONSULATE CARD.  I JUST

2  REMEMBER IT BEING GREEN, IT SAID "MEXICO" ON IT, AND IT HAD A

3  NAME AND BIRTH DATE.

4  Q.   AND THE NAME AND DATE OF BIRTH WAS -- THE NAME OF THE

5  INDIVIDUAL WAS ALBEAR CAMERINO; CORRECT?

6  A.   YES.

7  Q.   AND YOU GOT A CHANCE TO LOOK AT THE PICTURE; CORRECT?

8  A.   YES, SIR.

9  Q.   OKAY.  AND WHEN YOU LOOKED AT THE PICTURE YOU SAID THAT THE

10 PICTURE MATCHED THE PERSON THAT WAS STANDING IN FRONT OF YOU;

11 CORRECT?

12 A.   YES.

13         MR. SHREENATH:  MAY I APPROACH THE WITNESS, YOUR

14 HONOR?

15         THE COURT:  YES, YOU MAY.

16 BY MR. SHREENATH:

17 Q.   I WANT TO HAND YOU WHAT'S BEEN MARKED AS D1.

18 A.   OKAY.

19 Q.   IT'S A DOCUMENT WITH A PHOTOGRAPH; CORRECT?

20 A.   IT'S A PIECE OF PAPER WITH A PHOTOGRAPH AND NAME ON IT.

21 Q.   OKAY.  DO YOU RECOGNIZE THE PHOTO ON THAT PIECE OF PAPER?

22 A.   NO, SIR.

23 Q.   DO YOU RECALL THE PHOTO THAT YOU SAW OF THE INDIVIDUAL THAT

24 GAVE YOU THE IDENTIFICATION CARD ON AUGUST 23RD, 2011?

25 A.   NO, SIR.

1  Q.   OKAY.  YOU HAD MENTIONED THAT YOU HAD BEEN ON THE TASK

2  FORCE FOR ABOUT TWO WEEKS ON OR ABOUT AUGUST 23RD, 2011;

3  CORRECT?

4  A.   YES, SIR.

5  Q.   OKAY.  AND YOU GOT THERE AT WHAT TIME?  DO YOU RECALL?

6  A.   TO THAT APARTMENT?

7  Q.   YES.

8  A.   RIGHT AS EVERYBODY ELSE WAS, SO RIGHT ABOUT 8:00.

9  Q.   8:00 IN THE EVENING.  OKAY.  AND THE APARTMENT BUILDING, IS

10 THAT TWO STORIES OR THREE STORIES?

11 A.   I BELIEVE IT'S TWO STORIES.

12 Q.   OKAY.  AND DO YOU KNOW WHERE L-8 WAS IN RELATION TO THE

13 APARTMENT BUILDING?

14 A.   I KNOW IT WAS UPSTAIRS.  I DON'T KNOW IN RELATION TO -- I

15 GUESS, WHERE WE WERE STANDING, I DON'T KNOW IF IT'S THE FRONT OR

16 THE BACK BECAUSE IT'S KIND OF, LIKE, IN THE MIDDLE.

17 Q.   OKAY.

18 A.   L-8 -- THE WHOLE BUILDING WAS IN THE MIDDLE OF THE

19 APARTMENT COMPLEX AND THERE WERE APARTMENTS ON EITHER SIDE.

20 Q.   AND WHEN YOU SAY IT WAS UPSTAIRS, ARE YOU -- ARE YOU SAYING

21 YOU HAD TO GO ONE FLIGHT OF STEPS OR TWO FLIGHTS OF STEPS TO GET

22 TO L-8?

23 A.   I DON'T KNOW IF IT'S A -- I DON'T REMEMBER IF IT'S

24 CATTY-CORNERED OR IF IT'S ONE FLIGHT UP.  I DON'T REMEMBER IF

25 THERE'S A BREAK.

1    Q.    YOU TESTIFIED THAT THE PERSON WHO WAS OUT WALKING THE TWO

2    DOGS CAME OUT OF THE AREA THAT WAS L-8; IS THAT CORRECT?

3    A.    YES, SIR.

4    Q.    OKAY.  WHAT DO YOU MEAN BY -- WHAT EXACTLY -- WHERE EXACTLY

5    DID YOU SEE HIM IN RELATION TO THE L-8 APARTMENT?

6    A.    IN MOST APARTMENTS THEY HAVE, LIKE, I GUESS, WHAT YOU CALL

7    A BREEZEWAY, AND THERE'S AN ENTRANCE AND SEVERAL DOORS INSIDE OF

8    ONE BREEZEWAY HALLWAY WHERE YOU CAN ACCESS THE MULTIPLE

9    APARTMENTS.  AND HE HAD JUST CAME OUT OF DOWNSTAIRS, THE

10   BREEZEWAY LEADING UP TO L-8.

11   Q.    AND ARE YOU SURE IT WAS -- HE DIDN'T COME OUT OF L-7?

12   A.    I DIDN'T SEE HIM COME OUT OF AN APARTMENT.

13   Q.    OKAY.

14   A.    I WAS OUTSIDE.  I CAN'T --

15   Q.    JUST A COMMON AREA?

16   A.    YEAH, JUST A COMMON AREA.  I COULDN'T SEE INSIDE OF THAT

17   COMMON AREA.

18   Q.    AT THIS POINT HAD THE OTHER OFFICERS APPROACHED APARTMENT

19   L-8 TO YOUR KNOWLEDGE?

20   A.    IT WAS KIND OF AT THE SAME TIME.  THEY WERE APPROACHING IT

21   AS HE WAS -- HAD JUST -- WAS COMING OUT.

22   Q.    OKAY.  SO HE WOULD HAVE GONE PAST THE OFFICERS BEFORE HE

23   GOT TO YOU; CORRECT?

24   A.    HE WENT PAST -- I KNOW HE WENT PAST SPECIAL AGENT MARA

25   HEWITT BEFORE HE GOT TO ME.

1  Q.   OKAY.

2  A.   I WAS, LIKE, THE LAST ONE TO WALK UP.

3  Q.   WHERE WAS SPECIAL AGENT MARA HEWITT IN RELATION TO THE

4  APARTMENT AND THE APARTMENT COMPLEX?

5  A.   RIGHT AT THE -- RIGHT -- GOING RIGHT AT THE BREEZEWAY.

6  Q.   OKAY.  AND IS THIS THE SAME AGENT MARA HEWITT THAT YOU

7  ASKED TO SEE IF IT WAS ALL RIGHT TO ALLOW THIS GENTLEMAN TO KEEP

8  PROCEEDING?

9  A.   YES, SIR.

10  Q.   OKAY.  SO YOUR TESTIMONY IS THAT YOU SAW HIM COMING OUT OF

11  THE BREEZEWAY AREA OF L-8 --

12  A.   MM-HUM.

13  Q.   -- APARTMENT AS HE'S WALKING DOWN THE STEPS; CORRECT?

14  A.   I DIDN'T SEE HIM WALK DOWN THE STEPS.  I JUST SEE HIM COME

15  OUT OF THE COMMON AREA, AND IT'S REAL DARK AS YOU, LIKE, WALK

16  UP.  I MEAN, I COULDN'T SEE IF HE CAME OUT OF THE STEPS OR HAD

17  JUST CAME OUT OF THE BREEZEWAY.  HE WAS STANDING RIGHT NEAR IT.

18  Q.   OKAY.  AND THERE'S NO ELEVATOR FOR THIS APARTMENT

19  COMPLEX --

20  A.   NO, SIR.

21  Q.   -- OF THIS 6750 APARTMENT BUILDING; CORRECT?

22  A.   NOT THAT SPECIFIC BUILDING, NO.

23  Q.   OKAY.  AND DID YOU ACTUALLY ASK AGENT HEWITT WHETHER IT WAS

24  OKAY TO GO, OR DID YOU JUST SORT OF POINT TO THE INDIVIDUAL AND

25  THEN --

1  A.   I WAS, LIKE, IS HE GOOD?  I DON'T REMEMBER IF HE WAS ON MY

2  RIGHT OR LEFT OR IF I POINTED.  I MEAN, I DON'T -- I DON'T THINK

3  I WOULD HAVE POINTED RIGHT AT HIM AND SAID, IS HE GOOD?  BUT SHE

4  WASN'T NEXT TO ME.  I HAD TO YELL.  AND SHE HAD TO GIVE ME THE

5  THUMBS UP.

6  Q.   OKAY.  AND YOU SAID SHE WAS FAIRLY CLOSE TO YOU; IS THAT

7  CORRECT?

8  A.   NO.  FAIRLY FAR FROM -- AT LEAST PROBABLY 50 FEET, 30 OR

9  50 FEET.  I MEAN, THAT'S A GUESSTIMATE.

10  Q.   SO SHE COULD SEE THE INDIVIDUAL THAT YOU WERE REFERRING TO?

11  A.   YES.

12  Q.   OKAY.  DID YOU MAKE ANY KIND OF REPORT IN RELATION TO YOUR

13  INVOLVEMENT IN THIS CASE?

14  A.   YES.

15  Q.   OKAY.  AND WHAT KIND OF REPORT DID YOU PROVIDE?

16  A.   IT WAS A INVESTIGATIVE REPORT FROM A D.E.A. INVESTIGATIVE

17  REPORT.

18  Q.   ALL RIGHT.  AND AT SOME POINT YOU SEARCHED ONE OF THE

19  VEHICLES THAT WAS ON THE LOCATION; CORRECT?

20  A.   MM-HUM, YES, SIR.

21  Q.   OKAY.  AND DO YOU KNOW ABOUT WHAT TIME YOU MAY HAVE

22  CONDUCTED THE SEARCH OF THE VEHICLE?

23  A.   I DON'T KNOW SPECIFICALLY.  I MEAN, I GUESS IT WOULD BE

24  AFTER 9:00, 9:00.  IT WAS DARK OUTSIDE.

25  Q.   AND THE VEHICLE THAT YOU SEARCHED, DID THAT BELONG TO

1    CARLOS AREVELO?

2    A.    I'M ASSUMING IT DID.  HE GAVE ME HIS KEYS AND SAID I COULD

3    SEARCH HIS CAR, AND THAT'S WHERE I WENT.

4    Q.    SO IN THE TIME THAT YOU -- WHAT TIME DID YOU LEAVE THE

5    PREMISES THAT NIGHT?

6    A.    IT WAS WELL AFTER MIDNIGHT.

7    Q.    OKAY.  SO IN THE FOUR OR SO HOURS DID YOU HAVE ANY OTHER

8    INDICATION OF EITHER YOU OR SOMEBODY ELSE SPOTTING THIS

9    INDIVIDUAL WITH THE TWO DOGS?

10   A.    NO, SIR.

11   Q.    OKAY.  AND YOU DON'T HAVE ANY KIND OF AUDIO OR VIDEO

12   SURVEILLANCE OF YOUR ENCOUNTER WITH THIS INDIVIDUAL; CORRECT?

13   A.    NO, SIR.

14   Q.    IS THAT BECAUSE YOU DIDN'T -- YOU WERE JUST APPROACHING HIM

15   AS YOU WERE WALKING UP --

16   A.    WELL, MY CAR IS NOT EQUIPPED WITH AUDIO OR VIDEO RECORDING

17   DEVICES.

18   Q.    OKAY.  DID YOU -- DID YOU HAVE YOUR CELL PHONE WITH YOU?

19   A.    I BELIEVE SO.

20   Q.    OKAY.  DID YOU WRITE DOWN ANY INFORMATION FROM THE I.D.?

21   A.    JUST THE NAME AND THE BIRTHDAY.

22   Q.    THAT'S ALL YOU WROTE?

23   A.    I BELIEVE SO, YEAH.

24   Q.    DID THE I.D. HAVE ANY KIND OF HEIGHT OR WEIGHT INFORMATION?

25   A.    I DON'T -- I DON'T REMEMBER.  I DON'T KNOW IF IT DID.  I

 1  DIDN'T -- DON'T REMEMBER WRITING IT DOWN.

 2  Q.   OKAY.  DID YOU EVER SHOW THAT I.D. TO ANYBODY ELSE THAT WAS

 3  THERE --

 4  A.   NO, SIR.

 5  Q.   -- WITH YOU?  OKAY.  AND I KNOW YOU SAID YOU DON'T SPEAK

 6  SPANISH; CORRECT?

 7  A.   NO.

 8  Q.   AND OTHER THAN THE GENTLEMAN HANDING YOU AN I.D., WAS THERE

 9  ANY OTHER COMMUNICATION BETWEEN YOU AND THIS GENTLEMAN, WHETHER

10  VERBAL OR BY MAKING GESTURES, BETWEEN YOU AND THIS INDIVIDUAL

11  WITH THE TWO DOGS?

12  A.   THAT -- I'M NOT UNDERSTANDING YOUR -- LIKE, IS THERE ANY

13  AFTER -- I MEAN, THERE WAS -- I COULDN'T REALLY TALK TO HIM.  HE

14  DIDN'T SPEAK ENGLISH, SO THERE WAS NO COMMUNICATIONS, YOU KNOW.

15  Q.   DID HE SAY ANYTHING ABOUT WHERE HE WAS COMING FROM OR

16  ANYTHING?

17  A.   YEAH.  HE -- WHEN I FIRST APPROACHED HIM HE HAD MENTIONED

18  THAT HE HAD BEEN FROM L-7, AND THAT'S WHEN I ASKED HIM FOR HIS

19  I.D.

20  Q.   OKAY.  AND --

21  A.   BUT AFTER THAT POINT, THEN THERE WERE NO FURTHER

22  COMMUNICATIONS.

23  Q.   SO WHEN YOU -- JUST SO I UNDERSTAND IT, YOU APPROACHED HIM

24  INITIALLY?

25  A.   MM-HUM.

```
 1  Q.   AND AT THAT POINT HE'S WALKING HIS -- THE TWO DOGS;
 2  CORRECT?
 3  A.   YES, SIR, YES.
 4  Q.   AND WHAT EXACTLY DID YOU SAY OR GESTURE TO HIM?
 5  A.   WHERE DO YOU LIVE AND DO YOU HAVE I.D.?
 6  Q.   OKAY.  AND HIS RESPONSE TO THOSE QUESTIONS WAS HE SAID IN
 7  SPANISH, L-7?
 8  A.   SOMEHOW -- I DON'T REMEMBER EXACTLY THE VERBATIM WORDS THAT
 9  WERE USED, BUT I REMEMBER IT WAS KIND OF HARD DISCUSSING WITH
10  HIM WHERE HE ACTUALLY LIVED.  AND EVENTUALLY IT WAS L-7 AND HE
11  PULLED HIS I.D. OUT.
12  Q.   HOW DID YOU -- THAT'S WHAT I'M TRYING TO GET AT.  HOW DID
13  YOU FIND OUT THAT HE LIVED IN L-7?
14  A.   I BELIEVE HE TOLD ME L-7.
15  Q.   OKAY.  ALL RIGHT.  SO HE BASICALLY SAID L-7?
16  A.   YES.
17  Q.   AND THEN GAVE YOU THE MEXICAN --
18  A.   YES.
19  Q.   -- I.D. OF SOME SORT?
20  A.   YES, SIR.
21  Q.   DO YOU KNOW IF ANYBODY -- IF YOU OR ANY OTHER OFFICERS HAVE
22  GONE TO VERIFY WHETHER THE INDIVIDUAL THAT WAS LEASING L-7 WAS
23  INDEED THE INDIVIDUAL THAT PRESENTED THE I.D. TO YOU?
24  A.   NO, SIR, NOT TO MY KNOWLEDGE, NO.
25          MR. SHREENATH:  NOTHING FURTHER, JUDGE.
```

```
1              THE COURT:  OKAY.  ANYTHING ELSE OF THIS WITNESS?

2              MR. WILLIAMS:  NO, YOUR HONOR.

3              THE COURT:  OKAY.  YOU MAY STEP DOWN.

4              MR. WILLIAMS:  YOUR HONOR, AT THIS TIME I'D CALL

5    OFFICER DONAHUE.

6              THE COURT:  OKAY.

7              COURTROOM DEPUTY CLERK:  SIR, IF YOU WOULD RAISE YOUR

8    RIGHT HAND, PLEASE, TO BE SWORN.  THANK YOU.

9                   (WITNESS SWORN.)

10             COURTROOM DEPUTY CLERK:  THANK YOU, SIR.  YOU CAN TAKE

11   YOUR SEAT.  AND IF YOU WOULD, PLEASE, SIR, STATE YOUR FULL NAME

12   FOR THE RECORD AND SPELL YOUR LAST NAME.

13             THE WITNESS:  SERGEANT T.P. DONAHUE, D-O-N-A-H-U-E.

14             COURTROOM DEPUTY CLERK:  THANK YOU.

15                      T.P. DONAHUE

16      CALLED AS A WITNESS BY THE UNITED STATES OF AMERICA, AFTER

17        HAVING BEEN FIRST DULY SWORN, TESTIFIED AS FOLLOWS:

18                    DIRECT EXAMINATION

19   BY MR. WILLIAMS:

20   Q.   OFFICER DONAHUE, FOR WHOM DO YOU WORK?

21   A.   THE DEKALB COUNTY POLICE DEPARTMENT.

22   Q.   AND WHAT IS YOUR CURRENT POSITION OR TITLE?

23   A.   CURRENTLY I'M A SERGEANT ASSIGNED TO THE UNIFORM DIVISION.

24   Q.   AND HOW LONG HAVE YOU BEEN A SERGEANT?

25   A.   I BELIEVE I WAS PROMOTED FEBRUARY 4TH OF THIS YEAR, SO
```

1    PROBABLY A MONTH AND A HALF.

2    Q.    AND WHAT WERE YOU BEFORE THAT?

3    A.    PRIOR TO THAT I WAS A DETECTIVE ASSIGNED TO THE NARCOTICS

4    UNIT.

5    Q.    AND APPROXIMATELY HOW LONG HAVE YOU BEEN A POLICE OFFICER,

6    NOT JUST DETECTIVE -- NOT JUST WITH THE NARCOTICS UNIT, BUT HOW

7    LONG HAVE YOU BEEN A POLICE OFFICER?

8    A.    11 YEARS AND A FEW WEEKS AS A POLICE OFFICER, AND I WAS

9    ASSIGNED AS A NARCOTICS DETECTIVE FOR APPROXIMATELY EIGHT YEARS.

10   Q.    TURNING YOUR ATTENTION TO THE INSTANT CASE, HOW DID YOU

11   FIRST BECOME INVOLVED?

12   A.    I WAS NOTIFIED OF THE -- THE INCIDENTS GOING ON -- THERE

13   WERE SEVERAL LOCATIONS -- BY MY SERGEANT, SERGEANT JOHN

14   CORTZ (VERBATIM), AND I WAS ADVISED TO GO TO A LOCATION OFF OF

15   PEACHTREE INDUSTRIAL BOULEVARD.

16   Q.    AND TURNING YOUR ATTENTION TO ON OR ABOUT AUGUST 23RD,

17   2011, IF THAT'S THE CORRECT DATE, CAN YOU TELL US WHAT OCCURRED

18   THAT DAY RELATED TO YOUR INVOLVEMENT IN THIS INVESTIGATION?  AND

19   WHEN I SAY "THIS INVESTIGATION" -- WELL, I'LL GET TO THAT.  BUT

20   INVESTIGATION OF AN INDIVIDUAL IN THE VICINITY OF -- I BELIEVE

21   IT'S 20 -- I'M SORRY.  6750 PEACHTREE INDUSTRIAL.

22   A.    I HAD PERFORMED A COUPLE DIFFERENT TASKS IN RELATION TO

23   THIS INVESTIGATION.  WHEN I FIRST ARRIVED I REMEMBER BEING TOLD

24   THAT THERE WAS AN INDIVIDUAL THAT WE WERE LOOKING FOR TIED TO

25   THAT APARTMENT, THAT THAT INDIVIDUAL WAS SUPPOSED TO BE WALKING

1  A DOG.  I GOT INTO MY VEHICLE AND BEGAN TO CIRCULATE THE

2  APARTMENT COMPLEX IN THE ATTEMPT TO LOCATE SOMEBODY WALKING A

3  DOG.

4  Q.   AND WHAT TYPE OF VEHICLE, BY THE WAY, POLICE CAR?

5  A.   NO.  I WAS IN AN UNDERCOVER VEHICLE.  IT WAS AN S.U.V.

6  Q.   SO WAS THAT UNMARKED?

7  A.   YES, IT WAS AN UNMARKED VEHICLE.  I WAS IN PLAIN CLOTHES.

8  IF YOU WERE TO SEE MY DRIVEWAY YOU WOULDN'T HAVE IMMEDIATELY

9  KNOWN I WAS A POLICE OFFICER OR A DETECTIVE.  I WAS JUST

10 CRUISING THE PARKING LOT TRYING TO FIND SOMEBODY MATCHING THE

11 DESCRIPTION THAT WAS GIVEN TO ME.

12 Q.   DID YOU FIND THAT PERSON?

13 A.   NO, I DID NOT.

14 Q.   WHAT HAPPENED NEXT?

15 A.   NEXT I PROCEEDED BACK TO THE APARTMENT, AND I WAS ADVISED

16 THAT CONSENT HAD BEEN GIVEN TO GO INTO THE APARTMENT, AND ONCE

17 THEY WERE INSIDE OF THE APARTMENT, THAT A QUANTITY OF ILLEGAL

18 NARCOTICS WERE OBSERVED.  AND THEY ASKED ME IF I WOULD BE ABLE

19 TO GET A SEARCH WARRANT SO THAT THEY COULD CONTINUE SEARCHING

20 THE APARTMENT.

21 Q.   AND WAS THE APARTMENT THAT YOU'RE DESCRIBING AT THIS 25 --

22 I'M SORRY.  I KEEP SAYING THAT.  2765 (VERBATIM) PEACHTREE

23 INDUSTRIAL?

24 A.   THAT SOUNDS CORRECT.

25 Q.   AND SPECIFICALLY WAS THE APARTMENT L-8?

1  A.   I BELIEVE SO, YES.

2  Q.   DID YOU IN FACT OBTAIN A SEARCH WARRANT, AND, IF SO, HOW?

3  A.   I WAS -- YES, A SEARCH WARRANT WAS SIGNED.  WHAT HAPPENED

4  WAS ONE OF THE AGENTS ON SCENE RELAYED TO ME WHAT THE PROBABLE

5  CAUSE WAS UP UNTIL THAT POINT AND WHAT WAS OBSERVED IN THE

6  APARTMENT AND HOW CONSENT TO GO INTO THE APARTMENT WAS OBTAINED.

7  I THEN CALLED ANOTHER DETECTIVE IN DEKALB COUNTY THAT WAS -- I

8  DON'T RECALL IF HE WAS AT THE COURTHOUSE ALREADY OR IF HE WAS AT

9  OUR OFFICE, BUT I RELAYED TO HIM OVER THE PHONE WHAT HAPPENED.

10  HE TYPED IT UP, WENT BEFORE A MAGISTRATE JUDGE, SIGNED THE

11  WARRANT, AND THE WARRANT WAS ISSUED BY THE MAGISTRATE JUDGE OF

12  DEKALB COUNTY, AND THEN THAT DETECTIVE BROUGHT IT UP TO US, AND

13  WE CONDUCTED A SEARCH OF THE APARTMENT.

14  Q.   DID YOU PERSONALLY PARTICIPATE IN THE SEARCH OF THE

15  APARTMENT?

16  A.   I DID.

17  Q.   NOW, I TAKE IT YOU DIDN'T SEARCH EVERY LOCATION IN THE

18  APARTMENT, ALL THE ROOMS, BUT IN ADDITION TO SEARCHING, WHAT, IF

19  ANYTHING, ELSE DID YOU DO?

20  A.   MY RESPONSIBILITIES IN THE NARCOTICS UNIT AS A DETECTIVE

21  WAS MOSTLY SURVEILLANCE AND PHOTOGRAPHING, RECORDING SUSPECTS

22  AND EVIDENCE.  SO I ASSISTED IN SEARCHING, BUT MOSTLY I WAS

23  TAKING PICTURES OF WHAT I WAS FINDING AND WHAT OTHER PEOPLE WERE

24  FINDING IN THE APARTMENT.

25  Q.   I'M SHOWING YOU WHAT'S BEEN MARKED AS GOVERNMENT'S EXHIBIT

```
 1   A1 THROUGH A34.  IF YOU COULD TAKE A LOOK AT EXHIBITS A1 THROUGH

 2   A34.  DO YOU RECOGNIZE EXHIBITS A1 THROUGH A34?

 3   A.   YES.

 4   Q.   AND WHAT ARE THEY?

 5   A.   THEY'RE PHOTOGRAPHS THAT I TOOK AT THE SCENE THAT NIGHT.

 6   Q.   AND ARE THEY ALL THE PHOTOGRAPHS THAT YOU TOOK OR JUST A

 7   SUBSET?

 8   A.   IT'S JUST A SUBSET.

 9   Q.   AND WHEN YOU SAY THE PHOTOGRAPHS THAT YOU TOOK THAT NIGHT,

10   WHAT DO YOU MEAN BY THAT?

11   A.   I MEAN, I TOOK -- I HAD A --

12   Q.   AND I GUESS WHAT I'M TRYING TO ASK -- I DON'T MEAN TO BE

13   CRYPTIC.  THEY'RE PHOTOGRAPHS YOU TOOK DURING THE COURSE OF THE

14   SEARCH OF ITEMS THAT WERE FOUND AT THE LOCATION?

15   A.   YES.

16   Q.   AND THIS IS APARTMENT L-8?

17   A.   YES, SIR.

18   Q.   OKAY.  AND ARE THOSE PICTURES ONES THAT YOU TOOK FAIR AND

19   ACCURATE DEPICTIONS OF WHAT WAS BROUGHT TO YOU AND THAT WAS

20   DISCOVERED AT THAT APARTMENT THAT NIGHT?

21   A.   YES.  WHENEVER POSSIBLE ITEMS WERE PHOTOGRAPHED IN THEIR

22   ORIGINAL CONDITION.  WE TRY TO DO THAT AS MUCH AS POSSIBLE.

23   SOMETIMES DURING A SEARCH SOMETHING WILL FALL AND NOT BE EXACTLY

24   AS IT WAS.  SOMETHING WILL FALL OUT OF A COAT POCKET AND IT

25   WON'T GET PHOTOGRAPHED AS IT WAS IN THE COAT POCKET.  IT MIGHT
```

