**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| VS. | ) |
| | ) CRIMINAL ACTION |
| | ) NO.: 1:12-cr-00329-TCB-LTW |
| ALBEAR CAMERINO | ) |

**DEFENDANT'S POST HEARING BRIEF IN SUPPORT OF
MOTION TO DISMISS AND MOTION TO SUPPESS EVIDENCE
AND STATEMENTS**

COMES NOW, the Defendant, ALBEAR CAMERINO in the above-styled action, by and through his undersigned counsel, and files this Defendant's Post Hearing Brief in Support of the Motion to Dismiss and Motion to Suppress Evidence and Statements. In support thereof, Defendant shows as follows:

**PROCEDURAL HISTORY**

The Court held a hearing on April 1st, 2013 on the defendant's motion to suppress for the above-styled action. At the hearing, the court stated that it would address the issues of identity of the defendant, as it relates to the above-styled action, and Motion to Suppress Evidence and Motion to Suppress Statements of the Defendant.

## BRIEF STATEMENT OF FACTS

On August 23rd, 2011, DEA Special Agent Keith Cromer made the decision to conduct some enforcement activity. (Tr. Page 9, Lines 9-10). Agent Kromer was the group supervisor of several officers of Task Force Group Two that was involved in the enforcement activity. (Tr. Page 9, Lines 15-16). Agent Kromer and others decided to conduct a "knock and talk" (Tr. Page 10, Lines 1-3) and it involved the residence of Apartment L-8 located at 6750 Peachtree Industrial Boulevard. The knock and talk approach was undertaken because, as Agent Kromer acknowledged, there wasn't probable cause to obtain search warrant (Tr. Page 10, Line 3). Specifically, Agent Kromer testified that they did not have any probable cause to search L-8 (Tr Page 27, Line 1). As per testimony by Agent Kromer, when the officers spoke to the person at the door of apartment L-8, they asked for and received consent to search the apartment from the young man at the door. (Tr. Page 13, Line 9-14). However, even though Agent Kromer and Agent David Aguilar were there together at the time of the encounter with the young man, Agent Aguilar's testimony makes no mention of asking for consent to search. Rather, Agent Aguilar stated that they asked the young man if they can come in. (Tr. Page 95, Line 21). At that time, according to Agent Aguilar, the

young man said sure to their request to come in. (Tr. Page 95, Line 21-22). After the entry was made by law enforcement officers, a security sweep of the apartment was conducted. As a result of the protective security sweep, along with contraband found in the apartment, Agent Kromer testified that a passport belonging to the defendant in the name of Pablo Camaney Arzate was found in the drawer in the bedroom. (Tr. Page 15, Line 1). Other identification items belonging to the defendant were found in the apartment. (Tr. Page 15, Line 19). Officer Donahue, who took photos of the inside of the apartment, also confirmed that the passport belonging to the defendant, Pablo Camaney Arzate, was found in the dresser in the back bedroom. (Tr. Page 67, Lines 23-25).   The young man who was at the door had told law enforcement officers that the individual that was living there had just left the apartment and was out walking his dog. (Tr. Page 12, Line 18-23).

    Around this time, another officer, Officer Tyler Hooks, arrived at the apartment area outside L-8 apartment who encountered a male walking two dogs. (Tr. Page 45, Lines 9-10). Officer Hooks saw the male and had approached him and interacted with him and asked for his identification. (Tr. Page 46, Lines 6-8). He had interacted with this individual for about five minutes. (Tr. Page 52, Line 5). During this time period, Officer Hooks wrote

down the identification information from the identification card that the male provided to him. (Tr. Page 46, Line 21-24). Officer Hooks noted that the photo and physical description contained in the identification card provided to him by this individual male, matched the individual male. The identification card had the name of Albear Camerino. (Tr. Page 47, Lines 12-13). During this entire encounter, Officer Hooks testified that he had kept an eye on him. (Tr. Page 48, Line 5).

At the hearing on April 1st, 2013, Officer Hooks was asked if the individual he encountered walking the dog with the name of Albear Camerino had any tattoos and he said no. (Tr. Page 53, Lines 9-10). Pablo Camaney Arzate had a large tattoo on his arm. Officer Hooks, who sat less than five yards from the defendant at the hearing, was unable to identify the defendant as the male with whom he interacted who gave him identification card with his name of Albear Camerino. In fact at the hearing, Officer Hooks was also presented with a photo of defendant, Pablo Camaney Arzate, and asked to see if he recognized the individual in that photo, Exhibit B1, and he said that he could not recognize the person in that photo. (Tr. Page 54, Lines 21-22). Mr. Arzate testified that previously he had a driver's license from New Mexico. (Tr. Page 133, Lines 22-24).