1  BE ON THE FLOOR.  BUT, YES, THAT -- THIS IS HOW EVERYTHING

2  APPEARED THAT NIGHT TO THE BEST OF OUR ABILITY.

3          MR. WILLIAMS:  OKAY.  AND NOW I'M GOING TO GO THROUGH

4  THE PHOTOGRAPHS AND I'M GOING TO TRY TO GO THROUGH THEM

5  RELATIVELY QUICKLY.

6          THE WITNESS:  OKAY.

7          MR. WILLIAMS:  BUT, YOUR HONOR, AT THIS TIME I WOULD

8  OFFER GOVERNMENT'S EXHIBITS A1 THROUGH A34 INTO EVIDENCE AS

9  PHOTOGRAPHS TAKEN BY THIS DEFENDANT -- I MEAN, BY THIS WITNESS.

10         THE COURT:  ANY OBJECTION?

11         MR. SHREENATH:  NO, YOUR HONOR.

12         THE COURT:  A1 THROUGH 34 ARE ADMITTED.

13         MR. WILLIAMS:  THANK YOU, YOUR HONOR.

14  BY MR. WILLIAMS:

15  Q.  TURNING YOUR ATTENTION TO A1, WHAT IS THAT A PHOTOGRAPH OF?

16  A.  THE -- IT'S A PHOTOGRAPH OF A DOOR WITH THE PLACARD L-08 ON

17  IT.

18  Q.  OKAY.  AND IN OTHER -- IS THAT THE PHOTOGRAPHS OF THE DOOR

19  OF THE APARTMENT THAT WAS SEARCHED THAT NIGHT?

20  A.  YES.

21  Q.  TURNING YOUR ATTENTION TO EXHIBITS THAT HAVE BEEN ADMITTED

22  A2 AND A3, WHAT ARE THOSE EXHIBITS?

23  A.  A2 AND A3 ARE BOTH PHOTOGRAPHS OF INSIDE OF A DRESSER

24  DRAWER.  IT WAS INSIDE OF THE BACK BEDROOM, AS I RECALL.  A2 IS

25  A WIDER ANGLE SHOT, SHOWS A PASSPORT AND IT SHOWS A HANDGUN NEXT

1  TO THE PASSPORT, AND IT ALSO APPEARS THAT THERE IS SOME -- I

2  BELIEVE IT'S PACKAGING MATERIAL FOR SMALLER QUANTITIES OF

3  NARCOTICS.

4  Q.   NOW, WITH RESPECT TO THE PASSPORT, IS THERE A PHOTOGRAPH ON

5  THAT PASSPORT?

6  A.   YES, THERE IS.

7  Q.   AND IS THERE A NAME?

8  A.   YES, IT'S A LITTLE FUZZY, BUT THERE IS A NAME.

9  Q.   AND THE PHOTOGRAPH, THE INDIVIDUAL'S PHOTOGRAPH IN THAT

10 PICTURE, IS THERE ANYONE IN THIS COURTROOM TO WHOM THAT BEARS A

11 LIKENESS OF?

12 A.   I WOULD SAY THE DEFENDANT.

13 Q.   AND WHAT IS THE NAME ON THAT PASSPORT?

14 A.   THE FIRST NAME, I BELIEVE IT'S PABLO.  THE LAST NAME LOOKS

15 LIKE IT STARTS -- IT'S SPELLED C-A-M-A-N -- I'M SORRY.  I'M

16 STRUGGLING WITH IT.  AND THEN MAYBE THE NEXT LINE DOWN IS

17 A-R-Z-A-T-E.

18 Q.   BUT SOMETHING ALONG THE LINES OF PABLO ARZATE?

19 A.   YES.

20 Q.   TURNING YOUR ATTENTION TO EXHIBIT A4, WHAT IS THAT EXHIBIT?

21 A.   THIS APPEARS TO BE A RECEIPT FROM AN ANIMAL HOSPITAL

22 LOCATED ON SOUTH NORCROSS TUCKER ROAD, COMPANION ANIMAL

23 HOSPITAL.

24 Q.   SO IT'S ESSENTIALLY A VET BILL?

25 A.   YES, IT LOOK LIKE IT'S AN INVOICE.  AND THE NAME OF THE

```
 1   INDIVIDUAL LISTED ON THE INVOICE IS FERNANDO -- FERNANDOS MAYES,

 2   M-A-Y-E-S, I BELIEVE.

 3   Q.   TURNING YOUR ATTENTION TO EXHIBIT A5, WHAT IS THAT?

 4   A.   THIS IS ALSO A DRAWER THAT WAS IN THE BACK MASTER BEDROOM

 5   OF THE APARTMENT.  IT SHOWS LARGE QUANTITIES OF U.S. CURRENCY

 6   PACKAGED UP.  THERE'S ALSO A COUPLE OF PHOTOGRAPHS IN THERE.  I

 7   RECOGNIZE ONE OF THE PHOTOGRAPHS OF BEING ONE OF THE

 8   CO-DEFENDANTS IN THIS CASE, THE YOUNG MAN WHO GAVE CONSENT TO

 9   LET US INTO THE APARTMENT THAT NIGHT.

10   Q.   SO -- SO WITHIN THAT DRAWER, THE PHOTOGRAPH OF THE

11   INDIVIDUAL WHO OPENED THE DOOR AND GAVE CONSENT?

12   A.   YES.

13   Q.   TURNING YOUR --

14   A.   THERE'S ACTUALLY TWO PHOTOGRAPHS OF HIM IN THAT DRAWER THAT

15   I CAN SEE.

16   Q.   TWO PHOTOGRAPHS --

17        THE COURT:  I'M SORRY.  DID YOU SAY WHAT ROOM THAT WAS

18   IN?  I DIDN'T HEAR.

19   BY MR. WILLIAMS:

20   Q.   IF YOU COULD --

21        THE WITNESS:  THE MASTER BEDROOM, YOUR HONOR, THE SAME

22   AS THE OTHER PHOTOGRAPH OF THE DRAWER.

23   BY MR. WILLIAMS:

24   Q.   TURNING YOUR ATTENTION TO EXHIBITS A6 THROUGH A8, WHAT ARE

25   THOSE BRIEFLY?
```

1  A.   A6 IS SOME KIND OF PISTOL WITH A LONG EXTENDED MAGAZINE

2  CLIP HANGING OUT OF IT, UNSURE OF THE LOCATION WHERE IT WAS

3  TAKEN.  IT LOOKS LIKE IT'S IN A DRAWER.  I DON'T KNOW WHERE THAT

4  DRAWER WAS.  A7, AGAIN, MORE MONEY IN A DRAWER.  I BELIEVE THIS

5  WAS ALSO IN THE MASTER BEDROOM, BUT NOT IN THE DRESSER.  I

6  BELIEVE THIS WAS A SMALLER LITTLE FILING CABINET THAT ALSO HAD

7  CURRENCY IN IT.  A8 IS A DUFFEL BAG THAT WAS -- IF I REMEMBER,

8  IT WAS IN THAT MASTER BEDROOM AS WELL IN THE BACK.  IF YOU WERE

9  STANDING LOOKING AT THE DRESSER, THIS BAG WOULD HAVE BEEN TO

10  YOUR LEFT, IF I REMEMBER CORRECTLY, SITTING ON THE FLOOR.

11  Q.   AND THAT DUFFEL BAG, DOES IT HAVE MONEY IN IT?

12  A.   YES.  THERE'S ALSO SOME -- IT LOOKS LIKE SOME 20'S AND 50'S

13  BUNDLED UP.

14  Q.   AND WHEN YOU SAY, "BUNDLED UP," WHAT DO YOU MEAN BY THAT?

15  HOW -- DESCRIBE A BUNDLE AND HOW IS THAT.

16  A.   TYPICALLY IN THE DRUG WORLD AND IN THE CRIMINAL ELEMENT

17  THEY REFER TO THEM AS STACKS.  A STACK IS A THOUSAND DOLLARS

18  USUALLY AND IT WILL BE A THOUSAND DOLLARS EITHER BUNDLED UP IN

19  WHATEVER DENOMINATIONS, FIVE, TENS, TWENTIES.  IT WILL ADD UP TO

20  A THOUSAND DOLLARS AND THEY'LL WRAP SOME RUBBER BANDS AROUND IT.

21  AND THEN SOMETIMES YOU'LL SEE THEM TAKE THE THOUSAND-DOLLAR

22  STACKS AND STACK UP THE STACKS INTO 5,000-DOLLAR STACKS OR

23  10,000-DOLLAR STACKS.  BUT BECAUSE OF THE RUBBER BANDS AROUND

24  THE -- THE THOUSAND-DOLLAR STACKS, YOU CAN EASILY FLIP THROUGH

25  AND SEE HOW MUCH CURRENCY YOU HAVE TOTAL.

1  Q.   AND ARE THOSE BUNDLES OF MONEY CONSISTENT WITH THE

2  DESCRIPTION YOU JUST GAVE?

3  A.   YES.

4  Q.   TURNING YOUR ATTENTION TO EXHIBITS A11 THROUGH A12, WHAT

5  ARE THEY?

6  A.   A11 AND 12 ARE KILOS OF PRESSED COCAINE, IF I REMEMBER

7  CORRECTLY.  I DON'T RECALL HOW MANY THERE WERE.  A11 IS A BOX

8  THAT HAS QUITE A FEW -- OBVIOUSLY MORE THAN ONE, TWO, THREE,

9  FOUR -- MAYBE SIX OR SEVEN THAT I CAN SEE.  AND A12 IS A PICTURE

10  OF TWO THAT WERE JUST LAYING LOOSE ON THE FLOOR.

11  Q.   TURNING YOUR ATTENTION TO A13, WHAT IS THAT?

12  A.   A13 IS A ZIPLOC BAG, LOOKS LIKE IT'S PROBABLY A SANDWICH

13  BAG, MAYBE A LITTLE BIT LARGER THAN A BAG THAT YOU WOULD USE FOR

14  YOUR SANDWICHES, AND IT HAS LARGE CRYSTALS IN IT THAT I

15  RECOGNIZE FROM MY EXPERIENCE AND TRAINING TO BE CRYSTAL

16  METHAMPHETAMINE.

17  Q.   TURNING YOUR ATTENTION TO EXHIBITS A14 THROUGH 23, BRIEFLY

18  AND GENERALLY WHAT IS A14 THROUGH 23 PICTURES OF?

19  A.   A14 IS A NIGHTSTAND THAT WAS IN THE MASTER BEDROOM, AND

20  NEXT TO ON THE LEFT-HAND SIDE OF THE BED IN THE MASTER BEDROOM

21  THERE'S A -- I'M NOT SURE IF IT'S THE BOTTOM DRAWER, BUT IT'S

22  NOT THE TOP DRAWER, BUT I CAN SEE IT'S -- SECOND DRAWER FROM THE

23  TOP IT'S OPENED AND IT HAS A PISTOL VISIBLE IN IT.  THE NEXT

24  PICTURE IS A PICTURE OF A LONG GUN.  I'M NOT A FIREARMS EXPERT.

25  I BELIEVE IT'S A SHOTGUN.  AND I BELIEVE THAT WAS IN A CLOSET OR

```
 1   IT'S UP AGAINST THE WALL.  A16 IS -- IT'S UP CLOSE.  I CAN'T

 2   TELL IF IT'S A DRAWER.  IT APPEARS TO BE IN A DRAWER, ANOTHER

 3   BLACK HANDGUN.  A17, AGAIN, ANOTHER DRAWER.  THIS LOOKS LIKE

 4   IT'S THE TOP DRAWER OF THAT NIGHTSTAND NEXT TO THE BED IN THE

 5   MASTER BEDROOM.  THIS ONE APPEARS TO HAVE ONE -- TWO HANDGUNS IN

 6   IT.  I'M SORRY.  YOU SAID STOP AT A17?

 7   Q.    AND 23?

 8   A.    OKAY.  A18 LOOKS LIKE ANOTHER PICTURE OF THAT SAME SHOTGUN

 9   FROM A PREVIOUS PICTURE I DESCRIBED.  A19 LOOKS LIKE ANOTHER

10   HANDGUN IN A DRAWER.  THIS ONE IS UNDERNEATH A SHEET OF NOTEBOOK

11   PAPER, SO I DON'T BELIEVE IT'S ONE OF THE ONES THAT I'VE ALREADY

12   PHOTOGRAPHED.  A20 IS ALSO A HANDGUN IN A DRAWER.  A21 IS

13   ANOTHER SILVER HANDGUN.  I'M UNSURE OF THE LOCATION.  A22 IS A

14   BLACK PISTOL SITTING ON THE FLOOR NEXT TO WHAT APPEARS TO BE A

15   NIGHTSTAND.  AND A23 APPEARS TO BE TWO RIFLES LEANING UP AGAINST

16   THE WALL.

17   Q.    NOW, TURNING YOUR ATTENTION TO A26 THROUGH -- I'M SORRY,

18   A24 THROUGH A26, WHAT IS DEPICTED IN THOSE PHOTOGRAPHS?

19   A.    MORE STACKS OF MONEY IN A24, ONE, TWO, THREE -- THREE VERY

20   LARGE STACKS.  AND THE LARGE STACKS I CAN SEE ARE ALSO -- HAVE

21   WHAT APPEARS TO ME IN MY TRAINING AND EXPERIENCE TO BE

22   THOUSAND-DOLLAR STACKS BUNDLED UP INSIDE OF THEM.  A25 LOOKS

23   LIKE A SMALLER AMOUNT OF MONEY.  IT DOESN'T APPEAR TO BE A FULL

24   THOUSAND-DOLLAR STACK IN A25.  A26 LOOKS LIKE A25, BUT FROM A

25   DIFFERENT ANGLE FURTHER OUT, SOME $20 BILLS AND SOME $1 BILLS.
```

1    Q.    NOW, TURNING YOUR ATTENTION TO A27 --

2    A.    YES.

3    Q.    -- AND A29, WHAT ARE THOSE PHOTOGRAPHS OF?

4    A.    A27 IS A BOX FOR A MONEY COUNTER.  TYPICALLY YOU FIND THESE

5    IN LARGER SCALE DRUG-DEALING OPERATIONS.  IT'S JUST QUICKER AND

6    MORE CONVENIENT TO PUT YOUR MONEY IN THERE AND GET IT COUNTED

7    OUT FOR YOU THAN THUMBING THROUGH IT YOURSELF.  AND A29 IS THE

8    ACTUAL MONEY COUNTER ITSELF SITTING ON THE FLOOR OF THE

9    APARTMENT.

10   Q.    AND REALLY BRIEFLY, A28, WHAT IS THAT?

11   A.    STACKS OF MONEY, AGAIN, DENOMINATIONS.  LOOK LIKE THEY'RE

12   $10 BILLS AND $20 BILLS AND HUNDRED-DOLLAR BILLS BROKEN DOWN

13   INTO THE THOUSAND-DOLLAR STACKS I'VE DESCRIBED PREVIOUSLY.

14   Q.    TURNING YOUR ATTENTION TO EXHIBITS A30 AND A31, WHAT ARE

15   THOSE TWO?

16   A.    A31 IS A BOX FOR A 2.4 GIGAHERT (VERBATIM) WIRELESS

17   SURVEILLANCE SYSTEM.  AND A30 IS THE ACTUAL MONITOR FOR THAT

18   SURVEILLANCE SYSTEM.  THE MONITOR IS CURRENTLY DISPLAYING THE

19   OUTSIDE OF THE APARTMENT COMPLEX.

20   Q.    A32 AND A33, WHAT ARE THOSE?

21   A.    A32 AND A33 ARE ALTARS, FOR LACK OF A BETTER WORD, THAT WE

22   FIND IN A LOT OF LARGE SCALE -- PARTICULARLY WITH THE MEXICAN

23   CARTELS.  THE CHARACTERS DEPICTED HERE -- AGAIN, I'M NOT AN

24   EXPERT, BUT FROM MY TRAINING AND EXPERIENCE IT'S SANTA MUERTE.

25   IT'S THE PATRON SAINT OF DRUG DEALERS.  YOU MAKE OFFERINGS TO

```
 1   SANTA MUERTE, MONEY, CANDY --
 2           MR. SHREENATH:  OBJECTION.  CALLS FOR SPECULATION.
 3           MR. WILLIAMS:  WITHOUT -- WITHOUT -- WITHDRAWN.
 4   BY MR. WILLIAMS:
 5   Q.   LET ME JUST RE-ASK THE QUESTION.  WHAT IS THE -- SO, FIRST
 6   OF ALL, IN THOSE PICTURES, A32 THROUGH A33, ARE THEY CANDLES,
 7   AMONG OTHER THINGS?
 8   A.   YES.
 9   Q.   AND WHAT'S DEPICTED OR -- OR SHOWN ON THOSE CANDLES, IF YOU
10   CAN DESCRIBE THE PHOTO -- IF YOU CAN DESCRIBE THE -- I WON'T
11   CALL IT PHOTOGRAPH, BUT PAINTINGS OR DEPICTIONS ON THE CANDLES?
12   A.   IT'S SANTA MUERTE.
13   Q.   AND BASED ON YOUR TRAINING AND EXPERIENCE WHAT IS SANTA
14   MUERTE?
15   A.   SANTA MUERTE IS THE PATRON SAINT OF DRUG DEALERS, AND HE IS
16   SUPPOSED TO WARD OFF -- I'M SORRY.  SHE IS SUPPOSED TO WARD OFF
17   THE POLICE.
18   Q.   TURNING YOUR ATTENTION TO EXHIBIT A34, THE FINAL EXHIBIT,
19   WHAT DOES THAT DEPICT?
20   A.   THAT IS THE INSERT TO A BULLETPROOF VEST.  IT'S THE -- LIKE
21   I'M WEARING RIGHT NOW.  IT'S THE ACTUAL KEVLAR MATERIAL.
22   IT'S -- IT GOES INSIDE OF A HOLDER THAT WOULD HAVE STRAPS TO IT
23   THAT SOMEONE WOULD WEAR OVER THEM, BUT THAT'S THE ACTUAL
24   LIFE-SAVING MECHANISM THAT GOES INSIDE OF A BULLETPROOF VEST.
25   Q.   AND THESE ARE -- IF I -- AND THESE ARE PHOTOGRAPHS OF A
```

1  NUMBER OF THE THINGS THAT WERE FOUND AT THE APARTMENT WHERE

2  CONSENT WAS OBTAINED AND A SEARCH WARRANT, TO YOUR KNOWLEDGE?

3  A.   YES.

4          MR. WILLIAMS:  THANK YOU.  I HAVE NO FURTHER

5  QUESTIONS, YOUR HONOR.

6          THE COURT:  OKAY.  I THINK AT THIS JUNCTURE WE'RE

7  GOING -- BEFORE WE START THE CROSS-EXAMINATION -- IT'S FIVE

8  MINUTES 'TIL 1 -- I'LL GO AHEAD AND RECESS SO THAT THE DEFENDANT

9  CAN GET LUNCH AND THE COURT STAFF AND EVERYONE ELSE.  OKAY.  SO

10 IT IS FIVE MINUTES 'TIL 1.  WE'RE GOING TO GO AHEAD AND RECESS

11 UNTIL FIVE 'TIL 2.

12         MR. WILLIAMS:  THANK YOU, YOUR HONOR.

13             (RECESS TAKEN.)

14         THE COURT:  OKAY.  MR. SHREENATH, ARE YOU READY FOR

15 CROSS-EXAMINATION OF THE WITNESS?

16         MR. SHREENATH:  YES, YOUR HONOR.  THANK YOU.

17                 CROSS-EXAMINATION

18 BY MR. SHREENATH:

19 Q.   GOOD AFTERNOON, SERGEANT DONAHUE.

20 A.   GOOD AFTERNOON.

21 Q.   ON AUGUST 23RD, 2011, WHEN YOU GOT TO 6750 PEACHTREE

22 INDUSTRIAL BOULEVARD, WERE YOU FIRST ASKED TO LOOK FOR AN

23 INDIVIDUAL WITH TWO DOGS OR A DOG?

24 A.   I BELIEVE I WAS TOLD A DOG.

25 Q.   OKAY.  DID YOU HAVE ANY OTHER INFORMATION TO HELP YOU FIND

1  THIS INDIVIDUAL?

2  A.   THERE MAY HAVE BEEN A CLOTHING DESCRIPTION GIVEN OUT, BUT

3  I -- I DON'T RECALL.  IT WAS A YEAR AND A HALF AGO, AND I DIDN'T

4  WRITE IT DOWN.  IT WAS JUST, HEY, LOOK FOR THIS INDIVIDUAL.  AND

5  THE ONE -- THE ONE POINT I DO REMEMBER WAS A DOG.

6  Q.   OKAY.  DID -- WHO WAS IT THAT WAS GIVING YOU THIS

7  INFORMATION TO HELP YOU WITH THE SEARCH?

8  A.   I DON'T RECALL WHO GAVE US THAT INFORMATION.

9  Q.   AND DO YOU KNOW IF THIS INFORMATION WAS RELAYED TO YOU

10  BEFORE YOU GOT TO THE LOCATION, OR AFTER YOU GOT TO THE

11  LOCATION?

12  A.   IT WAS AFTER I GOT TO THE LOCATION BECAUSE I WAS OUT OF MY

13  VEHICLE, AND I WAS MAKING MY WAY TO THE APARTMENT.  AND I HAD TO

14  GO BACK TO MY VEHICLE TO CIRCULATE TO LOOK FOR THE INDIVIDUAL

15  WITH THE DOG.

16  Q.   AND YOUR VEHICLE, YOU TESTIFIED, WAS NOT A PATROL

17  VEHICLE --

18  A.   CORRECT.

19  Q.   -- AT THE TIME; CORRECT?

20  A.   CORRECT.

21  Q.   SO WAS THERE ANY SURVEILLANCE, A CAMERA OR ANYTHING LIKE

22  THAT ON YOUR VEHICLE?

23  A.   NO.

24  Q.   OKAY.  AND ABOUT HOW LONG DID YOU CONDUCT THE SEARCH FOR

25  THE PERSON WITH THE DOG?

1   A.   I'D BE GUESSING.  PROBABLY TEN TO 15 MINUTES.

2   Q.   OKAY.  AND YOU SAID THERE WAS A CLOTHING DESCRIPTION.  DO

3   YOU REMEMBER WHAT THE CLOTHING DESCRIPTION WAS THAT WAS GIVEN TO

4   YOU?

5   A.   NO.  THERE WAS PROBABLY A CLOTHING DESCRIPTION.  THEY

6   WOULDN'T HAVE -- I DON'T RECALL WHAT IT SPECIFICALLY WAS,

7   THOUGH.

8   Q.   DID THE PERSON GIVING YOU THE INFORMATION GIVE YOU ANYTHING

9   ELSE IN TERMS OF IDENTIFYING INFORMATION, FOR INSTANCE, THE RACE

10  OF THE INDIVIDUAL?

11  A.   YES.  I WAS TOLD A HISPANIC MALE WITH A DOG.

12  Q.   ANYTHING ABOUT HEIGHT OR WEIGHT, APPROXIMATE DESCRIPTIONS?

13  A.   NOT THAT I CAN RECALL.

14  Q.   ANY DISTINGUISHING REMARKS SUCH AS A TATTOO OR ANYTHING

15  LIKE THAT?

16  A.   NOT THAT I CAN RECALL AT THIS TIME.

17  Q.   AND AFTER YOU FINISHED THE SEARCH OF THE INDIVIDUAL WITH

18  THE DOG, AT SOME POINT YOU WENT INTO THE APARTMENT TO TAKE

19  PHOTOGRAPHS; CORRECT?

20  A.   YES.

21  Q.   OKAY.  BEFORE YOU DID THAT DID YOU GIVE INFORMATION THAT

22  ULTIMATELY LED TO THE ISSUANCE OF THE WARRANT?

23  A.   CAN YOU REWORD THAT OR SAY THAT AGAIN?

24  Q.   DID YOU PASS THE INFORMATION ON FOR THE WARRANT BEFORE OR

25  AFTER YOU WENT IN TO TAKE THE PHOTOGRAPHS?

```
 1  A.   I DON'T RECALL.  I MAY HAVE TAKEN A PHOTOGRAPH OF THE

 2  CRYSTAL METH THAT WAS IN PLAIN VIEW IN THE BATHROOM TO TAKE TO

 3  THE JUDGE TO SHOW WHAT WAS IN PLAIN VIEW DURING THE

 4  WALK-THROUGH.  I --

 5  Q.   SO YOU -- I'M SORRY.  GO AHEAD.  I DIDN'T MEAN TO INTERRUPT

 6  YOU.

 7  A.   THERE WAS VERBAL CONSENT GIVEN TO SEARCH THE APARTMENT.

 8  AND ONCE THE CRYSTAL METH WAS SEEN IN PLAIN VIEW, WE STOPPED

 9  GOING ANY FURTHER UNTIL WE GOT A SEARCH WARRANT.  I MAY HAVE

10  TAKEN A PICTURE JUST TO DOCUMENT WHAT WE HAD ALREADY SEEN AT

11  THAT POINT, BUT I DON'T RECALL SPECIFICALLY.  BUT THEN I DID

12  RELAY INFORMATION TO OBTAIN A SEARCH WARRANT.

13  Q.   AND WHEN YOU SAY CONSENT WAS GIVEN, WERE YOU PRESENT WHEN

14  THE CONSENT WAS GIVEN?

15  A.   NO.

16  Q.   OKAY.  AND WHEN YOU GOT TO THE APARTMENT -- WELL, LET ME

17  BACK UP.  IS THIS A THREE-STORY APARTMENT AS IN THREE LEVELS OF

18  APARTMENTS, OR TWO LEVELS OF APARTMENTS?

19  A.   I KNOW THERE WAS AT LEAST TWO LEVELS.  THERE MAY HAVE BEEN

20  A THIRD LEVEL ON THE BACK SIDE.  I DON'T RECALL SPECIFICALLY.

21  Q.   DO YOU RECALL WHERE L-8 WAS IN RELATION TO THE REST OF THE

22  APARTMENTS?

23  A.   FROM WHERE I PARKED I REMEMBER IT WAS FAR BACK, LIKE, YOU

24  ENTERED A DOOR, YOU HAD TO GO, I BELIEVE, TO THE BACK OF THE

25  BUILDING.  THE BUILDING WAS -- LIKE, IF THE BUILDING WAS LONG
```

1    LIKE THIS AND THERE WAS A DOORWAY AND A HALLWAY HERE, IT WAS ON

2    THE OTHER SIDE FROM WHERE I WAS PARKED.

3    Q.    OKAY.  AND DID YOU HAVE TO TAKE STEPS TO GO UP TO THE

4    APARTMENT?

5    A.    YES.

6    Q.    OKAY.  BUT YOU DON'T REMEMBER WHETHER YOU HAD TO GO TWO

7    FLIGHTS OF STEPS OR ONE FLIGHT OF STEPS?

8    A.    NO, I DON'T.

9    Q.    OKAY.  AND ON DIRECT YOU TESTIFIED THAT ONE OF THE ITEMS

10   THAT YOU PHOTOGRAPHED WAS A CAMERA, SURVEILLANCE SYSTEM.  I

11   THINK IT WAS ONE OF THE LATTER EXHIBITS --

12   A.    YES.

13   Q.    -- THAT HAD A MONITOR OF THE FRONT AREA OF THE APARTMENT;

14   IS THAT -- DID I GET THAT RIGHT?

15   A.    I DON'T RECALL IF I SAID IT WAS THE FRONT.  IF I DID, I --

16   I DON'T KNOW IF IT WAS LOOKING AT THE FRONT OR THE BACK.  I

17   CAN'T REMEMBER THE SPECIFIC LAYOUT OF THIS COMPLEX.  I KNOW IN

18   SOME PARTS OF THE COMPLEX YOU CAN PARK BOTH IN FRONT AND BACK OF

19   BUILDINGS.  SO I DON'T KNOW IF THAT CAMERA WAS LOOKING AT WHAT

20   WE WOULD CALL THE FRONT OR WHAT WE WOULD CALL THE BACK.  IT WAS

21   LOOKING AT A PARKING AREA.

22   Q.    OKAY.  SO IT WAS FROM THE BUILDING FOCUSED ON THE PARKING

23   LOT --

24   A.    YES.

25   Q.    -- OF THE BUILDING AREA?

1    A.    YES.

2    Q.    OKAY.  DO YOU KNOW IF THERE -- IF THE VIDEO WAS RECORDING

3    ANY OTHER PORTIONS OF EITHER THE APARTMENT OR OUTSIDE THE

4    APARTMENT?

5    A.    IF I COULD REFER BACK TO THE PHOTOGRAPHS, I DO BELIEVE

6    THERE WAS ANOTHER CAMERA MOUNTED OUTSIDE OF A DOOR, HANGING

7    ABOVE A DOOR, IF I REMEMBER CORRECTLY, BUT I DON'T KNOW IF ANY

8    OF THE CAMERAS WERE ACTUALLY RECORDING.

9    Q.    OKAY.  AND YOU HAD MENTIONED THAT YOU WENT IN THE

10   APARTMENT, YOU TOOK PHOTOGRAPHS OF WHAT WAS IN THE BATHROOM OF

11   THE APARTMENT; CORRECT?

12   A.    YES.

13   Q.    AND THEN AT THAT POINT YOU RELAYED INFORMATION TO ANOTHER

14   OFFICER IN DEKALB COUNTY WHO THEN PASSED THE INFORMATION ON TO

15   ANOTHER INDIVIDUAL; CORRECT?

16   A.    THAT OTHER INDIVIDUAL WOULD HAVE BEEN A JUDGE.  I RELAYED

17   IT TO DETECTIVE FITZGERALD, AND DETECTIVE FITZGERALD ACTUALLY

18   TYPED UP THE SEARCH WARRANT AND SWORE TO THE FACTS THAT I

19   RELAYED TO HIM.

20   Q.    OKAY.  SO YOU -- ALL RIGHT.  SO DETECTIVE FITZGERALD WAS

21   THE ONE WHO SWORE OFF THE AFFIANT FOR --

22   A.    YES, SIR.

23   Q.    -- WAS THE AFFIANT FOR THE WARRANT; CORRECT?

24   A.    YES, SIR.

25   Q.    AND ALL THE INFORMATION HE PUT IN THE WARRANT WAS COMING

```
 1  FROM YOU?

 2  A.    YES.

 3  Q.    AND DO YOU RECALL WHAT YOU TOLD HIM?

 4  A.    NOT -- NOT VERBATIM, NO.   I --

 5  Q.    OKAY.  DO YOU REMEMBER SEEING AN INDIVIDUAL BY THE NAME OF

 6  CARLOS AREVELO?

 7  A.    YES.

 8  Q.    AND DID YOU TALK TO HIM IN ANY WAY?

 9  A.    THAT NIGHT I MAY HAVE HAD JUST A BRIEF LITTLE CONVERSATION

10  WITH HIM, NOT -- I DON'T THINK I SPOKE TO HIM MUCH THAT NIGHT.

11  I DID TAKE HIM FOR A PRELIMINARY HEARING THE FOLLOWING DAY AND

12  WE DID CHIT-CHAT A LITTLE BIT ON HIS WAY TO HIS PRELIMINARY.

13  Q.    OKAY.  AND WHERE WAS THE PRELIMINARY HELD?

14  A.    THE DEKALB COUNTY MAGISTRATE COURT.

15  Q.    OKAY.  AND DO YOU SPEAK SPANISH?

16  A.    NO, SIR.

17  Q.    OKAY.  SO YOU WERE ABLE TO COMMUNICATE WITH HIM IN ENGLISH?

18  A.    YES, SIR.

19  Q.    OKAY.  DID YOU -- YOU HAD A CHANCE -- IN YOUR WORK THAT YOU

20  DID AT THE APARTMENT, YOU HAD A CHANCE TO PRETTY MUCH GO THROUGH

21  THE ENTIRE APARTMENT; CORRECT?

22  A.    YES.

23  Q.    DIFFERENT PARTS OF THE APARTMENT, BEDROOMS, CLOSETS,

24  BATHROOMS --

25  A.    YES.
```