On August 16th, 2012, the defendant, Pablo Camaney Arzate, was taken from Dekalb County Jail by immigration authorities to an immigration processing facility in hand-cuffs in a White Ford Van. (Tr. Page 134, Lines 13-23). The defendant provided the immigration officer his name, Pablo Camaney Arzate, and the immigration officials did not indicate anything that would suggest that the defendant was not using his true name. (Tr. Page 135, Lines 15-20). He was then transported from an immigration facility in Atlanta to the DEA Office in Atlanta, Georgia. There, Detective Aguilar started asking him questions and asked if defendant remembered Detective Aguilar and about Apartment L-8 on Peachtree Industrial Boulevard. (Tr. Page 136, Lines 18-21). During this conversation, Agents had placed handcuffs on the defendant. (Tr. Page 137, Line 1). At this point, the defendant had not been read his Miranda warnings. (Tr. Page 137, Lines 24-25). The defendant was surrounded by Detective Aguilar and other agents in a room and he felt threatened because he was told that he would not see his children for 20 years, unless he cooperated. (Tr. Page 138, Lines 3-5). He was then read the Miranda warnings by the agent. While Agent Aguilar states in his testimony that defendant made incriminating statements about his purported involvement with the contraband found in Apartment L-8 on

August 23rd, 2011 (Tr. Page 102, Lines 5-16, 20), the defendant testified that he only told Detective Aguilar that he had come to United States in 2001 and came to Atlanta in 2009 and that he bought cars at auctions to send them back to Mexico.  (Tr. Page 139, Lines 3-10).

## MEMORANDUM OF LAW

**A.  The Government has failed to establish the defendant as being the perpetrator of the crimes in the above-styled action, because the government cannot prove that the person identified as Albear Camerino is this defendant.**

One of the most important issues in this case is identification of the defendant as the perpetrator of the crimes for the above-styled action.  The Government has the burden to prove the identity of the perpetrator of the crime.  Specifically, the Government has the burden to prove that the defendant, Pablo Camaney Arzate, is indeed the same individual that was outside apartment L-8 on August 23rd, 2011 walking his dogs after exiting apartment L-8 area and running into Officer Tyler Hooks.

The Government fails to meet its burden here because the Government's only witness germane to this issue, Officer Hooks, who interacted with the Camerino individual outside the apartment on August 23rd,

2011 cannot identify Pablo Camaney Arzate as being the same individual. During this entire encounter, Officer Hooks kept an eye on him. (Tr. Page 48, Line 5). Officer Hooks spoke to the Camerino individual, (Tr. Page 46, Lines 6-8), interacted with this individual for about five minutes, (Tr. Page 52, Line 4) and got his identification information and wrote down his information that was on the identification card provided to him, (Tr. Page 46, Line 22-23) and wrote down his name as Albear Camerino (Tr. Page 47, Lines 12-14). Pablo Camaney Arzate had a distinguishing large tattoo on his arm. But, the individual dealing with Officer Hooks, i.e. Camerino, according to Officer Hooks observed that Camerino individual did not have a tattoo on him. (Tr. Page 53, Lines 9-10).

    Despite being a short distance from the defendant at the hearing during his testimony, Officer Hooks could not identify Pablo Camaney Arzate as the individual he knew outside that apartment as Albear Camerino. Even after being shown the photo (Exhibit B1), which is not a book-in photo, rather a photo that was taken about a month before August 2011, as per the testimony of Agent Kromer who stated that the photograph was taken in July 2011, (Tr. Page 20, line 8-10), Agent Hooks cannot identify the defendant, Pablo Camaney Arzate, as being the same as Albear Camerino.

Additionally, the evidence points to the conclusion that Pablo Camaney Arzate is not the same as Albear Camerino. The passport photo and documents of the defendant clearly show that is indeed Pablo Camaney Arzate. Even the United States Immigration Officer on August 16th, 2012, when dealing with the defendant, did not suggest or challenge the fact that the defendant was indeed Pablo Camaney Arzate. (Tr. Page 135, Lines 15-20).

**B. <u>The Defendant does have Standing to challenge the search of the residence located at 6750 Peachtree Industrial Boulevard, Apartment L-8 on August 23rd, 2011.</u>**

To contest the validity of a search, the defendant must demonstrate that he himself exhibited an actual subjective expectation of privacy in the area searched, and this subjective expectation of privacy is on that society is willing to accept as reasonable. <u>Smith v. Maryland</u>, 442 U.S. 735, 740 (1979). Legal ownership is not a prerequisite for a legitimate expectation of privacy. <u>United States v. Garcia</u>, 741 F. 2d 363, 365-66 (11th Cir. 1984). In <u>Minnesota v. Olson</u>, 495 U.S. 91 (1990), the United States Supreme Court held that visitors who were overnight guests have a legitimate expectation of privacy, recognizing the long standing social custom of overnight guests and

that society recognizes that an overnight guests have a legitimate expectation of privacy.