1  Q.   -- ALL OF THAT?  DID YOU SEE ANY KIND OF CLOTHING OR

2  ANYTHING INSIDE THE APARTMENT THAT WOULD INDICATE THAT IT

3  BELONGED TO CARLOS?

4  A.   I DON'T KNOW HOW -- I MEAN, I SAW CLOTHING.  I DIDN'T SEE

5  ANYTHING WITH HIS NAME TAG SEWN INTO IT.

6  Q.   OKAY.  DID YOU FIND ANY ITEMS IN THE APARTMENT THAT WOULD

7  INDICATE THAT THAT PARTICULAR ITEM OR THOSE ITEMS BELONGED TO

8  CARLOS?

9  A.   THERE WERE PICTURES OF HIM IN A DRESSER DRAWER IN THE

10 MASTER BEDROOM THAT I SAW.

11 Q.   OKAY.  ANYTHING ELSE?

12 A.   I CAN'T REMEMBER.  LIKE I SAID, I DON'T KNOW -- THERE COULD

13 BE SHIRTS ON THE FLOOR.  I DON'T KNOW IF THEY'RE CARLOS'S, YOUR

14 CLIENT'S, OR A FRIEND WHO WAS THERE LAST WEEK.  I DON'T KNOW HOW

15 I COULD MAKE THAT DETERMINATION.

16 Q.   ANY KIND OF UTILITY BILLS OR CABLE BILLS OR SOME KIND OF A

17 BILL THAT WOULD HAVE THE NAME OF THE APARTMENT -- THE LOCATION

18 OF THE APARTMENT AND THE INDIVIDUAL?

19 A.   I BELIEVE THERE WERE SOME -- SOME ITEMS TO THAT EFFECT, BUT

20 I DON'T RECALL ANY NAMES ON THEM.

21 Q.   WHAT KIND OF ITEMS DID YOU SEE?

22 A.   I MEAN, THERE WERE ENVELOPES IN THERE.  I THINK THERE WERE

23 ENVELOPES IN THERE, AND I REMEMBER SEEING, LIKE, TWO BOXES THAT

24 HAD -- THAT HAD BEEN SHIPPED SOMEWHERE, BUT THE ADDRESS WASN'T

25 THE APARTMENT THAT WE WERE AT.  IT WAS, LIKE, A LOCATION IN

1  NORCROSS.

2  Q.   OKAY.

3  A.   BUT --

4  Q.   DID YOU TAKE PICTURES OF THOSE ITEMS?

5  A.   THE BOXES?

6  Q.   OR THE ENVELOPES, BOXES OR THE ENVELOPES.

7  A.   IF THERE WERE ENVELOPES I WOULD HAVE TAKEN PICTURES OF

8  THEM.  AND THE BOXES, I RECALL SPECIFICALLY TAKING PICTURES OF

9  THE BOXES.

10  Q.   I KNOW I'VE HAD A CHANCE TO LOOK THROUGH THESE EXHIBITS

11  BRIEFLY, BUT ARE THERE ANY PICTURES OF BOXES OR ENVELOPES IN

12  THESE SETS OF EXHIBITS?

13  A.   I DON'T BELIEVE THEY'RE IN THOSE EXHIBITS.

14  Q.   OKAY.  DO YOU REMEMBER IF THE ENVELOPE -- YOU SAID ENVELOPE

15  OR ENVELOPES.

16  A.   MM-HUM.

17  Q.   ARE THESE THAT WERE ADDRESSED TO THAT PARTICULAR APARTMENT?

18  A.   I DON'T RECALL, SIR.  THERE WAS A LOT OF JUST MISCELLANEOUS

19  PAPERWORK THAT I SAW.  I CAN'T REMEMBER THE SPECIFIC DETAILS.

20  Q.   DO YOU KNOW WHERE YOU FOUND THESE DOCUMENTS?

21  A.   THERE WAS A LOT OF MISCELLANEOUS PAPERWORK IN THE DRAWERS,

22  ON -- IN THE -- ON THE DRESSER, IN THE DRESSER.

23  Q.   OKAY.  AND --

24            MR. SHREENATH:  MAY I APPROACH THE WITNESS, JUDGE?

25            THE COURT:  YES, YOU MAY.

 1 | BY MR. SHREENATH:

 2 | Q.   I'M GOING TO HAND YOU WHAT'S BEEN MARKED AS A4.  I THINK

 3 | YOU IDENTIFIED THIS EARLIER AS SOME KIND OF A VETERINARIAN BILL.

 4 | A.   YES.

 5 | Q.   DO YOU KNOW WHERE YOU FOUND THAT BILL?

 6 | A.   I DON'T RECALL SPECIFICALLY, NO.  I BELIEVE IT WAS IN THE

 7 | BACK BEDROOM, BUT I'M ZOOMED IN ON IT TOO FAR TO MAKE A

 8 | 100 PERCENT DETERMINATION WHERE IT WAS.

 9 | Q.   AND WHAT'S THE NAME OF THE INDIVIDUAL LISTED ON THAT BILL?

10 | A.   FERNANDES MOYES.

11 | Q.   DO YOU KNOW ANY INFORMATION ABOUT FERNANDES MOYES?

12 | A.   NO.

13 | Q.   AND THE OTHER PHOTOS -- I'M NOT GOING TO GO THROUGH EVERY

14 | SINGLE ONE OF THEM, BUT THERE WERE PHOTOS OF GUNS, ALLEGED

15 | DRUGS, CURRENCY.  DID YOU PUT THEM IN PLACES TO SORT OF TAKE

16 | PICTURES IN A ROOM, OR DID YOU TAKE PICTURES AS TO -- WHERE YOU

17 | FOUND THEM?

18 | A.   WHERE THEY WERE FOUND.  IF THEY WERE -- IF SOMETHING IS,

19 | LIKE, IN THE BACK OF A DRAWER WHERE IT CAN'T BE SEEN, THEN, YOU

20 | KNOW, WE'LL SLIDE IT OUT SO IT CAN BE PHOTOGRAPHED.  I MEAN, IT

21 | DOESN'T DO US ANY GOOD TO PHOTOGRAPH SOMETHING IN A POSITION

22 | WHERE IT CAN'T BE SEEN.

23 | Q.   IT WASN'T -- SO THIS IS NOT A MATTER OF COLLECTING ALL THE

24 | EVIDENCE AND PUTTING IT IN A ROOM AND THEN ESSENTIALLY TAKING --

25 | A.   NO.

```
1   Q.    -- PICTURES OF DIFFERENT PIECES OF EVIDENCE?

2   A.    THE MONEY, FOR EXAMPLE, WE OPENED THE DRAWERS.  THE MONEY

3   WAS RIGHT THERE.  WE TOOK PICTURES OF IT.  THE GUNS WERE RIGHT

4   THERE.  THE DRUGS -- IF I REMEMBER CORRECTLY, I MEAN, PRETTY

5   MUCH EVERYTHING WAS AS PHOTOGRAPHED.

6   Q.    DID YOU TAKE ANY PHOTOGRAPHS OF THE PARKING LOT OUTSIDE OF

7   THE BUILDING AND THE VEHICLES THAT WERE OUT THERE?

8   A.    I BELIEVE I TOOK ONE OR TWO PICTURES OF THE D.E.A.

9   CLANDESTINE LAB CLEAN-UP TEAM THAT HAD COME AND CORDONED OFF THE

10  AREA AND DECONTAMINATE THE APARTMENT BUILDING PRIOR TO US

11  SEARCHING IT, BUT I DON'T THINK I TOOK ANY PICTURES OF THE

12  VEHICLES AROUND IT.  I WAS JUST TAKING A PICTURE TO DOCUMENT

13  THAT THE CLAN LAB CLEAN-UP TEAM HAD TO COME OUT.

14  Q.    AND YOU WERE THERE FROM ABOUT WHAT TIME TO WHAT TIME?

15  A.    I REMEMBER IT WAS DARK WHEN I GOT THERE, SO, I MEAN, THIS

16  WAS AUGUST, SO IT WAS PROBABLY SOME TIME AFTER 8:00, I WOULD

17  GUESSTIMATE.  AND THE CLAN LAB CLEAN-UP IS VERY THOROUGH IN WHAT

18  THEY DO, SO THEY TOOK QUITE A WHILE.  SO I WOULD ESTIMATE I WAS

19  THERE 'TIL AFTER MIDNIGHT.

20  Q.    AND DURING THAT ENTIRE TIME DID YOU SEE ANY KIND OF A GRAY

21  S.U.V. IN THE PARKING LOT OUTSIDE THE APARTMENT?

22  A.    IF I DID, I COULDN'T RECALL.  I MEAN, THERE WERE A LOT OF

23  CARS COMING AND GOING.  THERE WERE A LOT OF PEOPLE UPSET THAT

24  THEY COULDN'T GET INTO THEIR BUILDING BECAUSE OF THE CLEAN-UP

25  TEAM THAT WAS THERE.  I DON'T REMEMBER ANY VEHICLES
```

1  SPECIFICALLY, THOUGH.

2  Q.   WHEN YOU GOT INTO THE APARTMENT DO YOU RECALL WHO ALL WAS

3  THERE IN TERMS OF LAW ENFORCEMENT OFFICERS?

4  A.   I DO REMEMBER THE GENTLEMAN WHO'S BEEN OUTSIDE WAITING TO

5  TESTIFY.

6  Q.   OKAY.

7  A.   HE WAS IN THERE, AND I REMEMBER HIM -- SEEING HIM TALK TO

8  CO-DEFENDANT -- I'M SORRY.  I CAN'T REMEMBER HIS NAME, BUT HE

9  WAS TALKING TO THAT INDIVIDUAL.  IT WAS A VERY FLUID -- IT WAS A

10 DYNAMIC SITUATION.  PEOPLE WERE COMING AND GOING.  MY FOCUS WAS

11 ON FINDING EVIDENCE AND PHOTOGRAPHING EVIDENCE THAT I WAS

12 FINDING AND OTHER PEOPLE WERE FINDING.

13 Q.   OKAY.  AND OTHER THAN THE PASSPORT, YOU DIDN'T SEE ANY

14 OTHER EVIDENCE CONNECTING MY CLIENT TO THAT APARTMENT, CORRECT,

15 THAT YOU RECALL?

16 A.   NOT THAT I CAN THINK OF.  YOU KNOW, I'M NOT VERY FAMILIAR

17 WITH THE DETAILS OF THE CASE.

18          MR. SHREENATH:  SURE.  OKAY.  NOTHING FURTHER, JUDGE.

19          THE COURT:  OKAY.  MR. WILLIAMS, ANYTHING FURTHER OF

20 THIS PARTICULAR WITNESS?

21          MR. WILLIAMS:  YES, YOUR HONOR.

22          THE COURT:  OKAY.

23                    REDIRECT EXAMINATION

24 BY MR. WILLIAMS:

25 Q.   OFFICER DONAHUE, I'M SHOWING YOU WHAT'S MARKED AS

1   GOVERNMENT'S EXHIBIT A35 THROUGH A43 IN JUST A MOMENT.  WOULD

2   YOU TAKE A LOOK AT THOSE PHOTOS -- COULD YOU TAKE A LOOK AT

3   THOSE EXHIBITS MARKED FOR IDENTIFICATION PURPOSES AT THIS TIME.

4   DO YOU RECOGNIZE THOSE PHOTOGRAPHS?

5   A.   I DO.

6   Q.   WHAT ARE THEY?

7   A.   THE FIRST THREE, A35, 36, 37, AND 38 ARE CARDBOARD BOXES.

8   FROM THE SHIPPING LABELS THAT I CAN SEE ON THEM THEY LOOK LIKE

9   THEY WERE SHIPPED VIA U.P. -- UNITED STATES POSTAL SERVICE.

10  Q.   AND DID YOU TAKE THOSE PHOTOGRAPHS?

11  A.   YES, I DID.

12  Q.   AND DO THEY FAIRLY AND ACCURATELY DEPICT THE BOXES AS THEY

13  WERE ON THE DATE THAT YOU MADE THOSE PHOTOGRAPHS?

14  A.   YES.

15          MR. WILLIAMS:  YOUR HONOR, I'D LIKE TO OFFER

16  GOVERNMENT'S EXHIBIT A35 THROUGH A38.

17          THE COURT:  ANY OBJECTION?

18          MR. SHREENATH:  NO OBJECTION.

19          THE COURT:  GOVERNMENT'S A35 THROUGH A38 ARE ADMITTED.

20  BY MR. WILLIAMS:

21  Q.   AND THOSE PHOTOGRAPHS HAVE NOW BEEN ADMITTED INTO EVIDENCE.

22  ARE THOSE PHOTOGRAPHS OF THE BOXES THAT YOU WERE ASKED ABOUT A

23  LITTLE EARLIER BY DEFENSE COUNSEL?

24  A.   YES.

25  Q.   AND THEY WERE THE BOXES THAT WERE ON THE SCENE AT THAT

1  APARTMENT DURING THE COURSE OF THE SEARCH?

2  A.    YES.

3  Q.    NOW, IF YOU CAN TAKE A LOOK AT THE OTHER EXHIBITS, EXHIBITS

4  A39 THROUGH A43.  DO YOU RECOGNIZE THOSE PHOTOGRAPHS?

5  A.    YES, I DO.

6  Q.    AND WHAT ARE THEY?

7  A.    THESE ARE PHOTOGRAPHS OF PHOTOGRAPHS THAT I TOOK.  THESE

8  PHOTOGRAPHS WERE IN, I BELIEVE, THE TOP DRAWER IN THE DRESSER IN

9  THE MASTER BEDROOM, THE BACK BEDROOM WHERE ALL THE U.S. CURRENCY

10  AND THE NARCOTICS WERE FOUND, THE KILOS OF COCAINE.  I RECOGNIZE

11  THE INDIVIDUAL.  THERE'S A MALE THAT'S IN EVERY PHOTO.  THE

12  PHOTOS ALSO INCLUDE OTHER PEOPLE THAT I'M NOT FAMILIAR WITH, BUT

13  EACH ONE OF THE PHOTOS INCLUDES A MALE, AND THAT WAS THE MALE

14  THAT WAS AT THE APARTMENT THAT NIGHT.  AGAIN, I'M SORRY.  I'M

15  HORRIBLE WITH NAMES, BUT IT WAS THE INDIVIDUAL THAT ALLOWED US

16  INTO THE APARTMENT AND THAT I TOOK FOR PRELIMINARY HEARING AT

17  MAGISTRATE COURT.  I BELIEVE HE'S THE CO-DEFENDANT IN THIS CASE.

18  Q.    AND THOSE PHOTOGRAPHS, THOSE EXHIBITS OF THOSE PHOTOGRAPHS,

19  DO THEY FAIRLY AND ACCURATELY DEPICT THE PHOTOGRAPHS THAT WERE

20  SEIZED THAT NIGHT AT THE APARTMENT?

21  A.    YES.

22  Q.    AND THOSE PHOTOGRAPHS ARE PHOTOGRAPHS THAT YOU TOOK OF

23  THOSE PHOTOGRAPHS?

24  A.    YES, SIR.

25  Q.    AND IF I FOLLOW AS YOU STATED THERE, OF THE INDIVIDUAL WHO

1  GAVE CONSENT TO SEARCH THE APARTMENT?

2  A.   YES.

3          MR. SHREENATH:  OBJECTION, JUDGE.  CALLS FOR

4  SPECULATION ON THE PART OF THIS WITNESS.  HE'S ALREADY TESTIFIED

5  THAT HE ARRIVED AFTER THE ISSUE OF CONSENT WAS RESOLVED

6  APPARENTLY.

7          MR. WILLIAMS:  YOUR HONOR, THE QUESTION WAS WHETHER

8  THE PHOTOGRAPHS DEPICT THE INDIVIDUAL WHO GAVE CONSENT, AND THIS

9  WITNESS HAS TESTIFIED THAT HE SAW THAT INDIVIDUAL WHO GAVE

10 CONSENT AND HE OBVIOUSLY TOOK THESE PHOTOGRAPHS, THESE PICTURES

11 OF THESE PHOTOGRAPHS.

12         THE COURT:  OVERRULED.

13 BY MR. WILLIAMS:

14 Q.   SO -- I'LL REPHRASE THE QUESTION.  ARE THOSE PICTURES --

15 THOSE PICTURES THAT WERE FOUND IN THE APARTMENT, ARE THEY -- ARE

16 THOSE PICTURES OF THE PERSON WHO GAVE CONSENT TO SEARCH THE

17 APARTMENT?

18 A.   YES.

19         MR. WILLIAMS:  YOUR HONOR, I HAVE NO FURTHER

20 QUESTIONS.

21         THE COURT:  OKAY.  MR. SHREENATH.

22         MR. SHREENATH:  JUST ONE QUESTION.

23         THE WITNESS:  YES.

24

25

```
 1                    RECROSS-EXAMINATION

 2   BY MR. SHREENATH:

 3   Q.   YOU WERE NOT PRESENT WHEN THE CONSENT WAS SUPPOSEDLY GIVEN

 4   TO ENTER OR SEARCH THE APARTMENT; CORRECT?

 5   A.   NO, I DID NOT WITNESS HIM GIVING CONSENT.  HOWEVER, THE

 6   NEXT DAY -- I SHOULDN'T SAY THE NEXT DAY.  WHEN I TOOK HIM FOR

 7   HIS PRELIMINARY WHEN WE WERE CHIT-CHATTING, HE DID INDICATE TO

 8   ME THAT HE DID GIVE CONSENT TO SEARCH THE APARTMENT.

 9             MR. SHREENATH:  OKAY.  NOTHING FURTHER, JUDGE.

10             THE COURT:  ANYTHING ELSE?

11             MR. WILLIAMS:  NO, YOUR HONOR.

12             THE COURT:  OKAY.  YOU MAY STEP DOWN, OFFICER.

13             THE WITNESS:  THANK YOU, YOUR HONOR.

14             MR. WILLIAMS:  YOUR HONOR, AT THIS TIME THE GOVERNMENT

15   CALLS SPECIAL AGENT DAVID AGUILAR.

16             THE COURT:  OKAY.  MR. SHREENATH, DO YOU HAVE ANY

17   WITNESSES?

18             MR. SHREENATH:  OTHER THAN POSSIBLY THE DEFENDANT, NO

19   OTHER WITNESSES.

20             THE COURT:  OKAY.

21             COURTROOM DEPUTY CLERK:  SIR, IF YOU WOULD RAISE YOUR

22   RIGHT HAND, PLEASE, TO BE SWORN.

23                  (WITNESS SWORN.)

24             COURTROOM DEPUTY CLERK:  THANK YOU.  YOU CAN TAKE YOUR

25   SEAT.  IF YOU WOULD, PLEASE, SIR, STATE YOUR NAME FOR THE
```