Here, the uncontroverted testimony is that the defendant, Pablo Camaney Arzate, was an overnight guest on several occasions at the residence that was searched on August 23rd, 2011. (Tr. Page 131, Lines 10-11). Additionally, the defendant testified that he had given the passport to Camerino for him to keep. (Tr. Page 131, Line 4-6). The defendant's passport was found in the drawer in the bedroom. (Tr. Page 15, Line 1). Other identification items belonging to the defendant were found in the apartment. (Tr. Page 15, Line 19). Officer Donahue, who took photos of the inside of the apartment, also confirmed that the passport belonging to the defendant, Pablo Camaney Arzate, was found in the dresser in the back bedroom. Additionally, the defendant testified that his IPhone was in the searched apartment. (Tr. Page 133, Line 14). All of these items being in the apartment at the time of the search shows that as frequent overnight guests, the defendant had a property or possessory interest in the place that was searched.

These facts, combined with the long established societal value of having overnight house guests and the extension of protection and privacy, as

recognized by the Court in Olson, establishes that the defendant has standing to challenge the Fourth Amendment Violation occurring in the search of the 6750 Peachtree Industrial Boulevard, Apartment L-8 on August 23rd, 2011.

## C. There was no valid consent given to enter or search the premises on August 23rd, 2011.

The defendant challenges the search of the residence of Apartment L-8 on August 23rd, 2011 on the grounds that there was no valid consent given. The occupant of the apartment that opened the door was a young man, about 19 years old. At about 8 p.m., he was facing at least four law enforcement officers at the front door wanting to come inside the apartment. (Tr. Page 10, Line 10-14). The Government has the burden to show that the consent to enter the premises and to search the premises was voluntarily given. Here, the government is unable to do so. Agent Kromer conceded that initially there was not enough for probable cause to obtain a search warrant to search the residence, (Tr. Page 10, Line 3). Agent Kromer testified that they did not have any probable cause to search L-8 (Tr. Page 27, Line 1). Since, there was no memorializing of the consent obtained by the young man by any of the agents in writing or otherwise, we are left with recollection of witnesses.

The two witnesses testifying on this issue for the Government differ in their testimony about their recollection of the interaction between the agents and the young man at the door. As per testimony by Agent Kromer, when the officers spoke to the person at the door of apartment L-8, they asked for and received consent to search the apartment from the young man at the door. (Tr. Page 13, Line 9-14). However, Agent David Aguilar's testimony is inconsistent with Agent Kromer's testimony, and Agent Aguilar's testimony was that at the time of this encounter at the door with the young man, there was no request for consent to search. Rather, Agent Aguilar stated that they asked the young man if they can come in. (Tr. Page 95, Line 21).

In fact, because of a lack of written or oral memorialization of the purported consent, there is no clear evidence to determine whether there was consent given to search the residence or whether there was a mere acquiescence by the young man to the show of force and authority at the front door and allowing the agents to enter the residence.

### D. **Pre-arrest protective sweep of the apartment was not lawful**.

Here, the Agents, upon entry into the residence conducted a protective sweep of apartment L-8 on August 23rd, 2011. Agent Kromer testified that even though the young man at the apartment told him and agents that there

was no one else in the apartment, he and other agents conducted a protective sweep of the apartment. (Tr. Page 13, Lines 22-25). Per Agent Kromer's testimony, it was during this protective sweep that agents said there was crystal methamphetamine throughout various areas of the apartment, money and numerous weapons in the apartment. (Tr. Page 14, Lines 2-5). In Maryland v. Buie, 494 U.S. at 327 (1990), the United States Supreme Court held that a protective sweep is valid only where the "searching officer possesse[d] a reasonable belief based on specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant[ed] the officer in believing that the area to be swept harbored an individual posing a danger to the officer or others".

Here, there aren't sufficient facts to reach a reasonable belief that Agent Kromer and others suspected that an individual posing a danger to the officers was present at the apartment. In fact, the young man had already told the agents that he was alone in the apartment. The agents did not have any information to contradict his assertion that he was alone in the apartment, that turned out to be true.

Accordingly, the defendant asks that the protective sweep conducted by the agents on August 23rd, 2011 be deemed as unlawful and that the

exclusionary rule be applied and the fruits of the unlawful search be ruled against the defendant at trial.