1   RECORD.

2          THE WITNESS:  FIRST NAME DAVID, LAST NAME SPELLING,

3   A-G-U-I-L-A-R, PRONOUNCED AGUILAR.

4          COURTROOM DEPUTY CLERK:  THANK YOU, SIR.

5                         DAVID AGUILAR

6      CALLED AS A WITNESS BY THE UNITED STATES OF AMERICA, AFTER

7       HAVING BEEN FIRST DULY SWORN, TESTIFIED AS FOLLOWS:

8                      DIRECT EXAMINATION

9   BY MR. WILLIAMS:

10  Q.   SPECIAL AGENT AGUILAR, FOR WHOM DO YOU WORK?

11  A.   I AM EMPLOYED WITH THE NORCROSS POLICE DEPARTMENT SINCE

12  1991, AND I'VE BEEN ASSIGNED TO THE DRUG ENFORCEMENT

13  ADMINISTRATION SINCE 2005.

14  Q.   AND WITH RESPECT TO YOUR ASSIGNMENT TO THE DRUG ENFORCEMENT

15  ADMINISTRATION, ARE YOU PART OF A PARTICULAR TASK FORCE?

16  A.   TASK FORCE GROUP TWO.

17  Q.   AND WHAT DO YOU FOCUS ON, THE PRIMARY FOCUS OF YOUR

18  INVESTIGATIONS?

19  A.   WE INVESTIGATE DRUG TRAFFICKING ORGANIZATIONS.

20  Q.   AND WHAT IS YOUR CURRENT POSITION OR TITLE WITH RESPECT --

21  AND I MAY HAVE MISSED IT -- WITH RESPECT TO THE POLICE

22  DEPARTMENT YOU WORK FOR?

23  A.   A DETECTIVE, I BELIEVE, SIR.

24  Q.   I MAY HAVE MISSED IT.  I APOLOGIZE.  TURNING YOUR ATTENTION

25  TO THE INSTANT CASE, BRIEFLY DESCRIBE HOW YOU FIRST GOT INVOLVED

1  IN THIS INVESTIGATION.

2  A.   IN REFERENCE TO AUGUST 23RD, 2011, SIR, WE WENT TO AN

3  APARTMENT, 6750 PEACHTREE INDUSTRIAL BOULEVARD, I BELIEVE, SIR,

4  APARTMENT L-8.  THAT'S HOW I GOT INVOLVED IN THIS ONE.

5  Q.   AND WHAT, IF ANYTHING, BY WAY OF BACKGROUND WERE YOU TOLD

6  PRIOR TO GOING TO THAT APARTMENT?

7  A.   YES, THERE WAS SOME BACKGROUND INFORMATION TOLD, SIR.  THIS

8  WAS IN REFERENCE TO A DRUG TRAFFICKING ORGANIZATION THAT WE HAD

9  BEEN INVESTIGATING PRIOR TO THAT, SIR.

10  Q.   NOW, SPECIAL AGENT AGUILAR, DO YOU SPEAK SPANISH?

11  A.   YES, SIR.

12  Q.   AND DO YOU CONSIDER YOURSELF FLUENT?

13  A.   YES, SIR.

14  Q.   DO YOU WRITE SPANISH?

15  A.   I CAN, SIR.

16  Q.   AND I TAKE IT YOU CAN READ SPANISH?

17  A.   I CAN, SIR.

18  Q.   HOW DID YOU LEARN SPANISH?

19  A.   MY DAD IS FROM NICARAGUA AND MY MOM IS FROM NASHVILLE,

20  TENNESSEE.

21          THE COURT:  I'M SORRY.  YOUR DAD IS FROM WHERE?

22          THE WITNESS:  IN NICARAGUA, CENTRAL AMERICA, MA'AM.

23          THE COURT:  OKAY.  I DIDN'T HEAR.

24          THE WITNESS:  YES, MA'AM.

25          THE COURT:  THANK YOU.

1           THE WITNESS:  YES, MA'AM.

2           MR. WILLIAMS:  NOT IN SPANISH.  WITHDRAWN.

3  BY MR. WILLIAMS:

4  Q.   TURNING YOUR ATTENTION TO THE INSTANT CASE, APPROXIMATELY

5  WHAT TIME ROUGHLY, IF YOU RECALL, DID YOU ARRIVE AT THE LOCATION

6  ON PEACHTREE INDUSTRIAL?

7  A.   A LITTLE RIGHT BEFORE 8, MAYBE ABOUT 8:00, SIR, RIGHT IN

8  THAT TIME.

9  Q.   IF YOU RECALL, WAS IT DARK OR LIGHT OUT?

10  A.   IT WAS GETTING TO BE DARK, SIR.  IT WAS STILL LIGHT WHEN WE

11  GOT THERE, HOWEVER, IT WAS GETTING DARK QUICK.

12  Q.   AND WHAT WAS YOUR PURPOSE FOR GOING TO THAT COMPLEX?

13  A.   WE WERE ACTUALLY GOING TO TRY TO MAKE CONTACT WITH ANYBODY

14  REALLY IN APARTMENT L-8.

15  Q.   AND WHY APARTMENT L-8?

16  A.   THAT WAS THE APARTMENT THAT SHOWED INTEREST AT THAT TIME IN

17  REFERENCE TO THE INVESTIGATION, AND WE WERE ACTUALLY DOING A

18  FOLLOW-UP INVESTIGATION THAT LED US TO L-8.

19  Q.   AND IF YOU HAD ONE, DID YOU HAVE A PARTICULAR ASSIGNED

20  ROLE, AND, IF SO, WHAT WAS IT OR WAS IT GENERAL?

21  A.   ON THAT PARTICULAR DAY MY ROLE WAS ACTUALLY TO MAKE CONTACT

22  AT THE FRONT DOOR, MYSELF AND MAYBE FOUR OTHER PERSONS, PEOPLE

23  TO ACCOMPANY ME AT THE FRONT DOOR, SIR.

24  Q.   NOW, STARTING WHEN YOU FIRST ARRIVED AT THE APARTMENT, HOW

25  WERE YOU DRESSED AND WHAT DID YOU ARRIVE IN?

1  A.   IT WAS A WARM DAY, SHORT-SLEEVED SHIRT, MARKED IN POLICE,

2  ALL MARKINGS, SIR, HAD POLICE.

3  Q.   WERE YOU ARMED?

4  A.   ACTUALLY I WAS, SIR, YES.

5  Q.   NOW, WAS YOUR WEAPON DRAWN OR NOT?

6  A.   NO.  NO, SIR, IT WAS NEVER DRAWN.

7  Q.   WHAT DID YOU FIRST OBSERVED WHEN YOU ARRIVED TO THE

8  COMPLEX?

9  A.   JUST THE DOOR, SIR.  IT WAS FOOT TRAFFIC OUTSIDE, CHILDREN

10 RUNNING AROUND.

11 Q.   DO YOU RECALL IF THE DOOR, L-7 -- I MEAN, EXCUSE ME -- L-8

12 WAS GROUND FLOOR OR FIRST FLOOR, LIKE, IF YOU HAD TO WALK UP TO

13 IT OR NOT?

14 A.   UPSTAIRS.  IT WAS UPSTAIRS.

15 Q.   AND WHO WAS AT THE DOOR WITH YOU?  WHEN I SAY "WHO,"

16 APPROXIMATELY HOW MANY AGENTS ROUGHLY, IF YOU RECALL?

17 A.   IF -- THREE MORE.  I CAN'T REMEMBER THE FOURTH ONE, SIR.  I

18 JUST KNOW THE THREE BECAUSE THOSE ARE THE THREE THAT WE USUALLY

19 GO TOGETHER.

20 Q.   WHAT HAPPENED?

21 A.   WELL, WE KNOCKED ON THE DOOR.

22 Q.   OKAY.

23 A.   AND I KNOCKED ON THE DOOR.  NO ANSWER.  HOWEVER, I COULD

24 HEAR SOMETHING INSIDE.  AND WE ANNOUNCED OURSELF (VERBATIM) AS

25 POLICE, I DID, MORE THAN TWICE, CONTINUED TO KNOCK ON THE DOOR.

1  I BELIEVE THERE WAS A -- THERE WAS AN OUTSIDE PERIMETER OUTSIDE

2  THE APARTMENT COMPLEX WHERE AGENTS JUST KIND OF STAGGERED IN

3  DIFFERENT AREAS.  AND THEY -- SOME OF THE AGENTS IN THE BACK

4  CAME -- OR WAS CONFRONTED WITH A PERSON COMING OUT TO THE

5  BALCONY OUTSIDE OF L-8.  THEY ASKED HIM TO GO TO THE FRONT DOOR,

6  AND AT THAT TIME IS WHEN THAT GENTLEMAN COMPLIED AND CAME TO THE

7  FRONT DOOR.

8  Q.   APPROXIMATELY HOW LONG WERE YOU STANDING AT THE FRONT DOOR

9  BEFORE THERE WAS AN ANSWER, BEFORE SOMEBODY CAME TO IT?

10  A.   OH, SIR, FIVE MINUTES MAYBE, MAYBE A LITTLE LONGER, SIR.

11  Q.   WHAT HAPPENED NEXT?

12  A.   WELL, HE OPENED THE FRONT DOOR.

13  Q.   WHEN YOU SAY "HE," DO YOU KNOW HIS -- WHO WAS THE YOUNG MAN

14  YOU IDENTIFIED --

15  A.   YOUNG GUY.  AREVELO, I BELIEVE.  AREVELO, I THINK, IS HIS

16  NAME, YOUNG GUY, HIGH SCHOOL, JUST GRADUATED OUT OF HIGH SCHOOL.

17  Q.   DID HE LOOK LIKE A MINOR OR AN ADULT TO YOU?  AND WHEN I

18  SAY "A MINOR OR ADULT," A CHILD OR AN ADULT?

19  A.   NO.  HE WAS AN ADULT, SIR.

20  Q.   WHAT HAPPENED NEXT?

21  A.   WELL, WE ASKED IF WE MAY COME IN.  HE SAID ABSOLUTELY SURE.

22  I ASKED IF HE HAD ANY GUNS OR ANYTHING ELSE OR ANY WEAPONS OR

23  WHATNOT OR WAS ANY OTHER PEOPLE INSIDE THE HOUSE.

24  Q.   IN ENGLISH OR IN SPANISH?

25  A.   ONCE I DID IT IN SPANISH, HE ANSWERED IN ENGLISH, SO HE

 1   SPOKE ENGLISH AND SPANISH.  AND, HOWEVER, IT WAS IN BOTH, SIR.

 2   HE DID INVITE US IN.  WE DID GO IN, BUT IMMEDIATELY AS WE WENT

 3   IN, SIR, THERE WAS CONTRABAND, GUNS, WEAPONS, MONEY, ICE, DRUGS.

 4   Q.   AND WHEN YOU SAY, "IMMEDIATELY AS WE WENT IN," ARE THOSE

 5   THINGS THAT YOU OBSERVED, YOU AND THE OTHER AGENTS?

 6   A.   SIR, IT WAS IN PLAIN VIEW.

 7   Q.   WHAT HAPPENED NEXT?

 8   A.   WELL, AT THAT TIME I DID DRAW MY WEAPON.

 9   Q.   WHY?

10   A.   BECAUSE I -- AS SOON AS I SAW THE GUNS.  WE WENT THROUGH

11   THE APARTMENT, MORE OF A SECURITY SWEEP AT THAT TIME.

12   UNFORTUNATELY WE CONTINUED TO LOCATE -- OR NOT LOCATE, SEE IN

13   PLAIN VIEW MORE WEAPONS, MORE GUNS, MORE MONEY.  THE APARTMENT

14   WAS CLEAR, SECURE.

15   Q.   AND WHAT DOES THAT MEAN?

16   A.   THERE WAS NO OTHER PERSONS INSIDE THE APARTMENT.

17   Q.   WHAT HAPPENED NEXT?

18   A.   WE IMMEDIATELY TURNED OUR ATTENTION TO THE YOUNG GENTLEMAN

19   AT THE FRONT DOOR, NOTICED THAT THERE WERE CAMERAS ALL OVER THE

20   APARTMENT.  ACTUALLY THERE WAS A CAMERA, SIR, WATCHING ME AT THE

21   FRONT DOOR.

22   Q.   AND HOW DO YOU KNOW THAT?

23   A.   BECAUSE WHEN WE WENT INTO THE BEDROOM.  I WAS RIGHT THERE

24   ON THE LAPTOP.

25   Q.   AFTER THE PROTECTIVE SWEEP, WHAT HAPPENED NEXT?

1   A.    WE TURNED OUR ATTENTION TO MR. AREVELO, THE YOUNG GUY.  WE

2   STAYED WITH HIM FOR A WHILE.  WE SPOKE TO HIM.  I ACTUALLY SPOKE

3   TO HIM.

4   Q.    AND WHAT DID YOU TALK TO HIM ABOUT?

5   A.    HEY, WHAT'S -- WHAT DO YOU HAVE HERE, YOU KNOW, WHAT'S

6   GOING ON INSIDE?  I DID READ HIM HIS MIRANDA.  I DID SPEAK TO

7   HIM IN SPANISH AND ENGLISH.  HE DID SPEAK ENGLISH.  HE ACTUALLY

8   TOLD ME HE GRADUATED FROM BROOKWOOD HIGH SCHOOL AT THAT TIME, SO

9   HIS ENGLISH WAS VERY UNDERSTANDABLE.

10  Q.    AND ALONG THOSE LINES WHEN YOU SPOKE ENGLISH TO HIM -- WHEN

11  YOU SPOKE ENGLISH AND/OR SPANISH TO HIM DID HE SEEM TO

12  UNDERSTAND WHAT YOU WERE SAYING BY HIS REACTION AND BY WHAT HE

13  SAID TO YOU?

14  A.    ABSOLUTELY, SIR.  HE WAS VERY NERVOUS AT THAT TIME.  HE

15  WAS -- BUT, HOWEVER, HE DID COMPLY.

16  Q.    AND WHEN YOU SPOKE WITH HIM DID HE SEEM TO UNDERSTAND WHAT

17  YOU WERE TALKING ABOUT?

18  A.    YES, SIR.

19  Q.    NOW, YOU SAID AFTER THE SWEEP OF THE APARTMENT THERE WAS

20  FOLLOW-UP CONVERSATION WITH THAT INDIVIDUAL.  I'M MISREMEMBERING

21  HIS NAME.  WHAT WAS THAT CONVERSATION ABOUT?

22  A.    IT CONSISTED OF HE DID SAY THAT HE JUST MOVED IN THAT

23  MORNING, THAT WAS HIS FIRST DAY THERE, AND THAT THE GENTLEMAN

24  THAT HE LEFT -- OR THAT LIVED THERE WITH HIM HAD JUST LEFT

25  WALKING A COUPLE OF DOGS THAT LIVED IN THAT APARTMENT.  THEN WE

1  TALKED -- WE WENT INTO A LITTLE DETAIL ABOUT THE DRUGS, THE

2  WEAPONS, AND THE MONEY THAT WAS FOUND.  HOWEVER, HIS -- HE WAS A

3  LITTLE NERVOUS, SIR.  I THINK HIS -- HE KIND OF CONCENTRATED ON

4  THE SUBJECT, ON THE PERSON THAT LEFT THE HOUSE THAT WAS WALKING

5  THE DOGS.

6  Q.   AND WHAT, IF ANYTHING, DID HE TELL YOU IN ADDITION TO THE

7  DISCUSSION ABOUT THE PERSON LEAVING WALKING THE DOGS ABOUT THE

8  PERSON WHO LIVED THERE, IF ANYTHING, ABOUT WHO LIVED THERE WITH

9  HIM?  WHAT DID HE TELL YOU ABOUT THEM?

10  A.   HE JUST SAID THAT THE GENTLEMAN -- IT WAS A FRIEND OF HIS,

11  THAT HE ALLOWED HIM TO COME IN THERE AND STAY IN THAT APARTMENT

12  BECAUSE APPARENTLY -- I DON'T KNOW WHAT HIS HOME LIFE WAS, BUT

13  WHAT I DO KNOW IS THAT HE WAS ALLOWED TO STAY IN THAT APARTMENT.

14  HE HAD JUST MOVED IN THAT MORNING.  THE GENTLEMAN THAT ALLOWED

15  HIM TO MOVE IN THAT MORNING, ACTUALLY HIS THINGS WERE INSIDE THE

16  APARTMENT, THE YOUNG GUY, HIS THINGS WERE INSIDE THE APARTMENT.

17  Q.   AND WHEN YOU SAY -- SO THE PERSON WHO LET YOU IN THE

18  APARTMENT HAD PERSONAL BELONGINGS IN THE APARTMENT?

19  A.   YES, SIR.  HE HAD A BAG AND WHATNOT.  HE EVEN SHOWED IT TO

20  ME.

21  Q.   AND WHEN YOU SAY HE SHOWED IT TO YOU, IF YOU CAN RECALL,

22  WHAT WERE SOME OF THE ITEMS?

23  A.   PERSONAL HYGIENE TYPE ITEMS, OTHER CLOTHING, CHANGES OF

24  CLOTHING.  IT WAS A BIG BAG, SIR.

25  Q.   WHAT HAPPENED NEXT?

1   A.   WELL, AT THAT TIME HE JUST, AGAIN, GOING BACK, HE SAID THAT

2   THE GENTLEMAN THAT LIVES HERE AT THE APARTMENT JUST LEFT, THAT

3   HE WAS WALKING TWO DOGS.

4   Q.   NOW, WAS A SEARCH THEREAFTER DONE OF THE APARTMENT?

5   A.   THERE WAS A SEARCH DONE INSIDE THE APARTMENT, SIR.

6   Q.   DID YOU PARTICIPATE IN THAT SEARCH?

7   A.   I DID, NOT THOROUGH LIKE THE OTHER AGENTS DID, BUT I DID --

8   A LOT OF -- ACTUALLY, NO, SIR.  I ACTUALLY -- WHAT I SAW IN

9   PLAIN VIEW, BUT, HOWEVER, AS FAR AS THE SEARCH, DUE TO THE

10  CHEMICAL BASE OF THE DRUGS AND WHATNOT THAT WAS LOCATED INSIDE

11  THE HOUSE IN PLAIN VIEW, WE HAD ANOTHER UNIT COME IN AT THAT

12  PARTICULAR NIGHT, AND THAT PARTICULAR NIGHT -- ON THAT -- THAT

13  PARTICULAR UNIT, THEY'RE A LITTLE BIT MORE CERTIFIED THAN I AM

14  AS FAR AS PUTTING ON A LITTLE CHEMICAL SUIT, GOING IN THERE,

15  COLLECTING EVIDENCE AND COLLECTING THE DRUGS, ESPECIALLY WHEN

16  IT'S AT A CHEMICAL BASE LIKE THAT.

17  Q.   NOW, WITH RESPECT TO THE PERSON THAT LIVED IN THE APARTMENT

18  WHO WAS OUT WALKING THE DOG, DID YOU DO ANYTHING THAT NIGHT OR

19  THAT DAY IN FOLLOW-UP TO TRYING TO FIND -- TO TRY AND FIND THAT

20  PERSON?

21  A.   WE DID --

22  Q.   YOU PERSONALLY?

23  A.   NO, I DID NOT.  NO, SIR.  NO.

24  Q.   WITH RESPECT TO THE SECOND INDIVIDUAL WHO LIVED IN THAT

25  APARTMENT, NOT THE ONE WHO OPENED THE DOOR, WHAT HAPPENED NEXT

1  IN THE CASE RELATED TO IDENTIFYING WHO THAT WAS THAT YOU WERE

2  INVOLVED IN?

3  A.    BASED ON THE EVIDENCE THAT WAS COLLECTED IN THERE, SIR,

4  THERE WAS PHOTOGRAPHS, NAMES, JUST OTHER THINGS THAT SHOWED

5  DIFFERENT IDENTITY OF THE OTHER PERSON.  THAT, I DID OBSERVE, I

6  DID LOOK AT.  AS FAR AS THAT NIGHT, IT WAS GOING INTO THE WEE

7  HOURS OF THE MORNING.  THERE WAS NO FOLLOW-UP AFTER THAT.

8  Q.    OKAY.  WHAT HAPPENED NEXT IN THE INVESTIGATION REGARDING

9  THE IDENTITY OF THAT PERSON, WHO THAT WAS?

10  A.    WELL, I DID NOT GET INVOLVED AGAIN UNTIL AUGUST 16TH OF

11  2012.

12  Q.    OKAY.  WHAT HAPPENED THAT DAY?

13  A.    AND ON AUGUST 16TH OF 2012, I MET THAT GENTLEMAN RIGHT

14  THERE IN THE GREEN JUMPSUIT --

15  Q.    GREEN, GREEN?

16  A.    I'M SORRY.  ORANGE.  WHOA.  ORANGE.  I'M SORRY.  GREEN.

17  -- IN AN INTERVIEW WITH MYSELF, TONY SMITH, AND OUR GROUP

18  SUPERVISOR KEITH CROMER.

19  Q.    AND TO YOUR KNOWLEDGE WHAT WAS HE DOING IN THE INTERVIEW

20  ROOM?  HOW DID HE GET THERE?

21  A.    I DIDN'T KNOW ANYTHING ABOUT THAT, SIR.  I DON'T KNOW.  I'M

22  NOT TOO SURE AT ALL.  ALL I KNOW IS I WENT IN THERE TO

23  PARTICIPATE.  I KNEW THE GENTLEMAN IN THE ORANGE JUMPSUIT SPOKE

24  ENGLISH, HOWEVER, I WAS IN THERE TO INTERPRET JUST IN CASE HE

25  DIDN'T UNDERSTAND AND WHATNOT.

1   Q.   AND HOW DID YOU KNOW HE SPOKE ENGLISH OR WHY DID YOU THINK

2   THAT?

3   A.   HE SAID HE SPOKE ENGLISH.  HE UNDERSTOOD US.

4   Q.   HE SAID THAT IN ENGLISH?

5   A.   YEAH.  ACTUALLY HE SAID, YEAH, HE SPOKE TO KEITH, OUR GROUP

6   SUPERVISOR, AND EVERYBODY IN ENGLISH.  BUT, NOW, THERE WAS TIMES

7   TO WHERE HE DIDN'T UNDERSTAND.  SO IF HE DIDN'T, I WAS THERE TO

8   HELP HIM.

9   Q.   AND WHAT -- WHAT WAS THE PURPOSE OF MEETING WITH AND

10  INTERVIEWING THAT INDIVIDUAL?

11  A.   WHEN I FOUND OUT THAT MORNING, THIS WAS IN REFERENCE TO THE

12  FOLLOW-UP INVESTIGATION.  IT HAD TO DO WITH L-8, THE APARTMENT

13  THAT WE -- THAT WE INVESTIGATED.

14  Q.   AND DURING THE COURSE OF THE INTERVIEW -- WELL, FIRST OF

15  ALL, WHERE WAS THE INTERVIEW HELD?

16  A.   HERE, SIR, ON OUR FLOOR.

17  Q.   OKAY.  AND THIS WAS IN OR ABOUT AUGUST OF 2012?

18  A.   AUGUST 16TH, 2012, SIR.

19  Q.   WHAT DID HE TELL YOU DURING THE COURSE OF THAT INTERVIEW?

20  THE DEFENDANT HERE IN THIS COURTROOM, WHAT DID HE TELL YOU?

21  A.   SIR, HE SAID SEVERAL THINGS.  WE TALKED ABOUT DIFFERENT

22  THINGS, WHERE HE HAD LIVED IN ANAHEIM, CALIFORNIA, WHEN HE

23  ENTERED INTO THE UNITED STATES, HIS OTHER SUBJECTS THAT WERE

24  INVOLVED IN THE DRUG TRAFFICKING ORGANIZATION.  HE EVEN GAVE

25  NAMES.

1  Q.   DID HE -- DID YOU TALK TO HIM REGARDING THE APARTMENT ON

2  PEACHTREE INDUSTRIAL, L-8?

3  A.   WE DID SPEAK ABOUT THE L-8.  THAT'S WHEN HE --

4  Q.   WHAT HE DID HE TELL YOU ABOUT THAT?

5  A.   HE TOLD ME WHAT HIS ROLE WAS IN L-8, BUT HE ALSO TOLD ME

6  THAT THE DRUGS BELONGED TO SEVERAL OTHER GENTLEMEN THAT WERE

7  INVOLVED IN THE ORGANIZATION, HOWEVER, SOME -- MAYBE ONE WAS IN

8  MEXICO, ONE MAY BE OUT OF STATE, THAT -- HE WAS PRETTY MUCH A

9  CARETAKER AT THAT APARTMENT AT THAT TIME, BUT THE DRUGS WERE --

10  BELONGED TO OTHER PEOPLE.

11  Q.   AND WHAT DID HE TELL YOU REGARDING THE PERSON WALKING THE

12  DOG AND THE PERSON LIVING AT THAT APARTMENT?

13  A.   ACTUALLY HE DID TELL ME THE PERSON THAT WAS WALKING THE DOG

14  WAS HIM.  HE TOLD ME HE LEFT THE APARTMENT 15 MINUTES PRIOR TO

15  US GETTING THERE AND THAT HE WAS ENCOUNTERED BY THE POLICE, BUT

16  THE POLICE LET HIM GO.

17  Q.   AND WHAT ABOUT WHETHER OR NOT HE WAS THE -- THAT PERSON --

18  IT'S OBVIOUS -- THAT PERSON THAT LIVED AT THE APARTMENT WITH THE

19  YOUNG BOY OR WITH THE YOUNG MAN, WHETHER HE WAS THAT PERSON?

20  A.   HE TOLD ME THAT WAS HIM.

21  Q.   NOW, WHAT, IF ANYTHING, DID HE TELL YOU ABOUT HIS -- IF HE

22  TOLD YOU ANYTHING, ABOUT HIS NAME AND/OR NAMES?

23  A.   ARZATE WAS HIS LAST NAME.  I DON'T KNOW HOW TO PRONOUNCE --

24  C-A-M-A-N-E-Y, CAMANEY, OR SOMETHING LIKE THAT, ARZATE WAS HIS

25  NAME.  THAT'S WHAT HE TOLD ME ON THE -- AUGUST 16TH.  HE DID

1  PRESENT AN I.D. CARD.  HE TOLD ME ABOUT THE I.D. WHEN HE GOT

2  STOPPED BY THE POLICE ON AUGUST 16TH -- I MEAN, AUGUST 23RD.

3  AND I FORGOT THE NAME THAT WAS ON THAT I.D. CARD.  HE TOLD ME

4  WHAT IT WAS, AND I JUST -- I FORGOT.  I DON'T RECALL THAT NAME.

5  Q.    NOW, IF YOU KNOW, WAS THIS INTERVIEW OF HIM PRIOR TO

6  CHARGES BEING BROUGHT AGAINST HIM IN THIS DISTRICT, IN THE

7  NORTHERN DISTRICT OF GEORGIA, FEDERAL CHARGES, IF YOU KNOW?

8  A.    NO, SIR.  THIS WAS DONE IN AUGUST, AUGUST 16TH OF 2012,

9  SIR.

10 Q.    AND HOW DID THE INTERVIEW CONCLUDE?

11 A.    ACTUALLY THE INTERVIEW WENT WELL.  I MEAN, HE COMPLIED.

12 THERE WAS NO MISUNDERSTANDING.  WE SAT THERE FOR A PERIOD OF

13 TIME.  THE INTERVIEW CONCLUDED WELL, SIR.  THE INFORMATION THAT

14 HE PROVIDED FOR US -- ACTUALLY HE PRETTY MUCH KIND OF CLEARED

15 EVERYTHING UP.

16          MR. WILLIAMS:  YOUR HONOR, I HAVE NO FURTHER QUESTIONS

17 AT THIS TIME.

18          THE COURT:  OKAY.  YOU READY, MR. SHREENATH?  YOUR

19 WITNESS.

20          MR. SHREENATH:  THANK YOU, JUDGE.

21                     CROSS-EXAMINATION

22 BY MR. SHREENATH:

23 Q.    GOOD AFTERNOON, DETECTIVE AGUILAR.

24 A.    HOW ARE YOU DOING, SIR?

25 Q.    I'M DOING WELL.  HOW ARE YOU?

1  A.   FINE.  THANK YOU, SIR.

2  Q.   I WANT TO PICK UP WHAT YOU HAD JUST MENTIONED ON DIRECT.

3  YOUR TESTIMONY WAS THAT MY CLIENT TOLD YOU THAT HE WAS THE ONE

4  OUTSIDE THE APARTMENT PRESENTING AN I.D. TO AN OFFICER, BUT THE

5  OFFICER LET HIM GO?

6  A.   CORRECT, SIR, 15 MINUTES PRIOR TO US KNOCKING AT THE DOOR.

7  HE JUST STEPPED OUT.  HE SAID HE WAS WALKING SOME DOGS.

8  Q.   DID YOU MAKE A REPORT FOR THIS CASE?

9  A.   I MADE A REPORT ON THE INTERVIEW THAT HIM AND I HAD.

10  Q.   OKAY.  NOW, YOU HAD -- GOING BACK TO AUGUST OF 2011,

11  AUGUST 23RD 2011 --

12  A.   YES, SIR.

13  Q.   -- PRIOR -- WELL, LET ME BACK UP.  PRIOR TO AUGUST 23RD,

14  2012, HAD YOU EVER SEEN MY CLIENT?

15  A.   2012, NO, SIR.  YOU MEAN '11?

16  Q.   NO, SIR.  WHEN WAS THE FIRST TIME YOU SAW MY CLIENT?

17  A.   AUGUST 16TH, 2012.

18  Q.   OKAY.  SO AT THE TIME THE SEARCH TOOK PLACE ON AUGUST 23RD,

19  2011, YOU HAD NEVER SEEN MY CLIENT; CORRECT?

20  A.   I NEVER HAVE, SIR.

21  Q.   OKAY.  AND YOU HAD NEVER SEEN ANY PHOTOGRAPHS OF MY CLIENT;

22  CORRECT?

23  A.   YES, I BELIEVE WE DID.  THERE WAS SOME PHOTOGRAPHS.  I'M

24  NOT TOO SURE -- I HAD AN IDEA, BUT AS FAR AS PHYSICAL, NO, SIR.

25  Q.   WHEN -- DO YOU REMEMBER WHEN YOU SAW THE PHOTOGRAPH?

1  A.   NO, SIR.  NO, SIR.

2  Q.   WOULD IT HAVE BEEN BEFORE OR AFTER THE AUGUST 23RD, 2011

3  SEARCH?

4  A.   BEFORE, SIR.

5  Q.   OKAY.  ALL RIGHT.  DO YOU KNOW ABOUT HOW MANY WEEKS OR

6  MONTHS BEFORE?

7  A.   NO, SIR.  I'M SORRY.  NO, I DON'T KNOW HOW LONG.

8  Q.   AND DID YOU SAY A PHOTOGRAPH OR PHOTOGRAPHS?

9  A.   THERE'S PROBABLY SOME SURVEILLANCE PHOTOGRAPHS, SIR.  YOUR

10  CLIENT'S BEEN UNDER SURVEILLANCE FOR A WHILE.

11  Q.   OKAY.  AND HOW DO YOU -- WHEN YOU SAY YOU SAW PHOTOGRAPHS,

12  SURVEILLANCE PHOTOGRAPHS, CAN YOU TELL US A LITTLE BIT MORE

13  ABOUT WHERE THE PHOTOGRAPHS WERE TAKEN AND WHAT YOU RECALL ABOUT

14  THE PHOTOGRAPHS?

15  A.   NO, SIR.  NO, SIR.

16  Q.   OKAY.  BUT YOU'RE SURE THAT IT WAS SEVERAL?

17  A.   THERE WERE SURVEILLANCE PHOTOS, SIR.  I JUST CAN'T GIVE YOU

18  THE EXACT DATES AND TIMES AND LOCATIONS.

19  Q.   WELL, THAT WAS MY NEXT QUESTION.  CAN YOU AT LEAST TELL US

20  WHAT AREA OF TOWN OR WHERE THESE PHOTOS WERE --

21  A.   THAT PARTICULAR AREA, SIR.

22  Q.   OKAY.

23  A.   YES, SIR.

24        MR. SHREENATH:  MAY I APPROACH THE WITNESS?

25        THE COURT:  YES, YOU MAY.

UNITED STATES DISTRICT COURT OFFICIAL CERTIFIED TRANSCRIPT

1  BY MR. SHREENATH:

2  Q.   I'M GOING TO HAND YOU WHAT'S BEEN MARKED AS B1.  DO YOU

3  RECOGNIZE THAT DOCUMENT?

4  A.   YEAH, THAT'S HIM, SIR.

5  Q.   OKAY.  AND HAVE YOU SEEN THIS PHOTOGRAPH BEFORE?

6  A.   I'VE SEEN THIS PHOTOGRAPH BEFORE.  I DON'T KNOW WHERE,

7  THOUGH, SIR.

8  Q.   OKAY.  AND WHEN YOU SAY YOU'VE SEEN IT BEFORE, WOULD YOU

9  HAVE SEEN THIS PHOTOGRAPH BEFORE AUGUST 23RD, 2011?

10  A.   YES, SIR.

11  Q.   OKAY.

12  A.   I JUST DON'T REMEMBER WHERE THIS WAS.

13  Q.   DO YOU RECOGNIZE ANYTHING IN TERMS OF THE LOCATION?

14  A.   NO, SIR.  THAT'S WHAT I WAS TRYING TO DO, BUT I DO -- I DO

15  DEFINITELY RECOGNIZE THE DEFENDANT, SIR.

16  Q.   OKAY.  HAVE YOU SEEN ANY OTHER PHOTOGRAPHS OF HIM OTHER

17  THAN THIS PRIOR TO AUGUST OF 2011?

18  A.   THERE MIGHT BE SOME MORE, SIR, BUT I'M NOT -- I DON'T HAVE

19  THEM, SIR.

20  Q.   OKAY.  ALL RIGHT.  SO WHEN YOU GOT TO THE APARTMENT ON

21  AUGUST 23RD, 2011, YOU SAID THAT YOU HAD AN INTEREST -- YOU AND

22  YOUR COLLEAGUES HAD AN INTEREST IN L-8 APARTMENT --

23  A.   YES, SIR.

24  Q.   -- CORRECT?

25  A.   YES, SIR.

```
 1   Q.    DID YOU KNOW WHO YOUR TARGET INDIVIDUAL WAS GOING TO BE?

 2   A.    WE WERE HOPING YOUR -- THE DEFENDANT, SIR.

 3   Q.    OKAY.  AND YOU ALREADY HAD HIS PHOTOGRAPH BEFORE YOU

 4   CONDUCTED THE SEARCH; CORRECT?

 5   A.    WE HAD AN IDEA THAT THAT'S WHERE HE MIGHT BE, SIR, WAS OUT

 6   THERE.

 7   Q.    AND ON AUGUST 23RD, 2011, YOU SAID YOU AND THREE OR FOUR

 8   OTHER OFFICERS WENT TO THE APARTMENT; CORRECT?

 9   A.    CORRECT, SIR.

10   Q.    OKAY.  AND YOU SAID IT COULD HAVE BEEN -- IT WAS OFFICER

11   CROMER?

12   A.    TONY SMITH.

13   Q.    TONY SMITH?

14   A.    KEVIN CLONINGER.  SIR, THERE MIGHT HAVE BEEN ONE MORE, BUT

15   IF IT WAS, HE WAS WAY BEHIND ME.

16   Q.    OKAY.  AND THE APARTMENT COMPLEX, THE 6750 PEACHTREE

17   INDUSTRIAL BOULEVARD, DO YOU REMEMBER IF IT'S THREE LEVELS OF

18   APARTMENTS OR TWO OR ONE?

19   A.    I CAN'T REMEMBER, SIR.

20   Q.    OKAY.  DO YOU KNOW WHAT LEVEL L-8 WAS IN?

21   A.    IT WAS UPSTAIRS, SIR, I DO KNOW THAT.  I DON'T KNOW HOW

22   HIGH -- HOW HIGH UP, SO I REMEMBER GOING A FLIGHT OF STAIRS,

23   MAYBE ONE FLIGHT OF STAIRS, SIR.

24   Q.    OKAY.  SO YOU GOT TO THE APARTMENT, YOU AND THE OTHER

25   OFFICERS GOT TO L-8, CORRECT, THE DOOR WAS CLOSED AT THAT TIME;
```