### E. The defendant's statements made on August 16th, 2012 as per Detective Aguilar should be suppressed.

According to Detective Aguilar, on August 16th, 2012, the defendant made statements, after having the Miranda warnings read to him, wherein the defendant admitted to knowledge of the contraband being present in the apartment L-8 on August 23rd, 2011, (Tr. Page 102, Lines 5-16, 20) and being present in the apartment area on that date.

The defendant denies making such statements to the detective. Rather, he told Detective Aguilar that that he had come to United States in 2001 and came to Atlanta in 2009 and that he bought cars at auctions to send them back to Mexico. (Tr. Page 139, Lines 3-10).

Regardless, the defendant asserts that the statements made by him were the result of his being intimidated by the agents. He was brought over from Dekalb County Jail to Immigration facilities in hand-cuffs and was then subsequently interviewed by DEA agents, including Detective Aguilar. Prior to the statements that were made by the defendant, the defendant felt threatened and intimidated. He felt threatened because he was told that he

would not see his children for 20 years, unless he cooperated.  (Tr. Page 138, Lines 3-5).  He was then read the Miranda warnings by the agent.

For *Miranda* purposes, "[t]he term 'interrogation' … not only refers to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." Rhode Island v. Innis, 446 U.S. 291, 300 (1980).

Here, the Government's agents knew that the defendant was already in custody after having been a part of process of transferring him from Dekalb County Jail to the Immigration facilities, in hand-cuffs, and then subsequently having him transferred to the DEA office and then surrounded by several agents at the DEA office while he was told that he could be dealing with a real prospect of not seeing his family for 20 years. These types of statements, as the agents should know, are likely to illicit incriminating response from defendants.

## **CONCLUSION**

Wherefore, the defendant moves this court to issue an order dismissing the charges against the defendant based on the Government's failure to meet

its burden in showing that the defendant, Pablo Camaney Arzate, is the perpetrator of the crimes alleged in the indictment for the above-styled action.

In the alternative, the defendant states that the facts and circumstances in this matter in conjunction with the afore-mentioned case to support the conclusion that the defendant has standing to contest the search of the premises of 6750 Peachtree Industrial Boulevard, Apartment L-8, on August 23rd, 2011.  The defendant has sufficient ties to the said location in terms of uncontroverted testimony that he was a frequent overnight guests, his passport was found in the bedroom dresser, and other identification information of his were found in the apartment.  The defendant also testified that his iPhone was in the apartment.  These contacts and property interests in the apartment have established an expectation of privacy for the defendant, consistent with the long standing societal traditions and customs of extending such an expectation of privacy to overnight guests.  As such, the defendant should be granted standing.

The government has failed to meet its burden to show that, based on the totality of circumstances, the warrantless entry and search of the residence should be upheld as lawful, because they have failed to establish the validity of the consent.  The facts and circumstances of what happened at that

apartment on August 23rd, 2011 before the agents entered that apartment would imply that the young man merely acquiesced to the show of authority and did not knowingly and voluntarily consent to the entry and search of the premises. Additionally, the government has failed to carry its burden to show that the protective sweep conducted by the agents was lawfully justified under the circumstances at hand. As such, the defendant asks that the evidence obtained and seized from apartment L-8 on August 23rd, 2011 be ruled as inadmissible against him at trial.

The defendant asks that the court issue an order suppressing the use of any and all statements purportedly made by the defendant on August 16th, 2012 as involuntary statements by the defendant. Statements were made by the defendant after the agent made statements regarding the defendant not being able to see his family for twenty years. Such statements made by an officer can be construed as a threat or a promise, whether express or implied, and the defendant testified that he felt threatened by such statements. For those reasons, the defendant's statements should be suppressed in the trial of the above-styled action.

This 11th day of May, 2013.

                        /s/ Jay Shreenath_____
                        JAY I. SHREENATH
                        Attorney for Defendant
                        State Bar Number:629894

5193 Austell Road
Austell, Georgia 30106
678-467-4645
Fax:770-941-8869

<u>CERTIFICATE OF SERVICE</u>

This is to certify that I have this day served a copy of the foregoing pleading by CM/ECF system which will send notice of filing and pleading to:

Ms. Ellen Endrizzi
Assistant U.S. Attorney
600 U.S. Courthouse
75 Spring Street, S.W.
Atlanta, Georgia 30303

This 11th day of May, 2013.

/s/ Jay Shreenath
_____
JAY I. SHREENATH
Attorney for Defendant
State Bar Number: 629894

5193 Austell Road
Austell, Georgia 30106
678-467-4645
Fax:770-941-8869