1    CORRECT?

2    A.    MM-HUM.

3    Q.    AND YOU DIDN'T SEE ANY INDIVIDUAL AT THAT POINT WALKING A

4    DOG OR WALKING A COUPLE OF DOGS OR ANYTHING LIKE THAT; CORRECT?

5    A.    NO, SIR, I DID NOT.

6    Q.    OKAY.  AND YOU ALREADY HAD MY CLIENT'S PHOTOGRAPH EITHER

7    WITH YOU OR YOU HAD SEEN IT BEFORE; CORRECT?

8    A.    IT WAS NOT WITH ME, CORRECT.

9    Q.    AND OTHER AGENTS HAD ALSO BEEN MADE AWARE OF THIS

10   PHOTOGRAPH, CORRECT, OF MY CLIENT?

11   A.    CORRECT.

12   Q.    OKAY.  AND YOU ALL DIDN'T SEE HIM THERE ON THAT DAY?

13   A.    SIR, I DID NOT SEE HIM THERE THAT DAY, NO, SIR.

14   Q.    AND YOU DIDN'T HEAR FROM ANYBODY SAYING, HEY, WE SAW THE

15   GUY THAT LOOKED LIKE THE GUY IN THE PHOTO, OR ANYTHING LIKE

16   THAT?

17   A.    I HEARD AFTER THE FACT, SIR.

18   Q.    WHO TOLD YOU THAT?

19   A.    THE GENTLEMAN THAT ANSWERED THE DOOR.

20   Q.    CARLOS?

21   A.    YEAH, THAT THAT COULD HAVE BEEN HIM, THE ONE WALKING THE

22   DOGS.  THEN HE TOLD ME ON AUGUST 16TH, 2012.

23   Q.    WHEN DID CARLOS TELL YOU?

24   A.    THE DAY WE KNOCKED ON THE DOOR, SIR.

25   Q.    HE TOLD YOU -- DID YOU SHOW HIM A PICTURE OF THIS --

1   A.   NO, SIR, I DIDN'T.

2   Q.   DO YOU KNOW IF ANY OTHER OFFICERS SHOWED HIM THE PICTURE?

3   A.   NO, SIR, I'M NOT -- NOT THAT I'M AWARE OF.

4   Q.   SO HOW DID THAT COME UP IN THE CONVERSATION?

5   A.   SIR, HE SAID THE GUY JUST LEFT HERE WALKING TWO DOGS.  IT

6   WAS BROUGHT TO MY ATTENTION LATER THAT THERE WAS A SUBJECT THAT

7   WAS STOPPED WALKING TWO DOGS AND THAT THAT COULD HAVE BEEN HIM.

8   NOW, HOW THAT INTERVIEW WENT, I DON'T KNOW.  BUT THEN AGAIN,

9   THAT WAS BROUGHT TO MY ATTENTION AFTER THE FACT, SIR.

10  Q.   OKAY.  SO CARLOS DIDN'T SPECIFICALLY SAY, HEY, PABLO IS THE

11  ONE WHO WAS OUTSIDE WALKING TWO DOGS; IS THAT CORRECT?

12  A.   HE DIDN'T LOOK -- HE DIDN'T SEE A PHOTOGRAPH.  HE DIDN'T

13  POINT TO A PHOTOGRAPH.  HE DID NOT SAY THAT, SIR.

14  Q.   OKAY.  AND HE NEVER MENTIONED THE NAME OF THE INDIVIDUAL

15  THAT WAS OUT THERE WALKING TWO DOGS; CORRECT?

16  A.   HE NEVER TOLD ME A NAME, SIR.

17  Q.   SO AFTER YOU KNOCKED ON THE DOOR YOU SAID IT WAS ABOUT FIVE

18  MINUTES BEFORE CARLOS OPENED THE DOOR; CORRECT?

19  A.   IT COULD HAVE BEEN A LITTLE LONGER, SIR.

20  Q.   OKAY.  AND DO YOU KNOW WHO WAS THE FIRST OFFICER TO TALK TO

21  HIM?

22  A.   ME.

23  Q.   OKAY.  AND WHAT WAS THE CONVERSATION THAT YOU AND HE HAD

24  INITIALLY?

25  A.   HEY, HELLO, HOW ARE YOU, SIR?  HOW ARE YOU DOING?  WHAT

1  TOOK SO LONG TO ANSWER THE FRONT DOOR?

2  Q.   OKAY.  AND WHAT WAS HIS RESPONSE?

3  A.   HE SAID HE WAS NERVOUS.  HE SAID HE WAS SCARED.  HE WALKED

4  OUT TO THE BALCONY AND SAW THE OTHER POLICE.

5  Q.   OKAY.  AND WHAT WAS THE NEXT CONVERSATION THAT YOU AND

6  CARLOS HAD?

7  A.   WE SET DOWN IN A CHAIR RIGHT AT A TABLE FOR A SHORT, BRIEF

8  TIME DUE TO THE FACT THAT -- THE ITEMS FOUND INSIDE OF THE

9  APARTMENT.  AND HE JUST TOLD ME, HEY, THE GUY THAT LIVES IN THIS

10  APARTMENT JUST LEFT.

11  Q.   OKAY.  LET ME BACK UP A LITTLE BIT.  CARLOS OPENS THE DOOR.

12  YOU ASK HIM, HEY, WHAT TOOK YOU SO LONG?  AND HE SAYS, I WAS OUT

13  ON THE BALCONY -- SOMETHING TO THE EFFECT OF, I WAS OUT ON THE

14  BALCONY, POLICE TOLD ME TO GO OPEN THE DOOR.  AND THEN YOU ALL

15  ARE IN THE APARTMENT SITTING ON A SOFA OR A CHAIR OR SOMETHING

16  LIKE THAT?

17  A.   NO.  WE SAT IN A CHAIR.

18  Q.   SAT IN A CHAIR.

19  A.   SAT IN A CHAIR, YES.

20  Q.   AND WHO ALL WENT INTO THE APARTMENT?

21  A.   AFTER THE SECURITY SWEEP WAS DONE, MAYBE FOUR OR FIVE OF

22  US, SIR --

23  Q.   OKAY.

24  A.   -- WENT IN THERE.  AND WE KIND OF BACKED OUT AFTER THAT.

25  Q.   WHO CONDUCTED THE SECURITY SWEEP?

1   A.   SIR, MYSELF AND THE THREE GENTLEMEN AT THE FRONT DOOR.

2   THERE COULD HAVE BEEN ANOTHER ONE BEHIND ME.  I DON'T REMEMBER

3   WHO IT WAS.  I DON'T REMEMBER HIS NAME, SIR.

4   Q.   AND HOW SOON AFTER YOU WALKED INTO THE APARTMENT DID YOU

5   CONDUCT THE SECURITY SWEEP?

6   A.   NO.  WE WENT IN THERE AFTER HE INVITED US IN, SIR, AFTER HE

7   GAVE US CONSENT TO COME IN.

8   Q.   OKAY.  MY QUESTION IS HOW SOON AFTER YOU WENT IN DID YOU

9   CONDUCT THE SECURITY SWEEP?

10  A.   ABOUT A MINUTE, SIR.

11  Q.   OKAY.  SO YOU WALKED IN, YOU'RE SITTING IN THE CHAIR HAVING

12  A CONVERSATION WITH CARLOS, AND THEN YOU CONDUCT THE SECURITY

13  SWEEP?

14  A.   NO, SIR.  WE WALKED IN, WE DID THE SECURITY SWEEP, WE SAT

15  DOWN ON THE CHAIR.  FIRST OF ALL, HE GAVE CONSENT TO COME IN.

16  HE INVITED US TO COME IN.  NOW, DUE TO THE NATURE OF THE WEAPONS

17  BEING FOUND INSIDE THE APARTMENT, THE SECURITY SWEEP HAD CHANGED

18  A LITTLE BIT MORE.

19  Q.   NOW, YOU MENTIONED HE GAVE CONSENT TO COME IN.  DID YOU ALL

20  ASK FOR CONSENT OUTSIDE THE APARTMENT, OR DID YOU WALK IN AND

21  THEN SAY, HEY, CAN WE COME IN?

22  A.   OUTSIDE THE APARTMENT, SIR.

23  Q.   OKAY.  AND YOUR TESTIMONY IS AT THIS POINT YOU HAVE YOUR

24  WEAPONS WITH YOU, BUT THE GUNS ARE NOT DRAWN?

25  A.   THEY WERE NOT DRAWN, SIR.

 1  Q.    OKAY.  AND SO HE GIVES YOU THE PERMISSION TO COME INSIDE.

 2  A.    MM-HUM.

 3  Q.    YOU COME IN.  YOU SIT IN THE, I GUESS, DEN AREA OR FAMILY

 4  AREA OR SOMETHING TO THAT EFFECT.

 5  A.    IT WAS AN APARTMENT, SIR, LIVING ROOM AREA.

 6  Q.    LIVING ROOM AREA?

 7  A.    THAT WOULD BE MY BEST GUESS, YES.

 8  Q.    SO YOU AND CARLOS ARE SITTING THERE HAVING A CONVERSATION;

 9  CORRECT?

10  A.    YES, SIR.

11  Q.    AND OTHER AGENTS ABOUT A MINUTE LATER CONDUCT A SECURITY

12  SWEEP; CORRECT?

13        MR. WILLIAMS:  OBJECTION, YOUR HONOR.  ASKED AND

14  ANSWERED.  THAT WASN'T THE TESTIMONY.

15        THE COURT:  OKAY.  REPHRASE.

16  BY MR. SHREENATH:

17  Q.    DID YOU CONDUCT A SECURITY SWEEP AFTER YOU HAD THE

18  CONVERSATION WITH HIM INSIDE THE APARTMENT?

19  A.    NO, SIR.

20        MR. WILLIAMS:  YOUR HONOR, ASKED AND ANSWERED.

21        MR. SHREENATH:  I'LL MOVE ON, JUDGE.

22        THE COURT:  OKAY.  THANK YOU.

23        MR. SHREENATH:  SURE.

24  BY MR. SHREENATH:

25  Q.    I WANT TO UNDERSTAND YOU CORRECTLY.  DID YOU SEE ANYTHING

1  TO CONDUCT A SECURITY SWEEP?

2  A.   GUNS, SIR.   THEY WERE ALL OVER THE PLACE.

3  Q.   WHERE EXACTLY DO YOU SEE THE GUNS?

4  A.   I CANNOT TELL YOU EXACTLY, BUT, SIR, THEY WERE VERY MUCH IN

5  PLAIN VIEW, MADE US KIND OF NERVOUS.

6  Q.   OKAY.   YOU SAY YOU KNOW IT WAS IN PLAIN VIEW --

7  A.   YES, SIR.

8  Q.   -- BUT YOU DON'T KNOW WHERE IN THE APARTMENT IT WAS?

9  A.   SIR, I DIDN'T SPECIFICALLY LOOK EXACTLY THE CORNER, IN

10  WHICH CORNER EXACTLY AND WHAT IT WAS.   I JUST NOTICED A GUN IN

11  MY PRESENCE.

12  Q.   OKAY.   SO IS IT ONE GUN OR MULTIPLE GUNS?

13  A.   THERE WAS MULTIPLE GUNS, SIR.

14  Q.   SO YOU SAW MULTIPLE -- MULTIPLE GUNS IN PLAIN VIEW AFTER

15  YOU ENTERED THE APARTMENT?

16  A.   AND MULTIPLE DRUGS.

17         MR. WILLIAMS:  OBJECTION, YOUR HONOR.  ASKED AND

18  ANSWERED.

19         THE COURT:  ONE AT A TIME.

20         MR. SHREENATH:  I'LL MOVE ON.

21  BY MR. SHREENATH:

22  Q.   DO YOU RECALL WHERE IN THE APARTMENT YOU SAW THE GUNS?

23  A.   SIR, THERE'S PHOTOGRAPHS OF WHERE THEY WERE.   THOSE CAN

24  HELP ME OUT IF I TAKE A LOOK AT THOSE PHOTOGRAPHS.   AND I'LL

25  HELP YOU OUT AND TELL YOU EXACTLY WHERE THEY WERE.

1           MR. SHREENATH:  MAY I APPROACH THE WITNESS, JUDGE?

2           THE COURT:  YES, YOU MAY.

3   BY MR. SHREENATH:

4   Q.   COULD YOU LOOK AT -- THIS IS A LIST OF EXHIBITS A1 THROUGH

5   A34.

6   A.   MM-HUM.

7   Q.   IF YOU WOULDN'T MIND GOING THROUGH THOSE AND LOOKING AT THE

8   ONES THAT HAVE PHOTOGRAPHS OF WEAPONS --

9   A.   ABSOLUTELY.

10  Q.   -- SPECIFICALLY.  AND IF YOU COULD IDENTIFY WHICH ONES YOU

11  SAW IN THE LIVING ROOM IN PLAIN VIEW.

12  A.   HERE'S ONE WEAPON.

13  Q.   WHAT EXHIBIT NUMBER ARE YOU REFERRING TO?

14  A.   A2.

15  Q.   OKAY.  AND --

16  A.   IT'S GOT A PICTURE WITH THE DEFENDANT NEXT TO IT.

17  Q.   IS THAT -- IN A2 -- CAN WE GO BACK TO A2 FOR A SECOND?

18  A.   UH-HUH.

19  Q.   IS IT YOUR TESTIMONY THAT YOU SAW THE ITEM DEPICTED IN A2

20  IN PLAIN VIEW?

21  A.   YEAH, BECAUSE THE DRAWER WAS ACTUALLY OPENED, SIR.

22  Q.   AND WHERE WAS THE DRAWER LOCATED?

23  A.   I BELIEVE IN A BEDROOM, SIR.

24  Q.   OKAY.

25  A.   YEAH.

1   Q.   SO YOU -- THAT WASN'T IN THE LIVING ROOM THAT YOU SAW THE

2   GUN; CORRECT?

3   A.   SIR, THERE'S ANOTHER WEAPON HERE, EXHIBIT A6, THAT WAS ALSO

4   LOCATED, FOUND.

5   Q.   AND --

6   A.   I'M NOT TOO SURE WHERE THIS IS, SIR.

7   Q.   YOU DON'T KNOW WHERE THAT WAS FOUND?

8   A.   NO, SIR.

9   Q.   OKAY.

10  A.   I DID NOT SEARCH, SIR, IF THAT WILL HELP YOU OUT.  I DID

11  NOT SEARCH.  I DID NOT COLLECT ANY EVIDENCE WHATSOEVER.

12  Q.   I UNDERSTAND.  I WAS JUST TRYING TO SEE IF YOU RECALL -- I

13  THINK YOUR TESTIMONY WAS THAT YOU SAW GUNS IN PLAIN VIEW, AND

14  I'M JUST TRYING TO --

15  A.   YES, SIR, THERE WERE GUNS IN PLAIN VIEW, SIR.

16  Q.   AND SO FAR YOU'VE IDENTIFIED --

17  A.   WELL, EXHIBIT A14, ANOTHER GUN IN A DRAWER.

18  Q.   AND WHERE WAS THE DRAWER LOCATED?

19  A.   SIR, IF I HAVE TO TAKE A GUESS, THIS DRAWER WOULD BE IN A

20  BEDROOM NEXT TO A BED, SIR.

21  Q.   OKAY.

22  A.   ANOTHER GUN -- WELL, IT'S A SHOTGUN ON THE FLOOR.  I DON'T

23  KNOW WHICH BEDROOM, SIR.

24  Q.   OKAY.

25  A.   AND THEN LOOKS LIKE THERE'S EXHIBIT 16, ANOTHER GUN.  I'M

1   NOT TOO SURE WHERE THIS WAS LOCATED, SIR.

2   Q.   DOES IT LOOK LIKE IT WAS A GUN THAT WAS IN THE LIVING ROOM,

3   OR DO YOU NOT KNOW LOOKING AT THAT EXHIBIT 16?

4   A.   NO, SIR.  I DON'T REMEMBER.  YOU KNOW WHAT, THERE WAS A GUN

5   UNDERNEATH -- YOU KNOW HOW WHEN YOU GO INTO A BEDROOM AND STUFF?

6   THERE WAS A GUN UNDERNEATH A CHEST OF DRAWER (VERBATIM) BECAUSE

7   IT LOOKED LIKE SOMEBODY TRIED TO KICK IT UNDERNEATH THERE OR

8   SOMETHING HANGING OUT UNDERNEATH.  SIR, THERE WAS MULTIPLE GUNS

9   INSIDE.  I MEAN, I WISH I COULD TELL YOU EXACTLY WHERE THEY

10  WERE, BUT UNFORTUNATELY THEY WERE IN PLAIN VIEW THAT JUST DREW

11  MY ATTENTION TO THAT.

12  Q.   AND WHEN YOU SAY "PLAIN VIEW," YOU'RE TALKING ABOUT PLAIN

13  VIEW IN THE BEDROOM, NOT IN THE LIVING ROOM; CORRECT?

14  A.   SIR, THEY WERE ALL OVER THE APARTMENT, I BELIEVE.

15  Q.   OKAY.

16  A.   I MEAN, I'M SURE THERE WAS MULTIPLE GUNS IN THE -- IN THE

17  BEDROOM TOO AS WELL, SIR.

18  Q.   THAT'S WHAT -- I GUESS THAT'S --

19  A.   I MEAN, HERE'S EXHIBIT A23.  I DON'T KNOW WHERE THEY WERE

20  FOUND, BUT THERE'S TWO MORE GUNS THERE, AND THOSE ARE AUTOMATIC

21  WEAPONS.

22  Q.   AND CAN -- YOU DON'T KNOW WHERE THOSE GUNS WERE FOUND?

23  A.   NO, SIR.  THE ONES I FOUND WERE HANDGUNS, AUTOMATIC GUNS.

24  NOT FOUND, SAW.

25  Q.   AND YOU SAW THOSE IN THE BEDROOM?

1  A.   I SAW -- I BELIEVE I SAW ONE IN THE LIVING ROOM, SIR.

2  Q.   WHERE IN THE LIVING ROOM?

3  A.   I DON'T KNOW WHERE.  PROBABLY RIGHT THERE -- I DON'T KNOW

4  EXACTLY WHERE, SIR.

5  Q.   IS THAT GUN IN THE PHOTOGRAPHS THAT YOU ARE LOOKING AT THE

6  ONE YOU CLAIM --

7  A.   IT WOULD BE THIS AUTOMATIC RIGHT HERE ON THE FLOOR,

8  EXHIBIT -- OH THIS ONE RIGHT HERE, EXHIBIT 22.  THAT MIGHT HAVE

9  BEEN IN THE BEDROOM, SIR.  I KNOW I SAW THAT ONE.

10  Q.   OKAY.  I GUESS MY QUESTION WAS -- I THOUGHT YOU WERE GOING

11  TO IDENTIFY THE GUN THAT YOU SAW IN THE LIVING ROOM.

12  A.   I MIGHT HAVE BEEN -- THIS ONE MIGHT HAVE BEEN THE ONE I SAW

13  IN THE BEDROOM, SIR.  THE ONE IN THE LIVING ROOM, I CAN'T

14  RECALL.

15  Q.   OKAY.  DID CARLOS TELL YOU ANYTHING THAT WOULD INDICATE

16  THAT THERE WAS ANYBODY ELSE IN THE APARTMENT?

17  A.   CARLOS TOLD ME THAT THERE WAS ANOTHER SUBJECT INSIDE THE

18  APARTMENT, SIR.

19  Q.   HE DID?

20  A.   YES, SIR.

21  Q.   OKAY.  DO YOU RECALL IF YOU PUT THAT IN YOUR REPORT?

22  A.   YES.  THE REPORT IN REFERENCE TO THE -- I PUT IT IN THE

23  REPORT I HAD WITH THE DEFENDANT THERE.  I HAVEN'T -- I GOT TO

24  GET BACK WITH THE REPORT WITH CARLOS, SIR.

25  Q.   WELL, LET ME -- LET ME BE CLEAR.  I GUESS MY QUESTION MAY

1  NOT HAVE BEEN CLEAR.  DID -- WHEN YOU SPOKE TO CARLOS AFTER YOU

2  ENTERED THE APARTMENT DID HE MENTION THAT THERE WAS ANOTHER

3  INDIVIDUAL AT THAT APARTMENT AT THAT TIME?

4  A.   AT THE TIME WE KNOCKED ON THE DOOR, SIR?

5  Q.   YES.

6  A.   NO, SIR.

7  Q.   OKAY.  DID HE GIVE YOU ANY INFORMATION THAT WOULD SUGGEST

8  THAT HE WAS A LESSOR OF THAT APARTMENT?

9  A.   SAY IT ONE MORE TIME, SIR.

10  Q.   THAT HE WAS LEASING THE APARTMENT.

11  A.   HE TOLD ME HE HAD MOVED IN THAT MORNING.

12  Q.   SIR, DID HE MENTION ANYTHING ABOUT HIS SISTER?

13  A.   NO, SIR.  I DON'T KNOW ANYTHING ABOUT HIS FAMILY, SIR.

14  Q.   OKAY.  AND WHAT WAS HIS INFORMATION ABOUT HIS CONNECTION TO

15  THE OTHER PERSON THAT LIVED IN THE APARTMENT?

16  A.   A FRIEND OF HIS, SIR.

17  Q.   JUST A FRIEND?

18  A.   A FRIEND OF HIS.

19  Q.   OKAY.  NO CONNECTION TO ANY OTHER FAMILY MEMBER?

20  A.   SIR, I DON'T KNOW ANYTHING ABOUT THE FAMILY, SIR.

21  Q.   OKAY.  AND I KNOW YOU KNOW NOW THAT CARLOS WAS AN ADULT --

22  IS AN ADULT, BUT AT THE TIME HOW DID YOU VERIFY OR COME TO THAT

23  CONCLUSION?

24  A.   I BELIEVE HE SAID HE WAS 19 YEARS OLD AT THAT TIME, SIR.

25  Q.   AND DID YOU ASK HIM HOW OLD HE WAS?

```
 1  A.   YES, SIR.

 2  Q.   OKAY.  IN THE NEXT -- THE ENCOUNTER THAT YOU HAD WITH MY

 3  CLIENT, THE FIRST ACTUAL ENCOUNTER WAS AUGUST 16, 2012; CORRECT?

 4  A.   16, YES, SIR.

 5  Q.   AND THAT WAS IN THIS BUILDING?

 6  A.   CORRECT, SIR.

 7  Q.   OKAY.  AND IT WAS AT THE D.E.A. OFFICE; CORRECT?

 8  A.   7TH FLOOR, SIR.

 9  Q.   OKAY.  AND WHEN YOU ENCOUNTERED HIM HE WAS IN THE INTERVIEW

10  ROOM; CORRECT?

11  A.   WE SET IN AN INTERVIEW ROOM, YES, SIR.

12  Q.   OKAY.  AND HE HAD SOME KIND OF A JAIL UNIFORM ON AT THAT

13  TIME?

14  A.   NO.  HE HAD PLAIN CLOTHES ON, SIR.

15  Q.   OKAY.  AND WHO ALL -- YOU SAID CROMER, SMITH, AND YOU --

16  A.   CORRECT.

17  Q.   WERE IN THE INTERVIEW ROOM; CORRECT?

18  A.   YES, SIR.

19  Q.   OKAY.  WAS ANYBODY ELSE THERE OTHER THAN MY CLIENT?

20  A.   NO, SIR, NOT AT THAT TIME.

21  Q.   OKAY.  AND WAS THERE EVER A RECORDING OF THE CONVERSATION

22  THAT YOU OR THE OTHERS HAD WITH MY CLIENT --

23  A.   NO, SIR.

24  Q.   -- IN THAT INTERVIEW ROOM?

25  A.   NO RECORDINGS.
```

1  Q.   NO AUDIO RECORDING?

2  A.   NO, SIR.

3  Q.   NO VIDEO RECORDING?

4  A.   NO, SIR.

5  Q.   NO AUDIO RECORDING THROUGH A CELL PHONE OR ANYTHING LIKE

6  THAT?

7  A.   NO, SIR, NOTHING.

8  Q.   NOTHING?

9  A.   NOTHING.

10  Q.   NO WRITTEN STATEMENTS OR ANYTHING LIKE THAT?

11  A.   NO, SIR.

12  Q.   AND WHAT I MEAN BY WRITTEN, NO STATEMENTS THAT HE WROTE OR

13  SIGNED OR ANYTHING LIKE THAT?

14  A.   NOTHING, SIR.

15          MR. SHREENATH:  OKAY.  NOTHING FURTHER, JUDGE.

16          THE COURT:  OKAY.  MR. WILLIAMS.

17                      REDIRECT EXAMINATION

18  BY MR. WILLIAMS:

19  Q.   OFFICER AGUILAR -- WELL, SPECIAL AGENT AGUILAR, BEFORE

20  INTERVIEWING THE DEFENDANT, MR. CAMERINO, WHAT, IF ANY, WARNINGS

21  DID YOU PROVIDE TO HIM?

22  A.   I DID READ HIM HIS MIRANDA WARNINGS, SIR, OFF MY 13A CARD.

23  Q.   IN WHAT LANGUAGE, ENGLISH OR SPANISH?

24  A.   EVEN THOUGH HE SPOKE ENGLISH, I READ THIS IN SPANISH TO HIM

25  SITTING RIGHT NEXT TO HIM.

```
1   Q.    DO YOU HAVE THAT FORM WITH YOU?

2   A.    I DO HAVE THAT WITH ME, SIR.

3   Q.    CAN YOU TAKE IT OUT?

4   A.    ABSOLUTELY.

5   Q.    IS THAT IN FACT THE FORM REQUIRED THAT YOU USE?

6   A.    THIS IS THE ONE I USED WITH HIM ON AUGUST 16TH, 2013 --

7   2012.

8   Q.    2012.  CAN YOU -- IF THE COURT DOESN'T MIND, CAN YOU TELL

9   US IN ENGLISH FROM THAT CARD WHAT YOU SAID TO HIM IN SPANISH?

10  A.    OF COURSE.  WOULD YOU LIKE FOR ME TO READ IT IN ENGLISH?

11  Q.    I WOULD, IF YOU DON'T MIND.

12  A.    AND IF I MAY, WHEN I DO DO THIS, YOUR HONOR, I ACTUALLY DO

13  SIT NEXT TO THE INDIVIDUAL AND I GET THIS INDIVIDUAL, NOT JUST

14  THE DEFENDANT -- INCLUDING THIS DEFENDANT, TO PARTICIPATE ON

15  THIS BY ASKING HIM TO READ THIS IF HE CAN AS WELL AND TO

16  ACTUALLY VERBALLY TELL ME YES OR NO IF HE UNDERSTANDS.

17  Q.    AND DID YOU FOLLOW THOSE PROCEDURES IN THIS INSTANCE?

18  A.    I ALWAYS -- IT'S JUST A HABIT OF MINE, SIR, YES, THOSE SAME

19  PROCEDURES.  AND ON THIS PARTICULAR DAY, AUGUST 16TH, 2012,

20  BEFORE WE ASK YOU ANY QUESTIONS, YOU MUST UNDERSTAND YOU HAVE

21  THE RIGHT TO REMAIN SILENT.

22  Q.    AND ARE YOU READING FROM THE SPANISH SIDE TRANSLATING IT

23  FOR US INTO ENGLISH?

24  A.    CORRECT.

25  Q.    THANK YOU.
```

1   A.   ANYTHING YOU SAY CAN BE USED AGAINST YOU IN COURT.   YOU

2   HAVE THE RIGHT TO TALK TO A LAWYER FOR ADVICE BEFORE WE ASK YOU

3   ANY QUESTIONS AND TO HAVE A LAWYER WITH YOU DURING -- DURING

4   QUESTIONING.  IF YOU CANNOT AFFORD A LAWYER, ONE WILL BE

5   APPOINTED FOR YOU BEFORE ANY QUESTIONING IF YOU WISH.  DO YOU

6   UNDERSTAND?  ARE YOU WILLING TO ANSWER ANY QUESTIONS?  BUT,

7   AGAIN, I READ THIS IN SPANISH TO HIM.

8   Q.   AND WHAT DID MR. CAMERINO, THE DEFENDANT, RESPOND TO YOU

9   AFTER YOU READ THAT TO HIM?

10  A.   HE WAS FINE.  HE COMPLIED.  WE HAD A CONVERSATION.  WE

11  SPOKE.

12  Q.   HE WAS WILLING TO ANSWER QUESTIONS?

13  A.   HE ANSWERED MANY QUESTIONS.

14  Q.   AND THAT WAS PRIOR -- AND YOU READ THAT TO HIM PRIOR TO HIM

15  ANSWERING ANY QUESTIONS DURING THAT INTERVIEW?

16  A.   WITNESSED BY TONY SMITH AND KEITH CROMER.

17          MR. WILLIAMS:  THANK YOU.  NOTHING FURTHER, YOUR

18  HONOR.

19          THE COURT:  OKAY.  ANYTHING ELSE, MR. SHREENATH?

20                      RECROSS-EXAMINATION

21  BY MR. SHREENATH:

22  Q.   DID YOU USE ANY KIND OF FORM TO INDICATE THAT HE HAD READ

23  AND UNDERSTOOD THE MIRANDA WARNINGS THAT YOU --

24  A.   SIR, THIS IS THE FORM THAT I USE ALL THE TIME.  THIS IS ONE

25  THAT I READ TO THEM.

1    Q.    OTHER THAN THE CARD THAT YOU'RE READING FROM, WAS THERE ANY

2    OTHER FORM THAT WAS GIVEN --

3    A.    NO, SIR.

4    Q.    -- TO HIM DURING THE INTERVIEW?

5    A.    NO, SIR.

6    Q.    OKAY.  DO YOU RECALL CONVERSATIONS WHERE EITHER YOU OR

7    OTHER AGENTS TALKED ABOUT THE LENGTH OF TIME THAT HE'S FACING

8    POTENTIALLY IN THIS CASE?

9    A.    NO, SIR.

10   Q.    YOU DON'T REMEMBER THAT CONVERSATION?

11   A.    NO, SIR.  I DON'T EVEN KNOW IF THAT CONVERSATION EXISTS,

12   SIR.  I DIDN'T DO IT.  I DIDN'T DO ANYTHING LIKE THAT.

13   Q.    DO YOU KNOW HOW LONG THE INTERVIEW LASTED?

14   A.    IT'S DOCUMENTED, SIR.  I CAN'T GIVE YOU AN EXACT TIME NOW,

15   BUT IT IS DOCUMENTED.

16   Q.    AND THERE IS NO QUESTION THAT HE WAS -- HE WAS IN CUSTODY

17   AT THE TIME OF THE --

18            MR. WILLIAMS:  OBJECTION, YOUR HONOR.  BEYOND THE

19   SCOPE OF REDIRECT AND ASKING FOR A LEGAL CONCLUSION.

20            THE COURT:  OVERRULED.  HE CAN ANSWER.

21            THE WITNESS:  MA'AM?

22            THE COURT:  YOU CAN ANSWER THE QUESTION.

23            THE WITNESS:  NOT IN MY CUSTODY, NO, SIR.

24   BY MR. SHREENATH:

25   Q.    TO YOUR KNOWLEDGE, WAS HE IN THE CUSTODY OF OTHER AGENTS OR

1  LAW ENFORCEMENT IN GENERAL WHEN YOU READ THE MIRANDA WARNINGS TO

2  HIM?

3  A.   NO, SIR, I DID NOT KNOW HE WAS ARRESTED AT ALL.  THAT'S MY

4  FIRST TIME SEEING HIM, SIR.  I DIDN'T KNOW ANYTHING OR HAVE ANY

5  KNOWLEDGE ABOUT THAT.

6  Q.   OKAY.  AND YOU SAID THIS INTERVIEW TOOK PLACE ON THE

7  7TH FLOOR OF THIS BUILDING; CORRECT?

8  A.   YES, SIR.

9  Q.   AND DO YOU RECALL WHERE SPECIFICALLY WHICH ROOM AT YOUR

10 OFFICE?

11 A.   SIR, WE -- I DON'T -- I DON'T LIKE TO SAY THAT OUT LOUD,

12 BUT IT'S ON THE 7TH FLOOR, SIR.

13 Q.   OKAY.  I GUESS LET ME BE MORE DIRECT.  ARE THERE ANY

14 CAMERAS IN THE AREA THAT THE INTERVIEW TOOK PLACE?

15 A.   THE WHOLE BUILDING'S GOT CAMERAS, SIR, YES.

16 Q.   YES, THERE ARE CAMERAS?

17 A.   YES.

18 Q.   OKAY.  AND DO THE CAMERAS CAPTURE THE AREA WHERE YOU AND MY

19 CLIENT HAD THE CONVERSATION?

20 A.   SIR, I'M NOT -- I DON'T KNOW HOW THE SECURITY SYSTEM IS SET

21 UP IN THE BUILDING, SIR.  I WISH -- I WISH I KNEW, BUT I DON'T.

22         MR. WILLIAMS:  AND, YOUR HONOR, I WOULD OBJECT TO THIS

23 LINE AS BEYOND THE SCOPE OF REDIRECT AND ALSO I'D ASK ABOUT ITS

24 RELEVANCE.  AND, THIRDLY, IT DOES SEEM TO TREAD UPON SUBJECTS

25 THAT WE'D RATHER NOT ANSWER DIRECTLY ABOUT, IN OTHER WORDS,

1    SECURITY IN THIS BUILDING.

2            THE COURT:  LET ME SIMPLIFY IT.  WAS THE INTERVIEW

3    VIDEOTAPED?

4            THE WITNESS:  NO, MA'AM.

5            THE COURT:  OKAY.  I THINK THAT'S WHERE YOU WERE GOING

6    WITH THAT.  THAT WOULD BE THE ONLY ONE YOU CAN GET ANYWAY.

7            THE WITNESS:  NOT BY US, NO, MA'AM.

8            THE COURT:  TO YOUR KNOWLEDGE, ANY OF THE OTHER

9    AGENTS?

10           THE WITNESS:  NOBODY PERIOD.  THERE WAS -- NOBODY

11   FILMED IT, NO, MA'AM.

12           MR. SHREENATH:  WELL, MAY I JUST FOLLOW UP ON JUST

13   THAT PART, YOUR HONOR?

14           THE COURT:  OKAY.

15   BY MR. SHREENATH:

16   Q.   THE COURT ASKED YOU IF IT WAS VIDEOTAPED.  I UNDERSTAND

17   WHAT YOU'RE SAYING, THAT NOBODY WAS THERE WITH A VIDEO CAMERA

18   TAPING THAT INTERVIEW.  BUT WAS THE INTERVIEW CONDUCTED IN AN

19   AREA WHERE THERE WAS CAMERA SURVEILLANCE GOING ON?

20   A.   SIR, AGAIN, I THINK THIS BUILDING HAS A LOT OF CAMERAS.

21   THAT WOULD BE MY INTELLIGENT GUESS.  WHERE AND WHEN AND HOW

22   THEY'RE BEING USED, I DON'T KNOW, SIR.

23           MR. SHREENATH:  OKAY.  NOTHING FURTHER, JUDGE.

24           THE COURT:  OKAY.  ANYTHING ELSE OF THIS WITNESS?

25           MR. WILLIAMS:  ONE QUESTION, YOUR HONOR, JUST TO PUT A

1    FINE POINT ON IT.

2                        REDIRECT EXAMINATION

3    BY MR. WILLIAMS:

4    Q.    THE INTERVIEW ITSELF WAS NOT BEING VIDEOTAPED FOR

5    INVESTIGATIVE OR LAW ENFORCEMENT PROCEDURES?

6    A.    NO, SIR.

7            MR. WILLIAMS:  OKAY.  NOTHING FURTHER BEYOND THAT,

8    YOUR HONOR.

9            THE COURT:  ANYTHING ELSE, MR. SHREENATH?

10        OKAY.  YOU MAY STEP DOWN.

11           THE WITNESS:  THANK YOU, MA'AM.

12           MR. WILLIAMS:  YOUR HONOR, THE GOVERNMENT RESTS AT

13   THIS TIME AND HAS NO FURTHER WITNESSES.

14           THE COURT:  OKAY.  MR. SHREENATH.

15           MR. SHREENATH:  JUDGE, I'VE GOT ONE.  MY CLIENT IS THE

16   WITNESS THAT I'D LIKE TO CALL.

17           THE COURT:  AND I'D JUST REMIND HIM AGAIN, YOU DO HAVE

18   THE RIGHT TO REMAIN SILENT.  ANYTHING YOU SAY CAN AND WILL BE

19   USED AGAINST YOU.  AND YOU ALSO UNDERSTAND THAT THE GOVERNMENT

20   IS ENTITLED TO A THOROUGH AND SIFTING CROSS-EXAMINATION.  SO I

21   WOULD JUST WARN YOU THAT BEFORE YOU TAKE THE WITNESS STAND,

22   PARTICULARLY IF YOU DECIDE YOU DON'T WANT TO TAKE THE WITNESS

23   STAND AND IF YOU GO TO TRIAL IN THIS CASE, THESE WORDS THAT YOU

24   USE DURING THIS PROCEEDING CAN COME BACK AND BE USED AGAINST

25   YOU.  DO YOU UNDERSTAND THIS?

1          MR. CAMERINO:  YES.

2          THE COURT:  AND HAVE YOU DISCUSSED YOUR RIGHT TO TAKE

3  THE WITNESS STAND WITH YOUR COUNSEL?

4          MR. SHREENATH:  JUST A COUPLE OF MINUTES, YOUR HONOR.

5          THE COURT:  OKAY.  LET ME FURTHER ADD AS HE'S DECIDING

6  WHETHER OR NOT TO TESTIFY, THIS IS PARTICULARLY SO IN THIS CASE

7  BECAUSE THE SUBJECT MATTER OF THIS HEARING IS WHETHER OR NOT THE

8  EVIDENCE THAT WAS -- YOUR STATEMENTS OR THE EVIDENCE FROM THE

9  APARTMENT SHOULD BE SUPPRESSED.  SO THAT'S -- WE'RE NOT GOING

10  BACK DISCUSSING THINGS OUTSIDE OF THAT.  WITH REGARD TO THE

11  APARTMENT, YOU WEREN'T THERE, SO I'M NOT SURE HOW MUCH YOU'RE

12  GOING TO BE ABLE TO ADD TO THAT.  SO THAT WOULD LEAVE US WITH

13  YOUR STATEMENTS THAT YOU PROVIDED.  SO WITH THAT HAVING BEEN

14  SAID, YOU GO AHEAD AND DECIDE WITH YOUR ATTORNEY AS TO WHETHER

15  OR NOT YOU WANT TO PROCEED WITH TAKING THE WITNESS STAND AND

16  TESTIFYING IN THIS CASE OR NOT.  OKAY.  YOU CAN HAVE A COUPLE OF

17  MINUTES.

18          MR. WILLIAMS:  YOUR HONOR, AND ONE ISSUE I WANTED TO

19  RAISE IF IT HADN'T BEEN -- AND MAYBE IT HAS BEEN ALREADY --

20  BEFORE THE DEFENDANT TESTIFIES, IS MY UNDERSTANDING IS THAT THE

21  DEFENDANT, TO ESTABLISH HIS RIGHT, HIS STANDING TO CONTEST THESE

22  ISSUES, THAT HE IS AFFIRMING THAT HE HAS STANDING AND THAT HE

23  HAS A RELATIONSHIP TO THAT APARTMENT COMPLEX.  BECAUSE IF -- IF

24  THE POSITION IS THAT WE'RE CONTESTING IDENTITY, THAT'S NOT ME IN

25  THE PARKING LOT WITH THE DOGS, THAT'S NOT MY APARTMENT, I HAVE

 1   NO RELATIONSHIP TO ANY OF THIS, THEN HE IS ALSO EFFECTIVELY

 2   SAYING I HAVE NO STANDING TO BRING FORTH ANY OF THESE

 3   CHALLENGES.  NOW, I PUT THAT OUT THERE BECAUSE I DON'T WANT IT

 4   TO BE -- I DON'T WANT ANYBODY TO BELIEVE OR NOT UNDERSTAND THAT

 5   THE GOVERNMENT IS PROCEEDING UNDER THE UNDERSTANDING THAT HE HAS

 6   STANDING AND THAT THAT'S WHAT HE'S ASSERTING.  IF HE'S NOT, THEN

 7   I DON'T THINK WE SHOULD BE HERE.

 8            THE COURT:  MR. SHREENATH.

 9            MR. SHREENATH:  WELL, WE ARE PREPARED TO ADDRESS THE

10   ISSUE OF STANDING.

11            THE COURT:  OKAY.  WITH REGARD TO THE APARTMENT?

12            MR. SHREENATH:  WITH REGARD TO THE APARTMENT.

13            THE COURT:  OKAY.

14            MR. SHREENATH:  WITH THAT, JUDGE, I'LL CALL MY CLIENT

15   AS A WITNESS.

16            COURTROOM DEPUTY CLERK:  MR. CAMERINO, IF YOU WOULD

17   RAISE YOUR RIGHT HAND TO BE SWORN.

18                (WITNESS SWORN.)

19            COURTROOM DEPUTY CLERK:  THANK YOU, SIR.  YOU CAN TAKE

20   YOUR SEAT.  IF YOU WOULD, PLEASE, STATE YOUR NAME FOR THE

21   RECORD.

22            THE WITNESS:  PABLO CAMANEY ARZATE.

23            COURTROOM DEPUTY CLERK:  COULD YOU SPELL THAT FOR THE

24   COURT, PLEASE.

25            THE WITNESS:  C-A-M-A-N-E-Y, A-R-Z-A-T-E.

1          COURTROOM DEPUTY CLERK:  THANK YOU.

2          THE COURT:  YOU MAY PROCEED.

3          MR. SHREENATH:  YOUR HONOR, BEFORE I ASK MY CLIENT

4  SOME QUESTIONS I JUST WANTED TO CLARIFY I BELIEVE THE GOVERNMENT

5  AND I AGREE THAT B1 HAS BEEN TENDERED INTO EVIDENCE.  IT IS A

6  PHOTOGRAPH DEPICTING MY CLIENT.

7          THE COURT:  I DON'T THINK IT WAS, BUT IF YOU WANT TO

8  ADMIT IT INTO EVIDENCE, WE CAN.

9          MR. SHREENATH:  WE WOULD MOVE TO TENDER B1.

10          THE COURT:  OKAY.  B OR D?  DEFENDANT'S EXHIBIT 1.

11          MR. SHREENATH:  YES, 'B' AS IN BOY.

12          THE COURT:  OH, GOVERNMENT'S EXHIBIT B --

13          MR. WILLIAMS:  GOVERNMENT EXHIBIT B1, 'B' AS IN BOY.

14          THE COURT:  OKAY.

15          MR. WILLIAMS:  AND IF HASN'T BEEN WE WOULD OFFER IT

16  INTO EVIDENCE, IF IT HASN'T BEEN.

17          THE COURT:  ALL RIGHT.  GOVERNMENT'S EXHIBIT B1 IS

18  ADMITTED.

19          MR. WILLIAMS:  THANK YOU, YOUR HONOR.

20                    PABLO CAMANEY ARZATE

21      CALLED AS A WITNESS BY THE DEFENDANT, AFTER HAVING

22      BEEN FIRST DULY SWORN, TESTIFIED AS FOLLOWS:

23                    DIRECT EXAMINATION

24  BY MR. SHREENATH:

25  Q.   WHAT IS YOUR LEGAL NAME?

```
 1  A.    PABLO CAMANEY ARZATE.

 2  Q.    AND WHERE WERE YOU BORN?

 3  A.    MEXICO.

 4  Q.    HOW OLD ARE YOU?

 5  A.    28.

 6  Q.    HOW LONG HAVE YOU BEEN IN THE UNITED STATES?

 7  A.    12 YEARS.

 8  Q.    AND DO YOU HAVE A PASSPORT FROM MEXICO?

 9  A.    CORRECT.

10  Q.    DO YOU HAVE A PASSPORT FROM ANY OTHER COUNTRY?

11  A.    NO.

12  Q.    AND IS THE PASSPORT IN YOUR TRUE AND LEGAL NAME?

13  A.    YES.

14          MR. SHREENATH:  MAY I APPROACH THE WITNESS, JUDGE?

15          THE COURT:  YES, YOU MAY.

16  BY MR. SHREENATH:

17  Q.    I WANT YOU TO LOOK AT WHAT'S BEEN MARKED GOVERNMENT'S

18  EXHIBIT A3.  DO YOU RECOGNIZE THAT DOCUMENT?

19  A.    YES.  THAT'S MY PASSPORT.

20  Q.    AND IS THAT A TRUE AND CORRECT COPY OF YOUR PASSPORT?

21  A.    YES.

22  Q.    OKAY.  AND IS THE INFORMATION ON THAT COPY ACCURATE?

23  A.    IT'S CORRECT.

24  Q.    THE PASSPORT WAS FOUND IN APARTMENT L-8, 6750 PEACHTREE

25  INDUSTRIAL BOULEVARD; IS THAT CORRECT?
```

1  A.   CORRECT.

2  Q.   HOW DID YOUR PASSPORT END UP IN THAT APARTMENT?

3  A.   WELL, WHAT HAPPENED WAS I WAS LIVING ON JIMMY CARTER WITH A

4  GIRLFRIEND THAT I HAD, BUT I HAD A FIGHT WITH HER AND I GRABBED

5  MY PERSONAL DOCUMENTS AND I GAVE THEM TO CAMERINOS (VERBATIM)

6  FOR HIM TO KEEP THEM FOR ME.

7  Q.   AND HAVE YOU BEEN TO APARTMENT L-8 ON 6750 PEACHTREE

8  INDUSTRIAL BOULEVARD?

9  A.   YES.

10  Q.   HAVE YOU BEEN -- HAVE YOU STAYED THERE OVERNIGHT?

11  A.   I STAYED THERE AT TIMES.

12  Q.   AND WHO WAS LIVING THERE IN THAT APARTMENT BACK IN AUGUST

13  OF 2011?

14  A.   CAMERINO.

15  Q.   AND WHEN YOU SAY "CAMERINO" YOU'RE TALKING ABOUT ALBEAR

16  CAMERINO?

17  A.   CORRECT.

18  Q.   OKAY.  AND DO YOU KNOW ABOUT HOW MANY TIMES YOU HAVE BEEN

19  IN THAT APARTMENT APPROXIMATELY?

20  A.   CONSTANTLY.

21  Q.   AND BACK ON AUGUST 23RD, 2011, WHERE WERE YOU LIVING?

22  A.   ON JIMMY CARTER, ON -- IN AN APARTMENT THAT'S NEAR 29.

23  Q.   AND WERE YOU LIVING BY YOURSELF OR WITH SOMEBODY ELSE?

24  A.   NO.  WITH MY GIRLFRIEND AND WITH A GIRLFRIEND OF HERS AND

25  HER BOYFRIEND.

```
1    Q.    DO YOU KNOW CARLOS AREVELO?

2    A.    YES.

3    Q.    AND HOW DO YOU KNOW CARLOS?

4    A.    HE IS THE BROTHER OF A DIFFERENT GIRLFRIEND THAT I HAD.

5    Q.    AND DID -- ON AUGUST 23RD, 2011, WERE YOU AT L-8, 6750

6    PEACHTREE INDUSTRIAL BOULEVARD?

7    A.    NO, I WAS NOT THERE.

8    Q.    DO YOU OWN ANY PETS?  DID YOU OWN ANY PETS BACK IN AUGUST

9    OF 2011?

10   A.    NO, I DON'T HAVE ANY.

11   Q.    OTHER THAN THE PASSPORT DID YOU HAVE ANY CLOTHES OR ANY

12   OTHER ITEMS IN THAT APARTMENT?

13   A.    I HAD JUST THE PHOTOS THAT CARLOS'S SISTER HAD GIVEN ME.

14   Q.    AND WHAT -- YOU MEAN A COPY OF THOSE PHOTOS?

15   A.    WELL, THE PHOTOS THAT WERE -- THAT ARE SHOWN IN HERE.

16            MR. SHREENATH:  OKAY.

17            THE COURT:  CAN YOU REFER TO AN EXHIBIT NUMBER SO I

18   CAN KNOW WHAT PICTURES HE'S TALKING ABOUT?

19            MR. SHREENATH:  ABSOLUTELY.

20   BY MR. SHREENATH:

21   Q.    ARE YOU REFERRING TO EXHIBITS NUMBER 39 THROUGH 43?  IF YOU

22   CAN TAKE A LOOK AT THOSE EXHIBITS.

23   A.    YES.

24   Q.    AND WHEN YOU SAY YOU HAVE THOSE PICTURES, WHAT EXACTLY DO

25   YOU MEAN BY THAT?
```

1  A.   WELL, CARLOS'S SISTER -- HER NAME IS ROSA -- GAVE ME THESE

2  PICTURES SO THAT I COULD HAVE THEM AS A RECUERDO.

3            THE COURT:  AS A WHAT?

4            THE INTERPRETER:  AS A MEMORY.

5  BY MR. SHREENATH:

6  Q.   WAS YOUR VEHICLE ANYWHERE IN THE PARKING LOT OF 6750

7  PEACHTREE INDUSTRIAL BOULEVARD --

8  A.   NO.

9  Q.   -- ON AUGUST 23RD, 2011?

10  A.   NO.

11  Q.   WAS THERE ANY KIND OF CELL PHONES OR ANY OTHER PERSONAL

12  ITEMS IN THAT APARTMENT THAT BELONGED TO YOU ON AUGUST 23RD,

13  2011?

14  A.   YES.  I HAD FORGOTTEN A PHONE THERE, AN IPHONE.

15  Q.   AND ON -- GOING FORWARD TO AUGUST 2012, DO YOU RECALL BEING

16  IN DEKALB COUNTY JAIL ON THAT DATE?

17  A.   CORRECT, ON AUGUST THE 5TH.

18  Q.   AND YOU WERE THERE FOR SOME TRAFFIC OFFENSES?

19  A.   YEAH, DRIVING WITHOUT A LICENSE AND TWO OTHER CHARGES.

20  Q.   OKAY.  AND SPEAKING OF LICENSE, DID YOU HAVE A LICENSE FROM

21  ANY OF THE STATES IN THE UNITED STATES?

22  A.   PREVIOUSLY I HAD A LICENSE FROM NEW MEXICO, BUT IT GOT

23  LOST.

24  Q.   AND WHOSE NAME WAS THAT LICENSE IN?

25  A.   PABLO CAMANEY ARZATE.

1  Q.   AND DID IT HAVE YOUR PHOTO?

2  A.   CORRECT.

3  Q.   DO YOU KNOW ABOUT HOW MANY YEARS AGO YOU GOT THE DRIVER'S

4  LICENSE FROM NEW MEXICO?

5  A.   IT WAS BACK IN 2011.  IT WAS BETWEEN JANUARY 26TH OR 27TH.

6  I DON'T REMEMBER THE EXACT DATE, BUT THE SAME DAY I GOT IT I

7  ACTUALLY GOT A TICKET IN NEW MEXICO.

8  Q.   OKAY.  AND DO YOU REMEMBER OFFICERS COMING TO THE DEKALB

9  COUNTY JAIL TO TAKE YOU FROM DEKALB COUNTY JAIL TO ANOTHER

10 LOCATION ON AUGUST 5TH, 2012?

11 A.   I DON'T REMEMBER BECAUSE THEY WERE FROM IMMIGRATION.  I

12 REALLY DIDN'T PAY A WHOLE LOT ATTENTION.

13 Q.   OKAY.  AND HOW MANY OFFICERS CAME TO GET YOU FROM DEKALB

14 COUNTY JAIL?

15 A.   WELL, ON AUGUST 16TH WHEN IMMIGRATION TOOK ME, THERE WERE

16 TWO OF THEM.

17 Q.   AND DID THEY TAKE YOU IN A -- WHAT KIND OF VEHICLE DID THEY

18 TAKE YOU IN?

19 A.   IT WAS A WHITE FORD VAN.

20 Q.   AND WERE YOU IN HANDCUFFS?

21 A.   CORRECT.

22 Q.   AND WERE THERE OTHER INDIVIDUALS IN THE VAN THAT WERE NOT

23 LAW ENFORCEMENT OFFICERS?

24 A.   THERE WERE OTHER PEOPLE IN THE VAN WHO WERE -- HAD BEEN,

25 LIKE, ARRESTED ON OTHER CHARGES FROM DIFFERENT COUNTIES.  I

1 DIDN'T ASK THEM WHERE THEY HAD COME FROM, BUT IT SEEMED LIKE THE

2 IMMIGRATION PEOPLE WERE JUST ON A ROUTE AND PICKING PEOPLE UP

3 FROM DIFFERENT COUNTIES THAT HAD BEEN ARRESTED.

4 Q.    FROM THE DEKALB COUNTY JAIL DID YOU GO TO AN ICE OFFICE?

5 A.    CORRECT.

6 Q.    AND TELL THE JUDGE WHAT HAPPENED WHEN YOU GOT THERE.

7 A.    WELL, I ARRIVED AND THE HANDCUFFS WERE TAKEN OFF.  AND THEY

8 PUT ME IN A ROOM ALONG WITH -- THERE WAS A GROUP OF -- I DIDN'T

9 COUNT THEM, BUT I WOULD SAY THERE WAS MORE THAN TEN OTHER

10 PEOPLE.  THEN AN IMMIGRATION OFFICER CALLED ME TO TAKE DOWN MY

11 PERSONAL DATA.  HE TOOK MY DATA AND THEN HE PUT ME IN A ROOM

12 NEAR THE ENTRANCE.  IT WAS ME AND ANOTHER PERSON.  I ASKED HIM.

13 HE WAS BEING DEPORTED TO AFRICA.  THERE WAS TWO OF US IN THAT

14 ROOM.

15 Q.    WHEN YOU GAVE THE IMMIGRATION OFFICER YOUR INFORMATION DID

16 YOU PROVIDE YOUR NAME AS -- WHAT DID YOU PROVIDE YOUR NAME AS?

17 A.    PABLO CAMANEY ARZATE.

18 Q.    AND DID THE IMMIGRATION OFFICER INDICATE ANYTHING TO

19 SUGGEST THAT THEY HAD YOU AS A DIFFERENT PERSON?

20 A.    NO.

21 Q.    UP UNTIL THIS POINT HAVE YOU BEEN ASKED ANY QUESTIONS

22 REGARDING WHAT HAPPENED ON AUGUST 23RD, 2011?

23 A.    THE IMMIGRATION OFFICERS DIDN'T ASK ME ANYTHING ABOUT THIS

24 CASE.

25 Q.    OKAY.  AT SOME POINT DID YOU ENCOUNTER D.E.A. OFFICERS?

1  A.    WELL, WHEN I WAS SITTING IN THAT -- IN A ROOM I NOTICED TWO

2  OTHER AGENTS.  I NOTICED THEY HAD A DIFFERENT KIND OF A BADGE.

3  I REMEMBER JOHN TUCK (PHONETIC), A WHITE MAN, BLONDE MAN.  AND I

4  THOUGHT I REMEMBER THE NAME AGUILAR, BUT THE PERSON WHO WAS HERE

5  BEFORE, I -- IT DOESN'T SEEM TO ME THAT THAT'S THE ONE I KNEW AS

6  AGUILAR.

7  Q.    DO YOU REMEMBER TALKING TO THE AGENT, THE PERSON YOU SAID,

8  JOHN TODD (VERBATIM), AND WHOEVER ELSE THERE WAS IN THE ROOM?

9  A.    WELL, JOHN TUCK ONLY JUST PUT THE HANDCUFFS ON ME.  I JUST

10  HAD -- I -- AT THAT TIME I WAS JUST DRESSED IN BLACK PANTS AND A

11  T-SHIRT.  AND THE MAN WHO WAS WITH JOHN TUCK, HE DIDN'T SEEM TO

12  BE THE PERSON THAT WAS -- THE PERSON WHO WAS HERE WAS NOT THE

13  PERSON THAT WAS THERE WHO ARRESTED ME.  WHEN THEY CAME TO ARREST

14  ME THEY DIDN'T SAY ANYTHING ABOUT WHAT THE CHARGE WAS.  THEY

15  DIDN'T SAY ANYTHING ABOUT WHAT MY NAME WAS.  THEY JUST HAD THIS

16  PHOTO ON THE GOVERNMENT'S EXHIBIT B1 AMPLIFIED (VERBATIM)

17  ABOUT -- AROUND THE TATTOO THAT I HAVE ON MY RIGHT ARM.  AND

18  AGUILAR JUST SAID TO TALK -- THIS IS HIM.  AND THEN AGUILAR

19  STARTED ASKING ME QUESTIONS IF I REMEMBER HIM.  AND I TOLD HIM

20  IT WAS THE FIRST TIME IN MY LIFE THAT I HAD SEEN HIM.  AND HE

21  ASKED ME IF I REMEMBERED THE APARTMENT L-8 ON PEACHTREE

22  INDUSTRIAL.  AND I ASKED HIM WHAT WAS HE TALKING ABOUT.

23  Q.    WELL, DID THIS CONVERSATION TAKE PLACE AT THE IMMIGRATION

24  OFFICE OR AT THE D.E.A.?

25  A.    IN THE IMMIGRATION OFFICE WHEN TUCK WAS PUTTING THE

1  HANDCUFFS ON ME, HE LIFTED THIS AND THEN HE SAID -- WHEN HE

2  LIFTED THIS HE SAID, THIS IS THE ONE, AND THEN HE STARTED ASKING

3  ME QUESTIONS AT IMMIGRATION OFFICE.

4  Q.    WHEN YOU SAY HE LIFTED THIS, DID HE LIFT A PART OF YOUR

5  SHIRT?

6  A.    YEAH, IT WAS A SHORT-SLEEVE T-SHIRT.  YOU COULD JUST SEE

7  THE VERY TIP OF THE WING.  HE LIFTED IT TO MAKE SURE IT WAS THE

8  SAME TATTOO THAT WAS IN B1.

9  Q.    WHAT ELSE DID Y'ALL TALK ABOUT OR WERE YOU ASKED ABOUT?

10  A.    WELL, HE TOLD ME HE KNEW -- WHAT (VERBATIM) HE WAS FROM, HE

11  KNEW ABOUT WHAT WAS INSIDE APARTMENT L-8.  AND HE JUST WANTED

12  FOR ME TO COOPERATE WITH HIM.  AND I REMEMBER IN THE WHOLE TRIP

13  FROM THE OFFICE -- I THINK IT'S PRETTY CLOSE TO HERE, BUT ALL

14  THE WAY EVEN IN THE ELEVATOR AND EVERYTHING WE WERE TALKING.  WE

15  WERE CONVERSING.

16  Q.    AND WHEN YOU WERE SAYING, "WE WERE CONVERSING," WHAT WAS

17  THE CONVERSATION ABOUT?

18  A.    HE ASKED ME IF I HAD FAMILY, IF I HAD CHILDREN.  AND I TOLD

19  HIM THAT, YES, I HAD A SON AT THAT TIME THAT WAS EIGHT YEARS OLD

20  AND A FIVE-YEAR-OLD GIRL AND ANOTHER GIRL WHO APPEARED TO BE

21  MINE.  IT WAS NINE YEARS -- I MEAN, NINE MONTHS OLD.

22  Q.    UP UNTIL THIS POINT HAVE YOU BEEN READ YOUR MIRANDA

23  WARNINGS?

24  A.    THEY DIDN'T TELL ME ANYTHING ABOUT WHAT THE REASON FOR THE

25  ARREST WAS, NOR DID THEY READ ME ANY MIRANDA WARNINGS.

1    Q.   WAS THERE EVER A CONVERSATION ABOUT THE KIND OF CHARGES

2    THAT YOU MAY BE FACING?

3    A.   WELL, I FELT LIKE I WAS BEING THREATENED BECAUSE I WAS

4    TOLD, YOU'RE NOT GOING TO SEE YOUR CHILDREN FOR 20 YEARS, AND HE

5    SAID, YOU HAVE TO COOPERATE WITH US.

6    Q.   WHO -- DO YOU REMEMBER IF THAT WAS A LAW ENFORCEMENT

7    OFFICER WHO TOLD YOU THAT?

8    A.   IT WAS AGUILAR.  I REMEMBER THAT HE -- AGUILAR WAS A DARKER

9    SKIN WITH A BEARD AND HAIR.

10   Q.   AND AT SOME POINT YOU CAME TO THE D.E.A. OFFICE IN THIS

11   BUILDING; CORRECT?

12   A.   CORRECT.

13   Q.   AND WHAT HAPPENED WHEN YOU GOT HERE?

14   A.   WELL, I MET THE FIRST WITNESS WHO TESTIFIED AND TUCK AND

15   AGUILAR WERE THERE IN THE ROOM.

16   Q.   AND WHAT HAPPENED WHEN YOU WERE IN THE ROOM WITH THESE

17   OFFICERS?

18   A.   WELL, BEFORE I WAS READ MY MIRANDA WARNINGS I WAS TOLD THAT

19   I HAD TO COOPERATE WITH THEM BECAUSE IF I DIDN'T I WOULD BE

20   DOING A LOT OF TIME IF I DIDN'T COOPERATE WITH THEM.

21   Q.   OKAY.  AND DID YOU -- HOW DID YOU FEEL ABOUT ANSWERING

22   THOSE QUESTIONS AT THAT POINT?

23   A.   I WAS INTIMIDATED.  I WAS INTIMIDATED BECAUSE I DIDN'T KNOW

24   WHY THEY HAD ARRESTED ME.

25   Q.   YOU HEARD DETECTIVE AGUILAR TESTIFY ABOUT THE STATEMENTS

1  YOU ALLEGEDLY MADE REGARDING THE AUGUST 23RD, 2011.  DO YOU --

2  DID YOU MAKE THOSE STATEMENTS?

3  A.   WELL, I ONLY HEARD A LITTLE BIT THAT WAS TRUTHFUL.  I DID

4  TELL HIM THAT I HAD BEEN HERE SEVERAL YEARS IN THE UNITED

5  STATES, THAT I HAD COME IN 2001.  WHAT I REMEMBER TELLING HIM

6  CLEARLY IS THAT I HAD COME HERE TO THE UNITED STATES IN 2001 AND

7  I WAS IN ANAHEIM, CALIFORNIA.  AND IN 2009 I CAME TO ATLANTA.

8  AND I REMEMBER VERY CLEARLY TELLING HIM THAT WHAT I DID WAS BUY

9  CARS AT AUCTIONS AND I WOULD IMPORT THEM, SEND THEM BACK TO

10  MEXICO.

11  Q.   DID YOU EVER POSSESS A I.D. FROM MEXICO WITH THE NAME

12  ALBEAR CAMERINO?

13  A.   I HAVE NEVER USED THAT NAME IN MY LIFE.

14          MR. SHREENATH:  NOTHING FURTHER AT THIS TIME, JUDGE.

15          THE COURT:  OKAY.  YOUR WITNESS, MR. WILLIAMS.

16          MR. WILLIAMS:  THANK YOU, YOUR HONOR.

17                      CROSS-EXAMINATION

18  BY MR. WILLIAMS:

19  Q.   MR. ARZATE, YOU UNDERSTAND ENGLISH, DON'T YOU?

20  A.   A LITTLE BIT, MORE OR LESS.

21  Q.   YOU UNDERSTAND A LOT, DON'T YOU?

22  A.   WELL, WHAT HAPPENS IS OUT OF NECESSITY YOU LEARN A LOT.

23  Q.   SO YOU UNDERSTAND A LOT OF ENGLISH?

24  A.   WELL, I'VE BEEN LOCKED UP ALL BY MYSELF FOR THE LAST TWO

25  MONTHS AND NOT BEING ABLE TO DO ANYTHING AND I'VE TAKEN THAT

1  TIME TO STUDY AND WORDS I DON'T UNDERSTAND I LOOK UP IN THE

2  DICTIONARY.

3  Q.   SO YOU'VE LEARNED ENGLISH IN THE LAST TWO MONTHS, HAVEN'T

4  YOU?

5  A.   WELL, I KNEW A LITTLE.   BUT IN THE LAST EIGHT MONTHS THAT I

6  HAVEN'T HAD MY FREEDOM I'VE HAD THE NEED AND I'VE MADE AN EFFORT

7  TO LEARN MORE.

8  Q.   BECAUSE ALL OF -- PRETTY MUCH ALL OF THE QUESTIONS BEING

9  ASKED BY YOUR ATTORNEY AND BEING ASKED BY ME, YOU'VE ANSWERED IN

10 SPANISH AFTER HEARING THE QUESTION IN ENGLISH; ISN'T THAT

11 CORRECT?

12 A.   YEAH, I'M EXPLAINING TO YOU CLEARLY I DID LEARN MORE.

13 Q.   WELL, MY QUESTION WAS THAT YOUR ATTORNEY AND I HAVE ASKED

14 OUR QUESTIONS IN ENGLISH AND THEY HAVEN'T BEEN TRANSLATED, AND

15 THEN YOU HAVE RESPONDED AND ANSWERED IN SPANISH, YES OR NO?

16 A.   WELL, I DON'T KNOW IF IT WASN'T -- I DON'T KNOW IF I HAVE

17 AN ANSWER FOR YOU, BUT I DID -- HAVE LEARNED MORE ENGLISH SINCE

18 I'VE BEEN LOCKED UP.

19 Q.   WELL, MAYBE THAT -- MAYBE THAT'S A YES.   YOU INDICATED THAT

20 YOU HAD BEEN TO THE APARTMENT L-8 FREQUENTLY; CORRECT?

21 A.   YES.   CORRECT.

22 Q.   AND IN FACT YOU HAD TAKEN SOME OF YOUR ITEMS OVER TO THAT

23 APARTMENT, ITEMS RELATED TO -- FOR INSTANCE, PHOTOGRAPHS; RIGHT?

24 A.   YES, MY PERSONAL DOCUMENTS BECAUSE I WAS AFRAID THAT THE

25 GIRLFRIEND THAT I WAS LIVING WITH, IF SHE FOUND OUT THAT I HAD

1  HAD SOMEONE ELSE, RELATIONSHIP WITH SOMEONE ELSE, THAT SHE WOULD

2  TAKE MY DOCUMENTS AND BURN THEM.

3  Q.   AND THAT SOMETIMES YOU EVEN LIVED AT THAT APARTMENT; RIGHT?

4  YOU SAID THAT, DIDN'T YOU?

5  A.   I SAID THAT I VISITED THERE AND SOMETIMES I STAYED THERE.

6  Q.   SO YOU --

7  A.   THAT DOESN'T MEAN THAT I LIVED.

8  Q.   STAYED IS DIFFERENT FROM LIVED?

9  A.   CORRECT.  IT IS DIFFERENT.  I CAN -- BECAUSE I CAN TELL YOU

10 THAT I WANT TO STAY HERE.  IT DOESN'T MEAN I WANT TO LIVE HERE,

11 OR DOES IT?

12 Q.   "HERE" BEING THE UNITED STATES?  "HERE" BEING THE UNITED

13 STATES?

14 A.   NO.  RIGHT HERE WHERE I AM.

15 Q.   OH, IN THAT CHAIR.  IN THAT CHAIR.

16 A.   BECAUSE THAT'S THE POINT YOU'RE TRYING TO MAKE BECAUSE THE

17 APARTMENT IS IN THE UNITED STATES, BUT IT'S JUST A LITTLE PART

18 OF THE UNITED STATES.

19 Q.   DID YOU KNOW IN ADDITION TO THE YOUNG MAN, THE 19-YEAR-OLD,

20 THE OTHER INDIVIDUAL WHO STAYED AT THE APARTMENT?  DID YOU KNOW

21 HIM?

22 A.   CAMERINO?

23 Q.   YES.

24 A.   CAMERINO, YES.

25 Q.   MET HIM A LOT OF TIMES?

```
 1   A.   WE WOULD GO OUT TO THE MEXICAN NIGHTCLUB.  SOMETIMES WE
 2   WOULD STAY THERE DRINKING IN HIS APARTMENT, AND SINCE I DIDN'T
 3   WANT TO DRIVE I WOULD STAY OVER THERE THE NIGHT.
 4   Q.   DID YOU EVER TAKE CARE OF HIS DOGS?
 5   A.   HUH?
 6   Q.   YOU EVER TAKE CARE OF HIS DOGS?
 7   A.   SOMETIMES HE WOULD LET ME JUST TAKE THE LITTLE ONE.
 8   Q.   AND WALK HIM?
 9   A.   WELL, I WOULD PUT IT IN THE CAR TO TAKE OUT TO RIDE OR TO
10   GO EAT.
11   Q.   WELL, DOGS LIKE TO WALK, DON'T THEY?
12   A.   HUH?
13   Q.   DOGS LIKE TO WALK; RIGHT?
14   A.   YES, BUT I DIDN'T LIKE TO WALK.
15   Q.   BUT DOGS DON'T LIKE TO RIDE IN CARS VERSUS WALKING, YOU
16   WALKED THE DOG, DIDN'T YOU?
17   A.   WELL, YES, BUT I DIDN'T WALK THEM.
18   Q.   YOU NEVER WALKED A DOG, IS WHAT YOU'RE SAYING?
19   A.   WELL, YES, FROM THE THIRD FLOOR DOWN.
20   Q.   SO APARTMENT L-8 WAS ON THE THIRD FLOOR?
21   A.   CORRECT.
22   Q.   AND YOU KNOW BECAUSE YOU LIVED THERE?
23   A.   NO.
24   Q.   YOU STAYED THERE, YOU STAYED THERE?
25   A.   NO.  I HAVE KNOWLEDGE.  I REMEMBER HOW THINGS WERE.  I'M
```

1   NOT MENTALLY RETARDED SO THAT I DON'T REMEMBER HOW THINGS WERE

2   IN THE PAST.

3   Q.   SO YOU KNOW BECAUSE YOU LIVED THERE?

4   A.   I ALREADY TOLD YOU.  I VISITED, AND THAT'S NOT THE SAME AS

5   LIVING THERE.

6   Q.   YOU KNOW BECAUSE YOU STAYED THERE?  YOU KNOW BECAUSE YOU

7   STAYED THERE?

8   A.   IF YOU'D JUST LET ME GIVE AN EXAMPLE.  IF YOU GO TO VISIT A

9   FRIEND, DOES THAT MEAN YOU LIVE WITH THE FRIEND?

10  Q.   WELL, ACCORDING TO YOU IT MAY MEAN, I STAY WITH A FRIEND.

11  A.   WELL, THE QUESTION WAS PLAIN.  DID YOU LIVE WITH HIM OR DID

12  YOU JUST VISIT HIM.

13  Q.   NO.  I SAID STAY, TO STAY.

14  A.   NO.

15  Q.   YOU DIDN'T STAY?

16  A.   I TOLD YOU THAT I STAYED THERE SOMETIMES WHEN WE WOULD GO

17  TO THE NIGHTCLUB AND WE WOULD DRINK AND I DIDN'T WANT TO DRIVE

18  SO AS NOT TO KILL SOMEBODY.  CORRECT?  I JUST DID WHAT MY HEART

19  TOLD ME TO DO AND NOT TO DRIVE AND NOT TO PUT INNOCENT PEOPLE

20  LIVES AT RISK.

21  Q.   BUT YOU DID MORE THAN JUST TO STAY THERE TO AVOID PUTTING

22  INNOCENT LIVES AT RISK, YOU TOOK SOME OF YOUR ITEMS TO THAT

23  APARTMENT; RIGHT?

24  A.   OKAY.  AND I ALREADY TOLD YOU WHAT THE REASON WAS, THAT I

25  BROUGHT MY DOCUMENTS THERE.  DON'T YOU REMEMBER?

```
1   Q.   SO YOU WEREN'T JUST -- YOU DIDN'T JUST GO THERE JUST WHEN

2   YOU WERE OUT DRINKING.  YOU WENT THERE FOR OTHER REASONS, RIGHT,

3   YOU STAYED THERE FOR OTHER REASONS?

4   A.   EXPLAIN TO ME WHAT REASONS.

5   Q.   OH, DON'T YOU KNOW?  I DIDN'T LIVE THERE.  I DIDN'T STAY

6   THERE.  YOU STAYED THERE.

7   A.   WELL, IF I TOLD YOU THAT I WAS JUST VISITING THERE, BUT

8   YOU'RE SAYING THERE WERE OTHER INSTANCES --

9   Q.   YOU SAID YOU STAYED THERE.  YOU SAID YOU STAYED THERE.

10  A.   SOMETIMES.

11  Q.   SOMETIMES.  YOUR GIRLFRIEND'S BROTHER STAYED THERE TOO;

12  CORRECT?

13  A.   NO.

14  Q.   HE DIDN'T STAY THERE?

15  A.   NO.  THAT WAS THE FIRST DAY THAT HE WAS STAYING THERE.  HE

16  DIDN'T EVEN WIND UP SLEEPING THERE.  HE STILL HAD THE THINGS

17  THAT WERE HIS IN THE CAR.  HIS MOM HAD KICKED HIM OUT.

18  Q.   SO YOU WERE -- YOU WERE VERY MUCH AWARE OF WHAT WAS GOING

19  ON WITH YOUR GIRLFRIEND'S BROTHER, RIGHT, YOU KNEW?

20  A.   WELL, I HAD CONTACT WITH HIM.

21  Q.   AND HE --

22  A.   THAT DOESN'T MEAN THAT I WAS DOING ANYTHING WRONG.

23  Q.   WELL, THERE WERE GUNS ALL OVER THAT APARTMENT; RIGHT?

24  A.   DO YOU HAVE PROOF THAT THEY WERE MINE, THAT THEY WERE IN MY

25  NAME?
```

1  Q.   WERE THEY YOURS?  YOU TELL US.  YOU'RE UNDER OATH.

2  A.   NO.

3  Q.   WHAT ABOUT THE DRUGS?

4  A.   NEITHER.

5  Q.   WERE YOU TRYING -- WERE YOU TRYING TO SELL ANY --

6  A.   DO YOU HAVE ANY EVIDENCE THAT IT WAS MINE?

7  Q.   WERE YOU TRYING TO SELL ANY OF IT?

8  A.   DO YOU HAVE EVIDENCE WHAT YOU'RE TRYING TO SAY?

9        THE COURT:  TOO MANY TALKING.  WE'RE DRIVING OUR COURT

10  REPORTER CRAZY.  OKAY.  ONE AT A TIME.  JUST LET ME GO.  HAVE A

11  SEAT.  LET ME HEAR THE QUESTION AGAIN.  I THINK THEY'RE PROBABLY

12  TWO QUESTIONS BEYOND WHERE YOU INTENDED TO OBJECT.  THE QUESTION

13  YOU POSED TO HIM, YOU ASKED HIM WHETHER OR NOT THE DRUGS WERE

14  HIS.

15        MR. WILLIAMS:  I THINK I STARTED WITH THE GUNS.

16        THE COURT:  OKAY.  LET ME ASK A QUESTION HERE.  I'M

17  SORRY.  LET ME JUST INTERJECT AND LET ME GO AHEAD.  AND

18  PROBABLY IT SEEMS TO ME THAT YOU'RE DENYING THAT THIS IS YOUR

19  APARTMENT, THAT YOU DON'T LIVE THERE; IS THAT CORRECT?

20        THE WITNESS:  CORRECT.

21        THE COURT:  OKAY.  AND WHEN WAS THE LAST TIME YOU

22  SPENT THE NIGHT AT THAT APARTMENT?

23        THE WITNESS:  LIKE, TWO DAYS BEFORE.

24        THE COURT:  TWO DAYS BEFORE THEY WENT THERE FOR THE

25  KNOCK-AND-TALK?

1          THE WITNESS:  OF THE 23RD.

2          THE COURT:  SO IF HE SAID HE HAS NO TIES TO THE

3  APARTMENT, THEN WE MAY HAVE AN ISSUE WITH REGARD TO STANDING TO

4  SUPPRESS THE EVIDENCE SEIZED FROM THE APARTMENT.  HE'S

5  DISAVOWING ANY KNOWLEDGE OF THE APARTMENT AND OWNERSHIP OF THE

6  APARTMENT; IS THAT CORRECT?  AND THEN WE'LL MOVE ON TO THE

7  STATEMENTS.  THAT SOUNDS LIKE WHAT HE'S SAYING, HE HAS NO TIES.

8  HE HAD STAYED THERE A COUPLE OF NIGHTS BEFORE THAT.

9          MR. SHREENATH:  WELL, YOUR HONOR, WE WOULD STILL ARGUE

10  THAT THERE HAS BEEN ENOUGH TESTIMONY TO ESTABLISH STANDING FOR

11  CONTESTING THE SEARCH OF THE APARTMENT.

12          MR. WILLIAMS:  AND, YOUR HONOR, THE GOVERNMENT -- HE

13  CAN'T BE RELYING ON THE GOVERNMENT'S EVIDENCE TO ESTABLISH

14  STANDING FOR HIS CLIENT.

15          MR. SHREENATH:  WE'RE NOT.  WE'RE NOT SUGGESTING THAT.

16          THE COURT:  OKAY.  SO YOU'RE GOING TO HAVE SOME

17  QUESTIONS OF HIM TO --

18          MR. SHREENATH:  WELL, YOUR HONOR, IF I MAY, IN ORDER

19  TO ESTABLISH STANDING TO CONTEST A SEARCH AS AN OVERNIGHT GUEST

20  HE HAS A LEGITIMATE EXPECTATION OF PRIVACY TO CONTEST -- TO HAVE

21  STANDING FOR THE SEARCH.

22          THE COURT:  WELL, THAT WASN'T SURE UNTIL MY QUESTION

23  TO HIM JUST NOW BECAUSE THAT WASN'T THE LAST TIME HE WAS THERE.

24  OKAY.  BUT ANYWAY, YOU MAY PROCEED.

25          MR. SHREENATH:  AS A REPEATED OVERNIGHT GUEST, I

```
 1   SHOULD SAY, TO BE FAIR.
 2            THE COURT:  OKAY.  MAYBE WE'LL GET THERE.  OKAY.  GO
 3   AHEAD, MR. WILLIAMS, WITH YOUR QUESTION.
 4        NOW, JUST WAIT UNTIL MR. WILLIAMS ASKS A QUESTION.
 5   BY MR. WILLIAMS:
 6   Q.   WHEN WERE YOU THE LAST -- WHEN WAS THE LAST TIME YOU WERE A
 7   OVERNIGHT GUEST?
 8   A.   TWO DAYS BEFORE THEY CAME AND SEARCHED ILLEGALLY.
 9   Q.   AND THE ONLY TIME YOU WERE THERE WAS WHEN YOU WERE A
10   OVERNIGHT GUEST OUT PARTYING OR SOMETHING LIKE THAT; ISN'T THAT
11   RIGHT?
12   A.   SOMETIMES I WOULD VISIT JUST DURING THE DAY.
13   Q.   YOU WOULD JUST VISIT DURING THE DAY, BUT YOU WERE NOT AN
14   OVERNIGHT GUEST, WERE YOU?
15   A.   I ALREADY ANSWERED YOU THAT SOMETIMES, YES, I STAYED THERE.
16   AND I WOULD LIKE TO SAY TO YOU WITH ALL RESPECT, I'VE LEARNED
17   ABOUT WHAT I'M GOING TO SAY TO YOU OUT OF NECESSITY.  I DON'T
18   KNOW IF YOU'RE FAMILIAR WITH THE FOURTH AMENDMENT OF THE UNITED
19   STATES CONSTITUTION.  FOURTH AMENDMENT IS CLEAR TO YOU AND THE
20   RULES THAT WERE ADDED.  THAT FOURTH AMENDMENT OF THE UNITED
21   STATES HAS BEEN ACTIVE FOR 221 YEARS, THREE MONTHS.
22            THE COURT:  OKAY.  LET'S ASK A QUESTION, MR. ALBEAR
23   CAMERINO.
24        GO AHEAD AND ASK A QUESTION.
25        JUST WAIT FOR A QUESTION.
```

1       OKAY.  GO AHEAD.  ASK ANOTHER QUESTION.

2  BY MR. WILLIAMS:

3  Q.   YOU DON'T LIVE AT APARTMENT 6-L -- I MEAN, APARTMENT L-8

4  CORRECT?

5  A.   CORRECT.

6  Q.   YOU DON'T, DO YOU?  THAT'S NOT YOUR APARTMENT, IS IT?

7  A.   I DON'T KNOW IF YOU INVESTIGATED IN THE OFFICE, THE

8  APARTMENT OFFICE BEFORE THEY WENT TO CHECK IT OUT, BUT WHO WAS

9  THE OWNER.

10  Q.   ARE YOU THE OWNER?

11  A.   THE OWNER WAS A WOMAN.  DO I LOOK LIKE A WOMAN?

12  Q.   ARE YOU THE RENTER, YES OR NO?

13  A.   NO.

14  Q.   YOU DON'T LIVE AT THAT APARTMENT, DO YOU, YES OR NO?  YOU

15  DON'T LIVE THERE, DO YOU?

16       THE COURT:  ONE AT A TIME.

17  A.   YOU'VE ASKED ME THE SAME QUESTIONS 20 TIMES, AND I'VE

18  ANSWERED IT.

19  BY MR. WILLIAMS:

20  Q.   WHICH IS?

21  A.   THAT VISITING IS NOT THE SAME AS LIVING.

22  Q.   SO YOU DON'T LIVE THERE, DO YOU, YES OR NO?  NO, YES OR NO?

23  A.   I ALREADY ANSWERED NO.

24       MR. WILLIAMS:  AND, YOUR HONOR, I RERAISE MY ISSUE

25  REGARDING STANDING.

1            THE COURT:  SO NOTED.

2    BY MR. WILLIAMS:

3    Q.    NOW, REGARDING THE INTERVIEW, YOU ONLY SPEAK SPANISH;

4    CORRECT?

5    A.    NO.

6    Q.    WHAT OTHER LANGUAGES DO YOU SPEAK?

7    A.    JUST A LITTLE.  AT THE TIME THAT I WAS ARRESTED, JUST A

8    LITTLE IN ENGLISH.

9    Q.    AND WHEN YOU WERE BROUGHT OVER OR WHEN YOU SPOKE WITH --

10   BEFORE, BEFORE YOU SPOKE WITH THE AGENT AGUILAR OF D.E.A., THE

11   PERSONS WHO BROUGHT YOU OVER TO SPEAK WITH HIM, THEY DON'T SPEAK

12   ANY SPANISH, DO THEY?

13   A.    I DIDN'T UNDERSTAND THE QUESTION.  COULD YOU REPEAT IT?

14   Q.    THE PERSONS THAT BROUGHT YOU OVER IN THE VAN TO THIS

15   BUILDING, THEY DON'T SPEAK SPANISH, DO THEY?

16   A.    I THINK YOU HEARD THE TESTIMONY OF THE PREVIOUS WITNESS.

17   HE SAID HE SPOKE SPANISH.

18   Q.    I'M ASKING YOU.

19   A.    I'M ANSWERING THE QUESTION.

20   Q.    SO THE PERSONS THAT BROUGHT YOU OVER, THEY DIDN'T SPEAK

21   SPANISH TO YOU, DID THEY, THE PEOPLE THAT BROUGHT YOU OVER?

22   A.    YES, ONE SPOKE SPANISH AND THE OTHER DIDN'T SPEAK SPANISH.

23   Q.    AND ACCORDING TO YOU THEY SPOKE TO YOU IN -- THAT PERSON,

24   NOT THEY, THAT PERSON SPOKE TO YOU IN SPANISH?

25   A.    MIXED.

```
1  Q.   SPANISH AND ENGLISH?

2  A.   CORRECT.

3  Q.   WHEN YOU ARRIVED HERE IN THIS BUILDING YOU WERE READ YOUR

4  MIRANDA WARNINGS, WEREN'T YOU?

5  A.   AFTER 30 OR 40 QUESTIONS.  THE WAY THAT THEY READ THEM WAS

6  AN ILLEGAL WAY BECAUSE EVERY QUESTION THAT THEY ASKED THEY HAVE

7  TO STOP AND ASK IF YOU UNDERSTOOD.  AND HE READ THEM JUST

8  STRAIGHT THROUGH.  AND THEY ASKED IF I UNDERSTOOD THEM, AND I

9  SAID MORE OR LESS.

10 Q.   NOW, YOU KNEW, ACCORDING TO YOU, THAT THEY READ THEM WRONG,

11 DIDN'T GO ONE AT A TIME, AND THEN WHEN ASKED IF YOU UNDERSTOOD

12 THEM AND YOU KNEW THAT THEY HAD DONE IT WRONG, YOU SAID MORE OR

13 LESS; IS THAT RIGHT?

14 A.   WELL, I WANT TO ANSWER YOU.  THAT DAY THAT I WAS ARRESTED I

15 DIDN'T KNOW THAT THE CONSTITUTION OF THE UNITED STATES EXISTED.

16 I DIDN'T KNOW THAT THE MIRANDA WARNINGS EXISTED.  I DIDN'T KNOW

17 ANY OF THAT.  I DIDN'T KNOW MY RIGHTS.  I WAS INTIMIDATED BY THE

18 D.E.A. AGENTS.

19 Q.   HOW DO YOU KNOW YOU WERE ARRESTED BY THE D.E.A. -- D.E.A.

20 AGENTS?

21 A.   THEY NEVER TOLD ME THAT I WAS ARRESTED.

22 Q.   SAY THAT AGAIN.  SORRY.

23 A.   THEY NEVER TOLD ME THAT I WAS ARRESTED.

24 Q.   BUT YOU SAID YOU WERE ARRESTED.  YOU SAID, WHEN I WAS

25 ARRESTED.  WHY DO YOU THINK YOU WERE ARRESTED?
```

1   A.   WELL, THEY PUT HANDCUFFS ON ME.  WHAT DOES THAT MEAN,

2   JUST -- THAT -- THAT THEY'RE JUST PLAYING?

3   Q.   I'M ASKING YOU --

4   A.   WELL, I ALREADY ANSWERED YOU.  WHEN THEY HANDCUFFED ME THEY

5   DIDN'T READ ME MY RIGHTS.  THEY NEVER SAID, YOU'RE UNDER ARREST.

6   NOT UNTIL I SET FOOT IN THEIR OFFICE DID THEY TELL ME.

7   Q.   DID THEY TELL YOU WHAT?

8   A.   THAT I WAS ARRESTED FOR TRAFFICKING IN CONTROLLED

9   SUBSTANCES.

10  Q.   SO YOU WERE TOLD BY AGENT AGUILAR THAT YOU WERE UNDER

11  ARREST FOR TRAFFICKING SUBSTANCES?

12  A.   I DON'T REMEMBER WHO IT WAS.

13  Q.   BUT YOU GOT --

14  A.   YES, I WAS TOLD THAT.

15  Q.   WHEN YOU GOT HERE YOU WERE TOLD YOU WERE UNDER ARREST?

16  A.   AT THE OFFICE.

17  Q.   AND YOU WERE READ YOUR MIRANDA RIGHTS AFTER 40 QUESTIONS?

18  A.   CORRECT.

19  Q.   ROUGHLY SHORT -- AND BRIEFLY, WHAT WERE THE 40 QUESTIONS

20  ABOUT?

21  A.   I CAN'T EXPLAIN WHAT THEY ALL WERE ABOUT.

22  Q.   ROUGHLY?

23  A.   WELL, YOU WERE HERE AND YOU HEARD THE QUESTIONS AND ANSWERS

24  THAT THEY ASKED AND I GAVE.  YOU WANT ME TO REPEAT THEM AGAIN?

25  I CAN REPEAT THEM.

1   Q.   IF YOU COULD TELL ME GENERALLY WHAT YOU WERE ASKED AND WHAT

2   YOU ANSWERED.

3   A.   WELL, ON AUGUST 16TH, 2012 AT THE IMMIGRATION OFFICE.

4   Q.   NOT THE IMMIGRATION OFFICE.  WHEN YOU WERE HERE IN THIS

5   BUILDING, NOT THE IMMIGRATION OFFICE.

6   A.   YOU'RE ASKING ME ABOUT THE 40 QUESTIONS, RIGHT, BEFORE MY

7   MIRANDA WARNINGS WERE READ?

8   Q.   HERE AT THIS OFFICE, HERE IN THIS BUILDING, IN THIS

9   BUILDING.

10  A.   I SAID BEFORE MY MIRANDA WARNINGS WERE READ.  I DIDN'T SAY

11  IN THIS OFFICE.  IN -- FROM LEAVING IMMIGRATION OFFICE ON THE

12  WAY UNTIL WE GOT TO THE OFFICE AND THEN WHEN I WAS FINALLY READ

13  MY MIRANDA WARNINGS.

14  Q.   WHERE WERE YOU READ YOUR MIRANDA WARNINGS, HERE?

15  A.   AT THE D.E.A. OFFICE.

16  Q.   OKAY.  AND THE D.E.A. OFFICE IS WHEN YOU WERE READ YOUR

17  MIRANDA WARNINGS BY D.E.A. AGENTS?

18  A.   BY AGUILAR.  BUT THE PERSON WHO WAS HERE DOESN'T SEEM TO ME

19  TO BE AGUILAR BECAUSE THE PHOTO THAT HE HAD, HE HAD A LONG BEARD

20  LIKE THIS AND HE HAD HAIR AND HE WAS A DARKER SKINNED.

21  Q.   AFTER YOU WERE ADVISED YOUR MIRANDA WARNINGS BY D.E.A.,

22  THEN D.E.A. ASKED YOU QUESTIONS; IS THAT CORRECT?

23  A.   CORRECT.

24  Q.   THE PERSON WHO WAS AT APARTMENT L-8, NOT THE YOUNG MAN, THE

25  OTHER INDIVIDUAL, WHAT WAS HIS NAME?

A.   THE ONE THAT THEY FOUND OUTSIDE OR THE ONE -- INSIDE OR THE

ONE THAT WAS WALKING?

Q.   LET'S GO WITH THE ONE INSIDE, NOT THE -- NOT THE YOUNG MAN,

THE OTHER INDIVIDUAL.

MR. SHREENATH:  JUDGE, I WOULD OBJECT TO THIS LINE OF

QUESTIONING UNLESS WE GET INTO HEARSAY EVIDENCE THAT THE COURT

WOULD ALLOW BECAUSE THERE'S NO FOUNDATION FOR HIM TO TESTIFY

ABOUT WHO ALL WAS AT THE APARTMENT SINCE HE WASN'T THERE, IF

THAT WAS WHAT THE QUESTION WAS.

MR. WILLIAMS:  HE SAID HE KNEW THE PERSON -- THE TWO

PERSONS WHO LIVED AT THE APARTMENT AND THAT HE HAD BEEN OUT

DRINKING WITH THE OLDER GENTLEMAN, THE OLDER ONE.  I'M ASKING

HIM WHAT'S THE NAME OF THAT PERSON.

THE COURT:  OVERRULED.  I'LL ALLOW THE QUESTION.

BY MR. WILLIAMS:

Q.   I THINK YOU UNDERSTOOD.

A.   THE PERSON WHO WAS INSIDE THE APARTMENT WHEN THEY MADE THE

WARRANTLESS SEARCH DID NOT LIVE THERE.  HE WAS JUST VISITING.

Q.   I'M NOT ASKING ABOUT THE DATE OF THE SEARCH --

THE COURT:  MR. CAMERINO, LISTEN TO THE QUESTION.

HE'S ASKING YOU THE NAME OF THE INDIVIDUALS WHO LIVED AT THE

APARTMENT.

BY MR. WILLIAMS:

Q.   WHEN YOU WERE THERE.  AND YOU TOLD ME YOU WERE THERE

BEFORE --

1            THE COURT:  ONE AT A TIME.

2   A.   THE ONE WHO LIVED AT THE APARTMENT, HIS NAME WAS CAMERINO

3   ALBEAR.

4   BY MR. WILLIAMS:

5   Q.   JUST THAT ONE INDIVIDUAL.  AND YOUR MIDDLE NAME IS WHAT?

6   A.   WHAT MIDDLE NAME?

7   Q.   WELL, NOT MIDDLE NAME.  YOUR NAME IS?

8   A.   PABLO CAMANEY ARZATE.

9   Q.   CAMANEY ARZATE?

10  A.   CAMANEY ARZATE.

11           THE COURT:  LET ME ASK A QUESTION WHILE YOU'RE LOOKING

12  AT YOUR NOTES.  IS ALBEAR CAMERINO THE PERSON YOU WENT OUT

13  DRINKING WITH?

14           THE WITNESS:  CORRECT.  YES, HE'S THE ONE THAT I WOULD

15  GO OUT WITH AT A PLACE CALLED NOAH, NOAH ON MOUNT PLEASANT AND

16  CHAMBLEE, I THINK IT IS.

17           THE COURT:  OKAY.  GO AHEAD, MR. WILLIAMS.

18  BY MR. WILLIAMS:

19  Q.   AND TURNING OUR ATTENTION, TURNING IT ALL THE WAY TO THE

20  INTERVIEW THAT YOU HAD WITH D.E.A., YOU HEARD THE TESTIMONY THAT

21  YOU ADMITTED THAT YOU HAD WALKED A DOG, THAT YOU HAD SOLD

22  DRUGS --

23           THE COURT:  LET HIM FINISH THE QUESTION.

24           THE WITNESS:  OKAY.  GO AHEAD.  GO AHEAD.

25

1  BY MR. WILLIAMS:

2  Q.   THAT THOSE ARE STATEMENTS YOU MADE; RIGHT?

3  A.   NO.

4  Q.   WHAT DID YOU TELL THE AGENTS?

5  A.   I TOLD THEM THAT MY BUSINESS WAS BUYING CARS AT THE AUCTION

6  AND SENDING THEM TO MEXICO.  AND AGUILAR ASKED ME IF I SENT

7  ANYTHING ILLEGAL IN THOSE CARS.  AND I TOLD HIM I DIDN'T NEED TO

8  SEND ANYTHING ILLEGAL BECAUSE AT THE BORDER THEY'VE GOT X-RAYS.

9  Q.   HOW DO YOU KNOW THAT?  HOW DO YOU KNOW THAT?

10  A.   BECAUSE THE PERSON THAT WOULD BRING THE CARS DOWN FOR ME

11  TOLD ME THAT WHEN THEY WOULD -- WHEN HE WOULD BRING CARS DOWN,

12  THAT THEY WOULD PASS THE CARS THROUGH THE X-RAY MACHINE TWO OR

13  THREE TIMES.

14  Q.   AND YOU NEVER TOLD D.E.A. THAT YOU WERE THE PERSON WALKING

15  THE DOGS ON AUGUST 23RD?

16  A.   THEY NEVER ASKED ME THE QUESTION ON AUGUST 23RD, 2011 I WAS

17  OUTSIDE WALKING DOGS.  THEY NEVER ASKED ME THAT QUESTION.

18  Q.   DID YOU EVER SAY --

19  A.   NEVER.

20  Q.   DID YOU EVER SAY THAT IN AUGUST OF 2011 IN THE VICINITY OF

21  APARTMENT L-8 YOU WERE WALKING DOGS?  DID YOU EVER SAY THAT?

22  A.   NOT ON THAT DAY.

23  Q.   ON ANY DATE DID YOU EVER SAY YOU WERE IN THE VICINITY OF

24  APARTMENT L-8 WALKING DOGS?

25        THE COURT:  LET HIM FINISH THE QUESTION FIRST.

1   A.   I TOLD YOU THE ANSWER CLEARLY.

2   BY MR. WILLIAMS:

3   Q.   IT WAS NOT VERY CLEAR.

4   A.   THAT CAMERINO SOMETIMES WOULD LEND ME THE LITTLE DOG, AND I

5   WOULD TAKE IT IN THE CAR.  AND THE DOG WALKED DOWN THE STAIRS

6   AND I WOULD PUT IT UP IN THE VEHICLE.  AND YOU ASKED ME DO DOGS

7   LIKE TO WALK, AND I ANSWERED THAT I DON'T LIKE TO WALK DOGS;

8   CORRECT?

9   BY MR. WILLIAMS:

10  Q.   THAT IS CORRECT.  THAT IS CORRECT.  DING, DING, DING.  AND

11  I'LL WRAP THIS UP.  IN ADDITION TO THE DISCUSSION ABOUT THE

12  DOGS, YOU WERE ASKED BY D.E.A. WHETHER YOU WERE INVOLVED IN DRUG

13  TRAFFICKING; RIGHT?

14  A.   WELL, THEY TOLD ME THEY KNEW WHO THE OWNER WAS.

15  Q.   THE OWNER?

16  A.   YEAH.

17  Q.   OF?

18  A.   OF THE SUBSTANCES THAT THEY FOUND IN THE APARTMENT.

19  Q.   OKAY.

20  A.   AND THEY TOLD ME THE ONLY THING THAT THEY WANTED WAS FOR ME

21  TO COOPERATE WITH THEM.  AND I TOLD YOU ALREADY THAT THE

22  STATEMENT THAT I MADE WAS NOTHING LIKE WHAT THEY PUT DOWN IN

23  WRITING.

24  Q.   WHAT DID YOU SAY ABOUT THE DRUGS THAT WERE FOUND AT THE

25  APARTMENT?

1   A.    THAT I DIDN'T KNOW WHO THEY BELONGED TO, THAT I HAD BEEN IN

2   THE UNITED STATES ALMOST 12 YEARS AND I DIDN'T KNOW ANY OF THE

3   PEOPLE IN MEXICO WHO HAD -- WHO THEY WOULD BE SENDING THINGS TO

4   OR SENDING DRUGS BACK.

5   Q.    DID THEY TELL D.E.A. WHEN THEY ASKED QUESTIONS ABOUT THOSE

6   DRUGS WHETHER YOU KNEW ANYTHING ABOUT DRUG TRAFFICKING?

7   A.    NO.  I TOLD THEM MY BUSINESS WAS IMPORTING CARS.

8   Q.    WELL, I UNDERSTAND THAT.  I UNDERSTAND THAT.

9   A.    AND I TOLD THEM THAT IN CALIFORNIA I MADE MY LIVING AS AN

10  AUTOMOBILE MECHANIC.

11  Q.    DID YOU TELL THEM THAT YOU KNEW ANYTHING ABOUT DRUGS?

12  FORGET THE CARS.

13  A.    OKAY.

14  Q.    ANYTHING ABOUT DRUGS?

15  A.    NO.  THEY ASKED ME, BUT I TOLD THEM I DIDN'T KNOW ANYTHING.

16  Q.    OKAY.  AND YOU HAD NEVER SEEN ANYTHING RELATED TO DRUGS OR

17  GUNS AT APARTMENT L-8 WHEN YOU WERE THERE?

18  A.    WELL, TRUTH IS I WOULD JUST COME AND VISIT.  I DIDN'T COME

19  TO GO SEARCH THE APARTMENT.

20  Q.    THAT WAS NOT MY QUESTION.  THAT WAS NOT MY QUESTION.  MY

21  QUESTION --

22  A.    TELL ME IT AGAIN.

23  Q.    DID YOU SAY ANYTHING TO D.E.A. ABOUT HAVING SEEN OR NOT

24  SEEN GUNS OR DRUGS AT APARTMENT L-8 WHEN YOU WERE THERE?

25  A.    NO.  THE ANSWER THAT I GAVE YOU IS CLEAR.  I NEVER SAW

1  ANYTHING OUT IN THE OPEN, LIKE, ON THE CHAIRS OR THE TABLES OR

2  THE SOFA.  I NEVER SAW ANY ARMS OR CONTROLLED SUBSTANCE LAYING

3  AROUND.

4  Q.  AND WHEN YOU SAY, "OUT IN THE OPEN," DID YOU EVER SEE ANY

5  HIDDEN?

6  A.  ANY WHAT?  WELL, IT SEEMS LIKE I ALREADY TOLD YOU I DIDN'T

7  GO THERE TO GO SEARCH.  I WAS THERE VISITING.

8  Q.  THE QUESTION IS, DID YOU EVER SEE OR WAS AWARE -- OR WERE

9  YOU AWARE OF GUNS OR DRUGS EITHER OUT IN THE OPEN OR NOT OUT IN

10  THE OPEN?

11  A.  WELL, I ALREADY ANSWERED YOU, NO.

12  Q.  YOU ALREADY ANSWERED ME, NO, AND DOES THAT MEAN, NO, TO THE

13  QUESTION OF HIDDEN OR OUT IN THE OPEN?

14  A.  I DIDN'T SEE ANY KIND OF SUBSTANCE ANYWHERE WHERE IT COULD

15  BE OBSERVED OUT IN SIGHT, LIKE, IN PLAIN SIGHT LIKE YOU ALL SAY.

16  Q.  I'M GOING TO WRAP THIS UP.  YOU STATED THAT YOU LEFT YOUR

17  IPHONE AT THAT LOCATION; RIGHT?

18  A.  CORRECT.

19  Q.  WHAT'S THE TELEPHONE NUMBER?

20  A.  I HAD JUST BOUGHT IT.  I DON'T REMEMBER THE NUMBER.

21  Q.  YOU DON'T KNOW YOUR OWN NUMBER?

22  A.  I JUST TOLD YOU I HAD JUST BOUGHT IT.  I HADN'T LEARNED THE

23  NUMBER.

24  Q.  I UNDERSTAND WHAT YOU SAID, YOU JUST BOUGHT IT.  I'M ASKING

25  YOU A SECOND QUESTION WHICH IS, DO YOU KNOW YOUR OWN NUMBER?

```
 1  A.   I ALREADY ANSWERED YOU.  I HAD JUST BOUGHT THE PHONE.

 2  Q.   YOU JUST BOUGHT IT.

 3  A.   AND THE NUMBER WAS NEW.

 4  Q.   AND THE NUMBER WAS NEW.

 5  A.   I HADN'T MEMORIZED THE PHONE NUMBER.

 6  Q.   THAT'S THE PART I THINK THAT'S THE ANSWER.  THE SECOND

 7  THING, WHAT TYPE OF CAR DID YOU DRIVE AT THIS TIME IN AUGUST OF

 8  2011?

 9  A.   A 2007 YUKON THAT WAS CHARCOAL GRAY WITH DARK WINDOWS.

10  Q.   AND THAT WAS THE ONLY CAR YOU DROVE, OR HAVE YOU FORGOTTEN?

11  A.   WELL, IN THAT TIME I HAD -- I HAD BEEN DRIVING A '98 LEXUS

12  E.S. 300, BUT I THINK I HAD -- I HAD SOLD IT BY THEN.

13          MR. WILLIAMS:  NICE CAR.  YOUR HONOR, NO FURTHER

14  QUESTIONS.

15          THE COURT:  ANYTHING ELSE?

16          MR. SHREENATH:  VERY BRIEF, YOUR HONOR.

17                      REDIRECT EXAMINATION

18  BY MR. SHREENATH:

19  Q.   HOW OLD WERE YOU WHEN YOU CAME FROM MEXICO TO THE UNITED

20  STATES?

21  A.   WELL, I CAME HERE IN 2001 IN FEBRUARY, LIKE, AROUND THE

22  MIDDLE OF THE MONTH, 16TH OR 17TH.  I WAS BORN IN '85, SO I WAS

23  16.

24  Q.   AND WHAT WAS THE HIGHEST GRADE OF EDUCATION YOU COMPLETED

25  IN MEXICO?
```

1  A.   TO 9TH GRADE IS ALL.

2  Q.   AND WAS ALL OF THAT IN SPANISH IN TERMS OF THE LANGUAGE?

3  A.   YES.  CORRECT.

4  Q.   OKAY.  AND WE'VE TALKED A LITTLE BIT ABOUT ALBEAR CAMERINO.

5  CAN YOU TELL THE COURT WHAT HE LOOKED LIKE IN RELATION TO HOW

6  YOU LOOK?

7  A.   WELL, CAMERINO IS A HUNDRED PERCENT DIFFERENT THAN ME.  IN

8  THE REPORT HE'S DESCRIBED CLEARLY AS A YOUNG MAN, AND HE GAVE

9  THEM THE BIRTH DATE OF 1992, I THINK, IN THE MONTH OF NOVEMBER.

10 I DON'T REMEMBER THE DATE.  THE OFFICER WHO SAID THAT HE

11 IDENTIFIED CAMERINO, I CAN SWEAR TODAY IS THE FIRST TIME I EVER

12 SAW HIM.  I'VE NEVER SEEN HIM BEFORE.

13 Q.   OKAY.  DO YOU KNOW IF HE HAD A -- BACK IN AUGUST OF 2011,

14 DO YOU KNOW IF CAMERINO HAD ANY TATTOOS VISIBLE?

15 A.   NO, HE DIDN'T HAVE ANY.  HE WAS ONLY BARELY 18 YEARS OLD.

16 HE DIDN'T HAVE ANY.

17         MR. SHREENATH:  NOTHING FURTHER, JUDGE.

18         THE COURT:  OKAY.  MR. WILLIAMS.

19                    RECROSS-EXAMINATION

20 BY MR. WILLIAMS:

21 Q.   BRIEFLY.  HOW OLD ARE YOU?

22 A.   I ALREADY TOLD YOU.  28.

23 Q.   SO YOU'RE HANGING OUT WITH A GUY WHO'S BARELY 18 GOING TO

24 THE CLUBS WITH HIM LETTING HIM BUY YOU LIQUOR?

25 A.   HUH?

1  Q.   LETTING HIM BUY YOU DRINKS, BUYING HIM DRINKS?

2  A.   I DIDN'T LET HIM BUY THEM MYSELF.  IT'S NOT MY FAULT THAT

3  THE NIGHTCLUBS ARE CORRUPT.

4  Q.   IF THE NIGHTCLUBS ARE CORRUPT.  BUT YOU WERE HANGING OUT

5  WITH HIM; RIGHT?

6  A.   WELL, I ALREADY TOLD YOU THAT I WENT OUT WITH HIM.

7  Q.   SO THE ANSWER IS, YES, YOU WERE HANGING OUT WITH HIM AT THE

8  CLUBS?

9  A.   BUT NOT BY FORCE.

10  Q.   I DIDN'T SAY THAT.  WAS IT BY FORCE?

11  A.   YOU'RE TRYING TO SAY I MADE HIM DRINK.

12  Q.   I'M JUST ASKING A QUESTION, SIR.  LET ME ASK YOU THIS:  HAS

13  ALBEAR CAMERINO REACHED OUT TO YOU SINCE YOU'VE BEEN IN CUSTODY,

14  THIS PERSON YOU SPENT TIME WITH, HUNG OUT, STAYED AT THE

15  APARTMENT?

16  A.   ONE -- A FAMILY MEMBER OF MINE COMMUNICATED WITH HIM.

17  Q.   WHO?

18  A.   A COMPADRE.

19  Q.   "COMPADRE," WHAT DOES THAT MEAN?  I DON'T SPEAK SPANISH.

20  A.   WELL, HIS -- I WAS THERE FOR THE BAPTISM OF HIS LITTLE

21  GIRL.

22  Q.   THAT ASIDE, YOU SAID ONE OF YOUR FAMILY MEMBERS REACHED OUT

23  TO ALBEAR CAMERINO?

24  A.   CORRECT.

25  Q.   WHO?

```
 1   A.   I TOLD YOU.

 2   Q.   YOU DID NOT TELL ME.  YOU SAID COMPADRE.  I DON'T KNOW WHAT

 3   THAT MEANS.  WHO, NAME?

 4   A.   LARRY.

 5   Q.   LARRY WHO?

 6   A.   LARRY, LARRY.

 7   Q.   I DON'T KNOW WHAT THAT MEANS.  IS THAT SPANISH?

 8   A.   LARRY.  YEAH, LARRY.

 9   Q.   YOUR FAMILY MEMBER NAMED LARRY WHAT?

10   A.   LARRY --

11   Q.   LARRY WHAT?

12   A.   NAVARRO, NAVARRO.

13   Q.   WHERE DOES HE LIVE?

14   A.   IN CALIFORNIA.

15   Q.   WHERE AT?  THAT'S A BIG STATE.

16   A.   CALIFORNIA.

17   Q.   THAT'S A BIG STATE.  WHICH PART?

18   A.   ANAHEIM.

19   Q.   ANAHEIM, CALIFORNIA?

20   A.   CORRECT.

21   Q.   DO YOU HAVE A TELEPHONE NUMBER?

22   A.   NO.

23   Q.   DO YOU HAVE AN ADDRESS?

24   A.   NO, I DON'T HAVE A PHONE NUMBER OR ANYTHING.  I'VE BEEN

25   WITHOUT A TELEPHONE FOR TWO MONTHS, AND I THINK HE CHANGED PHONE
```

```
 1   NUMBERS.  I DON'T HAVE -- I HAVEN'T HAD ANY COMMUNICATION WITH

 2   MY PARENTS OR WITH ANYBODY --

 3   Q.    HOW DO YOU KNOW LARRY --

 4   A.    -- NOT EVEN BY MAIL.

 5   Q.    HOW DO YOU KNOW LARRY REACHED OUT TO THEM?

 6   A.    HE TOLD ME.

 7   Q.    BY TELEPHONE?

 8   A.    YES, BEFORE FEBRUARY 13TH.

 9   Q.    BEFORE -- HOW DO YOU KNOW IT'S BEFORE FEBRUARY 13TH?

10   A.    BECAUSE ON FEBRUARY 13TH THE U.S. MARSHAL TOLD THEM TO TAKE

11   AWAY ALL MY FREEDOMS, AND I REMEMBER IT VERY WELL BECAUSE I'M

12   THE ONE THAT'S BEEN ALL BY MYSELF ALONE FOR ALL THIS TIME.

13   Q.    SO WHEN DID LARRY CALL YOU AND TELL YOU --

14   A.    HE DIDN'T CALL ME.  HE CAN'T CALL ME.

15   Q.    DIDN'T YOU JUST TELL ME LARRY CALLED YOU AND TOLD YOU?

16   A.    I TOLD YOU I CALLED HIM.

17   Q.    OH, YOU CALLED LARRY.  WHEN DID YOU CALL LARRY?

18   A.    I CAN'T TELL YOU THE EXACT DATE BECAUSE I DIDN'T WRITE IT

19   DOWN.

20   Q.    ROUGHLY, ROUGHLY WHEN DID YOU CALL LARRY?

21   A.    WELL, IT'S GOT TO BE IN THE RECORDINGS.

22   Q.    DON'T YOU REMEMBER ROUGHLY?

23   A.    WELL, I TOLD YOU IT WAS BEFORE FEBRUARY 13TH.

24   Q.    FEBRUARY 12TH, FEBRUARY 10TH?

25   A.    BEFORE THE 12TH -- 13TH, SORRY, 13TH.
```

```
1  Q.   DO YOU KNOW WHEN, ROUGHLY WHEN?

2  A.   I ALREADY TOLD YOU.

3  Q.   YOU DIDN'T TELL ME WHEN ROUGHLY.  YOU DIDN'T TELL ME.  TELL

4  ME AGAIN.

5  A.   I CLEARLY TOLD YOU I DIDN'T WRITE DOWN THE PHONE NUMBERS OR

6  THE PHONE CALLS THAT I MADE.

7  Q.   AND I'M SAYING IF YOU TOLD ME, I DON'T REMEMBER.  SO CAN

8  YOU TELL ME AGAIN.

9  A.   I DON'T WRITE DOWN THE CALLS THAT I MAKE.

10  Q.   YOU CAN'T TELL ME AGAIN?

11          THE COURT:  WAS IT THIS YEAR?  MR. CAMERINO, WAS IT

12  THIS YEAR?

13          THE WITNESS:  YES, IT WAS.

14          THE COURT:  SOMETIME BEFORE THE 13TH OF FEBRUARY THIS

15  YEAR?

16          THE WITNESS:  CORRECT.

17          THE COURT:  OKAY.  AND HOW IS HE RELATED TO YOU?  HE

18  IS YOUR WHAT?

19          THE WITNESS:  I HAVE KNOWN HIM EVER SINCE I GOT TO THE

20  UNITED STATES.

21          THE COURT:  SO HE'S NOT A RELATIVE?

22          THE WITNESS:  WELL, WE BECAME RELATIVES.

23          THE COURT:  OKAY.  THANK YOU.

24     ANYTHING ELSE?

25          MR. WILLIAMS:  YOUR HONOR, I HAVE NO FURTHER
```

1   QUESTIONS.

2           THE COURT:  ANYTHING ELSE, MR. SHREENATH?

3           MR. SHREENATH:  NO, YOUR HONOR.

4           THE COURT:  OKAY.  YOU MAY STEP DOWN.

5       ANYTHING ELSE ON BEHALF OF EITHER PARTY WITH REGARD TO THE

6   EVIDENTIARY HEARING?

7           MR. WILLIAMS:  NOT FROM THE GOVERNMENT, YOUR HONOR.

8           MR. SHREENATH:  NO, JUDGE.

9           THE COURT:  YOU MAY GO BACK TO YOUR SEAT.  TODAY IS

10  THE 1ST, SO WE SHOULD HAVE A -- GIVE THE COURT REPORTER SINCE WE

11  HAVE AN ALL-DAY HEARING, THE 20TH -- HOLD ON.  APRIL 22ND.  WE

12  SHOULD HAVE A TRANSCRIPT BY APRIL 22ND.  AND, THEREFORE, I WILL

13  GIVE THE DEFENDANT UNTIL MAY THE 13TH TO FILE YOUR PERFECTED

14  MOTION TO SUPPRESS EVIDENCE AND STATEMENTS.  AND THEN I WILL

15  GIVE THE GOVERNMENT UNTIL JUNE 3RD TO FILE YOUR RESPONSE.  IF

16  THE DEFENDANT WOULD LIKE TO FILE A REPLY, I WILL GIVE YOU UNTIL

17  JUNE 24TH TO FILE A REPLY TO THE GOVERNMENT'S RESPONSE.  OKAY.

18  ANYTHING ELSE ON BEHALF OF EITHER PARTY AT THIS TIME?

19          MR. WILLIAMS:  NOT FROM THE GOVERNMENT, YOUR HONOR.

20          THE COURT:  OKAY.  NOTHING ELSE IN FRONT OF THE COURT,

21  THE COURT IS IN RECESS.

22              (PROCEEDINGS ADJOURNED.)

23

24

25

C E R T I F I C A T E


UNITED STATES OF AMERICA

NORTHERN DISTRICT OF GEORGIA

    I, MONTRELL VANN, CCR, CSR, RPR, RMR, CRR, OFFICIAL COURT

REPORTER OF THE UNITED STATES DISTRICT COURT, FOR THE NORTHERN

DISTRICT OF GEORGIA, ATLANTA, DO HEREBY CERTIFY THAT THE

FOREGOING 165 PAGES CONSTITUTE A TRUE TRANSCRIPT OF PROCEEDINGS

HAD BEFORE THE SAID COURT, HELD IN THE CITY OF ATLANTA, GEORGIA,

IN THE MATTER THEREIN STATED.

    IN TESTIMONY WHEREOF, I HEREUNTO SET MY HAND ON THIS, THE

19TH DAY OF APRIL 2013.


                  _____

                  MONTRELL VANN, CCR,CSR,RPR,RMR,CRR
                  OFFICIAL COURT REPORTER
                  UNITED STATES DISTRICT COURT